**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

CASE NO.:    2021 CA 000859

HARRISON BROER, Individually and On
Behalf Of All Others Similarly Situated,

                Plaintiff,

      v.

FLORIDA STATE UNIVERSITY, and
FLORIDA STATE UNIVERSITY BOARD
OF TRUSTEES, AS THE PUBLIC BODY
CORPORATE OF FLORIDA STATE
UNIVERSITY,

                Defendants.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

_____

        Plaintiff Harrison Broer, individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), brings this class action complaint against Defendants Florida State University ("FSU" or the "University") and Florida State University Board of Trustees ("FBOT", and collectively, "Defendants"). Plaintiff makes the following allegations upon personal knowledge as to his own acts, and upon information and belief, and his attorneys' investigation, as to all other matters, alleging as follows:

**I.      NATURE OF THE ACTION**

        1.      This is a class action brought on behalf of all people who paid fees for tuition and other services for the Spring 2020 academic semester or any future semester at the University and who, because of Defendants' response and policies relating to the Novel Coronavirus Disease 2019 ("COVID-19") pandemic, had their educational experiences and class(es) moved to online learning and lost the benefits of the on-campus services for which their fees were paid, without

Exhibit 1

having a fair and pro-rated portion of those fees refunded to them in full and without condition.

2.      Plaintiff and Defendants entered into a contract(s) where Plaintiff and members of the class would provide payment for the fees charged for tuition and other services and Defendants would provide in-person educational services, experiences, opportunities, access to campus facilities and other related services.

3.      Plaintiff is informed and believes and thereon alleges that FBOT is the final authority concerning waivers of fees charged to students at the University and, accordingly, is ultimately responsible and liable for Defendants' decision not to order fair and pro-rated refunds of these monies.

## II.    PARTIES

### A.    <u>Plaintiff</u>

4.      Plaintiff Broer is a Florida citizen, residing in Auburndale, Florida.  He was a student at the Florida State University College of Law in Tallahassee, Florida and paid, directly or indirectly, fees for tuition and other services for the Spring 2020 semester.

5.      Plaintiff paid said fees for the entire Spring 2020 semester, the benefits of which he did not receive because of the University's decision to close campus and deny the services contracted for by Plaintiff and the proposed Class.  Plaintiff has neither been offered nor provided a refund of said fees.

6.      Plaintiff is not suing to recover monies paid by taxes to the University; rather, Plaintiff files suit against FBOT, a corporate body that may be sued, for specific disgorgement of fees paid by students and their parents, guardians, and families for services not received.  Florida does not have sovereign immunity for breach of contract suits in its own courts.  *See, e.g.*, *Pan-Am Tobacco Corp. v. Dep 't of Corr.*, 471 So.2d 4, 5 (Fla. 1984) ("[W]here the state has entered

into a contract fairly authorized by the powers granted by general law, the defense of sovereign immunity will not protect the state from action arising from the state's breach of that contract.")

B.    **Defendants**

7.    Defendant Florida State University is a is a public research university with its main campus in Tallahassee, Leon County, Florida.  It is a senior member of the State University System of Florida and traces its origins to 1851.

8.    Defendant Florida State University Board of Trustees ("FBOT") is the public body corporate of the University.  It sets policy for the institution and serves as the institution's legal owner and governing board.  The Board of Trustees holds the institution's resources in trust and is responsible for their efficient and effective use.  The thirteen-member Board of Trustees is composed of six members appointed by the Governor, five members appointed by the Florida Board of Governors, the Chair of the Faculty Senate and the President of the Student Body. Plaintiff is informed and believes and thereon alleges that FBOT is located in Tallahassee, Leon County, Florida.

III.    **JURISDICTION AND VENUE**

9.    This is an action for damages and the amount in controversy exceeds this Court's minimum jurisdictional amount ($30,000 exclusive of interest, costs, and attorney's fees) and because more than two-thirds of the proposed class in the aggregate and FBOT are citizens of Florida.  Further, the Plaintiff in this matter seeks declaratory relief as appropriate.

10.    This Court has personal jurisdiction over FBOT because it resides in Leon County, Florida.

11.    Venue is proper in this District pursuant to section 47.011, Florida Statutes, because Defendants are located in Leon County, Florida, and because of Florida's common law home

venue privilege.

## IV.    FACTS

### A.    <u>Background And The Parties' Agreements</u>

12.    FSU is a public research university.  The university is comprised of 16 separate colleges and more than 110 centers, facilities, labs and institutes that offer more than 360 programs of study, including professional school programs.  FSU's main campus is in Tallahassee, Florida and it has a satellite campus in Panama City, Florida.  FSU includes its College of Law and College of Medicine and offers year-round Florida State study centers in Panama City, Mexico, London, England, Florence, Italy, and Valencia, Spain.

13.    FSU has admitted the benefits of the on-campus experience stating "[s]ome of the most memorable experiences for Florida State University students happen outside of the classroom."

14.    Plaintiff was enrolled as a full-time student for the Spring 2020 academic semester at the University in its College of Law.

15.    Plaintiff and members of the proposed Class as more fully defined hereunder are individuals that agreed to pay fees for tuition and other services for the Spring 2020 semester, and/or any future semester to the University.

16.    As a precondition for enrollment, Plaintiff was required to and did pay substantial fees for tuition for the Spring 2020 semester either out of pocket or by utilizing student loan financing, as did all members of the proposed Class (defined below).

17.    Defendants accepted Plaintiff's and members of the proposed Class' payments in exchange for in-person educational services, experiences, opportunities and access to campus facilities as detailed in Defendants' marketing, advertisements, and other public representations.

4

18.     The University offers both an in-person and online curriculum.  Plaintiff and members of the proposed Class did not choose to attend another institution of higher learning, but instead chose to attend FSU and enrolled on an in-person basis with significantly high fees.

19.     Plaintiff's agreement with Defendants was initially established with Plaintiff's application for admission to the University sent to Defendants, and Defendants' letter of acceptance sent to Plaintiff.

20.     The scope of the agreement between Plaintiff and Defendants was formed throughout the application process, admission, enrollment, registration, and payment – including through all the documents and materials shared and agreed to during those processes.  By way of example only, FSU Regulation FSU-2.0249 provides in relevant part:

> Students incurring tuition and fees greater than $150.00 are eligible to execute an installment fee payment agreement for the Fall and Spring semesters only.

21.     By enrolling in courses and paying his fees for tuition and other services for the Spring 2020 semester, Plaintiff provided consideration for and accepted the Regulations and Policies established by Defendants and governing fees for tuition and other services.  On its website at https://regulations.fsu.edu/, Defendants define "Regulations" and "Policies" as:

> **University Regulations** are adopted by the Board of Trustees and are university-wide "laws". Regulations must be consistent with federal and state law and BOG Regulation.

> **Policies** are adopted by the President or Vice Presidents under the specific executive authorities granted to the President by the FSU Board of Trustees. Policies generally involve more detailed matters of procedure and matters not specifically addressed in state law or BOG or FSU Regulation.  FSU Policies may not conflict with State and Federal law, BOG Regulation or FSU Regulation.

22.     Regarding fees for tuition and other services, the FSU Regulations state in relevant part:

**FSU-2.024 Tuition and Fees**.

5

The following tuition and fees shall be levied and collected in U.S. dollars for each student regularly enrolled, unless specifically provided otherwise […]

\*\*\*

**FSU-2.0247 Tuition and Fee Liability**.

(1)    Tuition and fee liability shall be defined as the liability for the payment of tuition incurred at the point at which the student has completed registration, as defined in paragraphs FSU-2.024(2)(a), (b), F.A.C., above.

(2)    A student becomes liable for his/her tuition and fees upon registration.

23.    Additional agreements between Plaintiff and Defendants are bills provided by Defendants to students (including Plaintiff), invoices provided by Defendants to students (including Plaintiff), and other written policies requiring students to make specific fee payments in exchange for certain services.

24.    These contracts are express written agreements between Plaintiff and members of the proposed Class and the University and are constituted by these bills provided to students, invoices provided to students, and other written policies requiring students to make specific fee payments in exchange for certain services.

25.    Although Plaintiff does not have all of the documents constituting the express contracts currently in his possession (*e.g.*, his application and letter of acceptance, course catalogs, mission statements, student handbooks, and bills/invoices for the relevant periods), Plaintiff should be given the opportunity to establish the contracts' existence by discovery directed to Defendants, who certainly have these express contracts in their sole and exclusive possession. *See, e.g.*, *Amiker v. Mid-Century Ins. Co.*, 389 So. 3d 974 (Fla. 1st DCA 1981).

26.    Plaintiff and members of the proposed Class did not enter into an agreement with Defendants for online education, but rather agreed to pay for and receive in-person education and

6

access to campus facilities from the University.  Defendants call their online degree programs "Distance@FSU" which is a separate FSU website, https://distance.fsu.edu/.

27.    Defendants were unable to provide in-person educational experiences, services, opportunities and access to campus facilities for approximately 50% of the Spring 2020 semester.

B.    **Defendants' Response To COVID-19**

28.    On March 2, 2020, the University announced that spring semester programs at Florida State University's Study Center in Florence, Italy were canceled, and preparations were underway to close the Florence Study Center no later than March 9, 2020.

29.    On March 11, 2020, the University announced that all its courses would shift to online instruction only starting March 23 and remain in this format for at least two weeks.  This announcement added that on March 14, 2020 residence halls would close at noon to visitors and for those residents who depart for spring break. It added that residents who stay may remain in the halls.

30.    On March 12, 2020, FSU Athletics announced that all FSU athletic competitions and events would be suspended until further notice.  On that date FSU also announced that it was postponing or canceling external speakers and groups scheduled to perform on campus.

31.    On March 17, 2020, FSU Athletics announced the cancelation of all spring sports seasons, cancelation of its annual spring football game along with the post-game concert, all spring sports seasons and athletics-related banquets and award ceremonies through the spring semester. On that date FSU also announced that it was following CDC guidance for gatherings and crowds, and that campus events were canceled until at least May 3, 2020.

32.    On March 17, 2020, FSU also announced that all classes previously taught in-person would be delivered remotely for the remainder of the 2020 spring semester.

33.    On March 19, 2020, FSU's president John Thrasher announced that FSU had canceled the previously scheduled spring 2020 commencement ceremonies.

34.    On March 23, 2020, FSU announced that all courses for FSU's Summer Sessions A, B, F, and Law (8 week) would be conducted remotely.

35.    On March 25, 2020, FSU announced modification of its grading policy.  It stated that undergraduate courses that used letter grades would continue to use letter grades but that students may individually opt to receive a Satisfactory/Unsatisfactory (S/U) grade for eligible courses rather than a letter grade.  However, students may not opt for S/U status after 11:59 p.m. ET Sunday, April 12, 2020.

36.    On March 26, 2020 and in acknowledgment of the financial hardship COVID-19 was causing its students, FSU announced that the FSU Foundation launched an emergency fundraising effort ". . . aimed at helping students struggling due to financial fallout from the COVID-19 pandemic."  It further stated that "[a]ll funds will go to FSU students and will cover a variety of needs from medical bills, rent, living expenses and technology to help distance learning."

37.    On March 26, 2020, FSU also announced that the University would implement a Student Refund Plan for students who have paid or have been assessed housing and dining charges for the Spring 2020 semester and were no longer utilizing these services.  This announcement explicitly acknowledged FSU's agreements with its students and stated in relevant part:

- March 23, 2020 is considered the last service date for housing and meal plans.

- For University Housing residents, we will refund the respective spring semester rate per individual resident based on their number of unutilized bed nights and the specific rate for the residence hall in which they lived.

- For students on the Residential Dining Services All-Access Meal Plan, we will refund the respective spring semester rate per unused days and Flex Bucks. Block Meal Plans will be refunded based on the unused meal balance and Flex Bucks. Garnet Bucks will automatically roll over based on the Meal Plan Terms and Conditions.

- Refunds will be applied to students' university accounts. Any university balance will be paid prior to the refund being disbursed.

- Acceptance of the refunds will constitute full resolution of the student's residence hall and meal plan agreements.

We expect to electronically issue refunds the week of April 6. This will allow us time to calculate refund amounts and ensure all refunds are compliant with financial aid rules . . . .

38.     On April 8, 2020, FSU issued a reminder to students about their deadline to opt to receive a Satisfactory/Unsatisfactory (S/U) grade for eligible courses rather than a letter grade. FSU included the following additional information:

- Students may select to change one or all of the eligible undergraduate classes in which they are enrolled. There is no requirement that students change any course if they wish to continue receiving a letter grade for any or all of their eligible undergraduate classes.

- Students should consult with their instructors as to what constitutes an "S" or "U" in each class as it may be different.

- The grading policy for graduate courses will not change. All graduate courses will receive letter grades.

- Students in professional programs should check with their respective colleges for any grading policy changes.

39.     FSU's notices to its students regarding opting for a S/U grade was silent as to the implications of electing such an option.  Instead, the notices provided yet another link for its students to follow.

40.     Defendant FBOT knew of and was kept apprised of FSU's changes to the delivery of courses (from in-person to online) and the impact on extracurricular activities as evidenced by

the FBOT March 23, 2020 meeting minutes, which state in relevant part:

## IV.    PRESIDENT'S REPORT

*Mr. John Thrasher, President*

President Thrasher provided an update in regards to the University's efforts during the COVID-19 pandemic. Today, ***March 23rd, was the first day of remote online teaching/classes***. Many of the professors are doing live teaching through ZOOM. ZOOM was used for Cabinet meeting and President Thrasher joined a Chemistry class using.  Administration is working with faculty to determine grading options.

FSU currently has approximately 180 students remaining on campus. Staff is continuing to work with these students and assist them with their needs.

***Spring graduation has been cancelled*** and administration hopes to have spring graduates participate in a later graduation.

***All spring athletic events have been cancelled.*** The NCAA is working to extend eligibility for spring sport athletes.

Vice President Jennings is creating a special fund to assist students who fall under financial hardships.   ·

***Students accepted for the summer term will do classes online due to campus being shut down***. Students should contact their academic advisors with questions regarding their summer schedules.  [Emphasis added]

## C.    The CARES Act Allocation

41.    The Federal Government has also responded to the COVID-19 pandemic in ways that benefit the University and help Defendants cover the costs associated with the disruption.

42.    The CARES Act required that at least half of the funds needed to be spent in the form of emergency aid to students, which could include grants to defray the cost of food, housing, course materials or childcare, according to the U.S. Department of Education.  Upon information and belief, however, only half of the money provided to the Universities under the CARES Act will be allocated to the students.

43.    Upon information and belief, as a result of COVID-19, the U.S. Department of

Education ("DOE") allocated $29,339,828 to the University, of which the minimum allocation to be awarded for emergency financial aid grants to its students was $14,669,914.

44.     Upon information and belief, as a result of the Coronavirus Response and Relief Supplemental Appropriations (CRRSAA) Act, FSU received at least an additional $14.69 million from the DOE to support student aid.

**D.     In-Person Tuition vs. Online Tuition**

45.     The chart below lists the 2019-2020 Academic Year Undergraduate and Graduate cost to attend the University in-person:

| Fee Category | Undergraduate Courses | Graduate Courses |
|---|---|---|
| State Fees (per credit hour) | | |
| Matriculation Fee | $105.07 | $403.51 |
| Student Financial Aid | $5.25 | $20.17 |
| Capital Improvement Fee | $4.76 | $4.76 |
| Subtotal of State Fees | $115.08 | $428.44 |
| | | |
| Local Fees (per credit hour) | | |
| Athletics Fee | $7.90 | $7.90 |
| Activities and Services Fee | $12.86 | $12.86 |
| Student Health Fee | $13.97 | $13.97 |
| Subtotal Local Fees | $34.73 | $34.73 |
| | | |
| Other Fees (per credit hour) | | |
| Transportation Fee | $8.90 | $8.90 |
| Tuition Differential Fee | $49.59 | $0.00 |
| Student Facilities Use Fee | $2.00 | $2.00 |
| Technology Fee | $5.25 | $5.25 |
| Subtotal University Fees | $65.74 | $16.15 |
| Total In-State (per credit hour) | $215.55 | $479.32 |
| | | |
| Out-of-State Fees (per credit hour) | | |
| Out-of-State Fee | $481.48 | $601.34 |

| | | |
|---|---|---|
| Out-of-State Financial Aid Fee | $24.07 | $30.06 |
| **Total Out-of-State (per credit hour)** | **$721.10** | **$1,110.72** |
| | | |
| Term-based Flat Fees | | |
| Per-Semester Facilities Use Fee (all terms) | $20.00 | $20.00 |
| FSU Card Term Fee (Fall & Spring only) | $5.00 | $5.00 |

46.    The chart below lists the 2020-2021 Academic Year Undergraduate cost to attend the University's College of Law in-person:

| Fee Category | Rate |
|---|---|
| State Fees (per credit hour) | |
| Matriculation Fee | $602.36 |
| Student Financial Aid | $30.11 |
| Capital Improvement Fee | $4.76 |
| Subtotal of State Fees | $637.23 |
| | |
| Local Fees (per credit hour) | |
| Athletics Fee | $7.90 |
| Activities and Services Fee | $12.86 |
| Student Health Fee | $13.97 |
| Subtotal Local Fees | $34.73 |
| | |
| Other Fees (per credit hour) | |
| Transportation Fee | $8.90 |
| Tuition Differential Fee | $0.00 |
| Student Facilities Use Fee | $2.00 |
| Technology Fee | $5.25 |
| Subtotal University Fees | $16.15 |
| **Total In-State (per credit hour)** | **$688.11** |

| Out-of-State Fees (per credit hour) | |
|---|---|
| Out-of-State Fee | $635.31 |
| Out-of-State Financial Aid Fee | $31.76 |
| **Total Out-of-State (per credit hour)** | **$1,355.18** |
| | |
| Term-based Flat Fees | |
| Per-Semester Facilities Use Fee (all terms) | $20.00 |
| FSU Card Term Fee (Fall & Spring only) | $5.00 |

47.    In addition to fees for tuition, Plaintiff and Class Members were charged other fees

including but not necessarily limited to:

**Matriculation Fee**              **Classification: State Fee**
Purpose: Basic fee charged for instruction provided by a public postsecondary educational institution in Florida. In some contexts matriculation is synonymous with "tuition." Except as otherwise provided by law, undergraduate tuition shall be established annually in the General Appropriations Act. The sum of tuition and out-of-state fees assessed to nonresident students must be sufficient to offset the full instructional cost of serving such students.

**Tuition Differential Fee**              **Classification: State Fee**
Purpose: Supplemental fee charged for instruction provided by a public university in Florida pursuant to 1s.1009.24(15). The fee is to be used to support undergraduate educational programs and services. Students continuously enrolled since before 07/01/2007 are exempt from this fee. Using a Florida Prepaid Plan purchased before 07/01/2007 qualifies students for a temporary waiver of this fee for terms in which the plan is billed by the school.

**Financial Aid Fee**              **Classification: State Fee**
Purpose: A university board of trustees is authorized to collect, for financial aid purposes, an amount not to exceed five per cent of the tuition and out-of-state fee. The revenues from fees are to remain at each campus and replace existing financial aid fees.

**Capital Improvement Fee**              **Classification: State Fee**
Purpose: Exists to provide educational and support facilities for students, faculty, and staff in a manner that maximizes the effectiveness of the capital investment, maximizes the use of existing facilities, and promotes orderly, planned campus development.

**Athletics Fee Classification:**                    **Local Fee**
Purpose: Supplements the university's diverse athletic programs and provides students a means to enjoy university athletic events without direct cost to the student. Supports programming at athletic spaces.

**Activities and Services Fee Classification:**          **Local Fee**
Purpose: Supports student governing boards and programs and student organizations to improve services directly related to student activities.

**Health Fee Classification:**                      **Local Fee**
Purpose: Funds programming that promotes healthy lifestyle choices and provides students access to the campus-based Health and Wellness Center with many services offered at little to no direct cost to the student.

**Transportation Access Fee Classification:**       **University Fee**
Purpose: Funds the use of city and campus busses, the campus parking permit, campus pedestrian paths, parking lot lights and maintenance, and the creation of additional parking and transportation services. Students with vehicles may obtain their parking permit at no additional charge on-line at FSU Transportation Services.

**Student Facilities Use Fee Classification:**       **University Fee**
Purpose: Assessed to main campus students to construct and renovate campus facilities for student services. In accordance with SGA's request, initial revenues were used to construct the new Health and Wellness Center.

**FSU Card Term Fee Classification:**                **University Fee**
Purpose: Assessed to students for Fall, Spring, or Summer semesters at a rate of $5 per term, but not exceeding $10 annually, to support the various uses of the FSU Card on campus.

**Technology Fee Classification:**                   **University Fee**
Purpose: Funds the maintenance and expansion of University technology services, including the continued support of the Blackboard learning environment, and the expansion of wireless capabilities and services.

48.    As stated on the University's website at https://studentbusiness.fsu.edu/tuition-fees, "[s]ome courses are assessed additional costs for online fees, labs, materials and supplies, and general cost recovery." These additional fees are detailed in a linked spreadsheet, attached hereto as Exhibit A.

49.    FSU offers a variety of online courses and degrees which is separate from the

14

remote learning necessitated by COVID-19 and discussed above. FSU refers to its online courses

and degrees as "Distance@FSU". Its website also states:

> Distance students typically pay tuition plus a distance learning fee. Tuition for
> distance students reflects several fee reductions and waivers: FSU waives student
> health, transportation, and facilities use fees for distance students and significantly
> reduces athletics and activities/services fees.

50.    By way of example, the chart below lists the 2020-2021 Academic Year FSU

School of Law cost of online attendance:

| Fee Category | Rate |
|---|---|
| State Fees (per credit hour) | |
| Matriculation Fee | $602.36 |
| Student Financial Aid | $30.11 |
| Capital Improvement Fee | $4.76 |
| Subtotal of State Fees | $637.23 |
| | |
| Local Fees (per credit hour) | |
| Athletics Fee | $0.69 |
| Activities and Services Fee | $9.88 |
| Student Health Fee | $0.00 |
| Subtotal Local Fees | $10.57 |
| | |
| Other Fees (per credit hour) | |
| Transportation Fee | $0.00 |
| Tuition Differential Fee | $0.00 |
| Student Facilities Use Fee | $0.00 |
| Technology Fee | $5.25 |
| Subtotal University Fees | $5.25 |
| **Total In-State (per credit hour)** | **$653.05** |

| | |
|---|---|
| Out-of-State Fees (per credit hour) | |
| Out-of-State Fee | $635.31 |
| Out-of-State Financial Aid Fee | $31.76 |
| **Total Out-of-State (per credit hour)** | **$1,320.12** |
| | |
| Term-based Flat Fees | |
| Per-Semester Facilities Use Fee (all terms) | $0.00 |
| FSU Card Term Fee (Fall & Spring only) | $5.00 |

### E.    University Marketing and Solicitation Brochures

51.    The University does not sell merely credit hours and diplomas as one would sell some common consumer commodity.  They sell an experience – one enriched both personally and academically through social interaction and involvement with faculty and with other students.

52.    Defendants do not deny that the physical location and amenities of its campus is a main benefit of enrollment that attracts many students to the University.

53.    By way of example, the University's website and recruitment brochures are the primary means through which Defendants target prospective new students and attempt to influence such students to apply for enrollment at UF as opposed to other institutions of higher learning.

54.    Through these publications, Defendants' market to and enroll students in two separate and distinct products.

55.    Defendants specifically market certain classes and degree programs as being offered on a fully online basis.

56.    Indeed, Defendants dedicate an entire section of the University website to these programs, known as "Distance@FSU" which can be accessed at https://distance.fsu.edu/.

16

57.     Conversely, Defendants' publications with respect to non-online classes are full of references to the on-campus experience, including numerous references to student activities; campus amenities; campus diversity, campus location, and the like.

58.     Upon information and belief, there were no references or disclaimers in any of Defendants' websites, circulars, bulletins, publications, brochures, or other advertisements prior to January 1, 2020, that even referenced the possibility of in-person classes being changed to fully online classes at Defendants' unilateral discretion or for any other reason whatsoever after the start of a given term.

59.     In fact, it is clear that, prior to the onset of COVID-19, Defendants had no plans whatsoever to offer its in-person classes via an online delivery model, on an emergency basis or otherwise.

60.     Those prospective students who were interested in enrolling for in-person services at the University after consuming the marketing materials listed herein were invited to complete applications, and some were selected for and offered admission.

61.     The University's solicitation and marketing brochures, as they appear on its website, state[1]:

No one benefits from a life of all work and no play. We encourage our students to be active, both inside the classroom and out. At Florida State, you'll find over 700 student organizations, an extensive array of intramurals to keep you active, a wealth of entertainment options, and countless service opportunities to do your part in making the world a better place.

### Live & Learn

A residence hall is more than just a place to lay your head. It's the center of your collegiate life, a hub of social activity where new friendships are forged. Living on-campus is the best way to get involved, meet new people, and give yourself a leg up in the class room. It's a fact that students living on campus earn higher GPAs.

---

[1]     *See* https://admissions.fsu.edu/studentlife (lasted visited April 12, 2021).

With over a dozen residence halls on campus, you're sure to find one that fits your own personal style.

**Chow Down**

With a variety of meal plan options and 25 locations across campus, Seminole Dining has your food options covered. You can eat all you want at Suwanee Room and Seminole Café or grab a coffee between classes at Einstein's or Starbucks. Be on the lookout for new restaurants opening around campus and the new dining hall, 1851!

**Noles Can Hack It**

At the newly opened Innovation Hub in the heart of campus, students have access to all the latest technologies and staff support. Build a prototype in the Design & Hacking lab, take your creation into reality using the Fablab's laser cutters and 3D printers, and then bring it to life with Raspberry Pi or Arduino boards and a little programming know-how. Leap into virtual and augmented reality with Oculus Rift, HTC Vive, Microsoft HoloLens, and 360° cameras. There's also plenty of hangout and collaboration space where you can get together with other Noles and create "the next big thing." After you've built up your skills in the Innovation Hub, show them off at the annual HackFSU hackathon!

### Get Involved

College is an amazing time to discover more about yourself and what you're really into. FSU students are into a lot of different things, and have formed over 700 recognized student organizations to share their passions. Join a club, honor society, Greek organization, community service group, or start your own brand new student org to meet like minds and make lifelong friends.

\*    \*    \*

**Find What Moves You**

When class is over, it's time to play. At the Leach Recreation Center and Fitness & Movement Clinic, you can get in the zone on an extensive collection of workout equipment, run on the indoor track overlooking our 16-lane pool, and enjoy group fitness and personal training opportunities. Meet some new friends for a game at the Main Campus Fields, Rec SportsPlex, or Westside Courts. Play to win or just for fun by participating in one of over 50 intramural and club sports. Or, relax along the lake at the "Rez", FSU's lakefront property where you can sail, swim, sun, paddleboard, and more. It's all free for FSU students from Campus Rec.

If you're looking for the true fan experience, Seminole Athletics are where it's at. Cheer on our 20 NCAA Division I teams as they complete in the Atlantic Coast

Conference (ACC). Go Noles!

**Are You Not Entertained?**

With tons of events and activities on campus, there's always something fun to do at the Oglesby Union's facilities. Enjoy music and comedy at Club Downunder. Get in a game of bowling or billiards at Crenshaw Lanes. Create a masterpiece at the Art Center. Marvel at the wonder of the FSU Flying High Circus, one of only two collegiate circuses in the nation. Catch free blockbuster, indie, foreign, or cult classic film at the Student Life Cinema. Battle it out in a tournament or just have fun playing the hottest games with your friends in the Student Life Center's Cyber Café.

**Get Around**

With one of the most compact campuses in the state, it's already easy to get around Florida State. But Transportation & Parking Services has made it even easier with a variety of services. Six multi-level garages, real-time parking availability counts, and valet services mean campus parking has never been easier. Seminole Express shuttle buses will quickly get you to and around campus. During late night hours, services such as S.A.F.E. Connection, Night Nole, and Nole Cab provide transportation around campus so you won't have to walk alone. If you're looking to get off campus, FSU students ride for free on all City of Tallahassee (StarMetro) buses, or you can pick up a Zipcar at one of three campus locations and go your own way.

62.     On the same webpage and by way of example, FSU quotes its student Amanda Schell, who states:

"My extracurricular activities were essential to my undergraduate experience at Florida State - there is more to the collegiate experience than just academics!"

63.     On its website at https://campusrec.fsu.edu/outdoors/rez/activities/, Defendants identify various FSU activities and corresponding fees for gate entry, watercraft rentals, climbing wall, swimming, and sailing clinics.  The fees are either not charged or reduced for Plaintiff and other FSU students with a "valid FSUCard".  As noted above (¶¶ 36-38), Defendants charged Plaintiff and other members of the proposed Class a fee for their FSUCard.

64.     Defendants have not offered fair and/or appropriate refunds of fees charged for tuition and other services paid to cover the cost of certain on-campus services which are no longer

19

available to students. To the extent refunds have been offered, the refunds have not been commensurate with the financial losses to the students and their families.

65.    Defendants have improperly retained monies paid by Plaintiff and the other members of the proposed Class, while prohibiting or otherwise preventing Plaintiff and the other members of the proposed Class from obtaining the benefits for which they paid. Even if Defendants claim they did not have a choice, the University has nevertheless improperly retained funds for services it is not providing. Defendants' actions are unlawful and unfair, and as a matter of both contract and equity, Plaintiff and members of the proposed Class are entitled to disgorgement of the fees paid.

## V.    CLASS ACTION ALLEGATIONS

66.    Plaintiff brings this case individually and, pursuant to Florida Rule of Civil Procedure 1.220(a), (b)(2), (b)(3), and/or (c)(4) for damages, equitable relief, and disgorgement on behalf of the following Class:

> All people who paid fees to the University for tuition and other services for or on behalf of students enrolled in classes at the University for the Spring 2020 semester and thereafter but who were denied live, in-person instruction, and access to and use of campus facilities.

67.    Excluded from the Class are Defendants, and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the judicial officers, and their immediate family members, and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

68.    **Numerosity-Florida Rule of Civil Procedure 1.220(a)(l)**.  The Class members are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiff but may be readily

ascertained from the University's records. Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

69.    **Commonality-Florida Rule of Civil Procedure 1.220 (a)(2); Predominance-Florida Rule of Civil Procedure 1.220 (b)(3)**.  This action involves questions of law and fact common to the Class, which predominate over any individual questions, including, without limitation:

(a)    Whether Defendants engaged in the conduct alleged herein;

(b)    Whether Defendants breached their contracts with Plaintiff and the other members of the Class by retaining a portion of their fees representing the difference between what the Plaintiff and the other members of the Class paid for and what they received;

(c)    Whether Defendants breached their contracts with Plaintiff and the other members of the Class by retaining a portion of their fees representing the value of access to campus facilities and services while denying Plaintiff and the other members of the Class access to said campus facilities and services;

(d)    Whether Defendants were unjustly enriched by retaining a portion of the fees paid by Plaintiff and the other members of the Class representing the value of access to campus facilities and services while denying Plaintiff and the other members of the Class access to said campus facilities and services;

(e)    Whether certification of any or all of the classes proposed herein is appropriate under the Florida Rules of Civil Procedure;

(f)    Whether Plaintiff and the other members of the Class are entitled to

declaratory, equitable, or injunctive relief, and/or other relief; and

(g)     The amount and nature of relief to be awarded to Plaintiff and the other members of the Class.

70.     **Typicality-Florida Rule of Civil Procedure 1.220(a)(3)**. Plaintiff's claims are typical of the other members of the putative classes' claims because Plaintiff and the other members of the Class each paid fees for tuition and other services associated with the Spring 2020 semester at the University and thereafter but were not provided the services that those fees were meant to cover, nor were they reimbursed therefor. Plaintiff and the other members of the proposed Class each suffered similar harm, namely Defendants' retention of their fees paid as a direct and proximate result of the same wrongful conduct in which Defendants engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other members of the proposed Class.

71.     **Adequacy of Representation-Florida Rule of Civil Procedure 1.220(a)(4)**. Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the proposed Class who he seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

72.     **Declaratory and Injunctive Relief-Florida Rule of Civil Procedure 1.220(b)(2)**. Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other members of the proposed Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

73.     **Superiority-Florida Rule of Civil Procedure 1.220(b)(3)**. A class action is

superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

74.    **Certification of Specific Issues-Florida Rule of Civil Procedure 1.220(c)(4)**.  To the extent the proposed Class does not meet the requirements of Rules 1.220(b)(2) or (b)(3), Plaintiff seeks the certification all issues that will drive the litigation toward resolution.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

75.    Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 74, as if fully alleged herein.

76.    Plaintiff brings this claim individually and on behalf of the other members of the proposed Class.

77.    Plaintiff and the other proposed members of the Class entered into contracts with the University which provided that Plaintiff and the other members of the Class would pay fees for tuition and other services to be provided on campus and in-person and, in exchange Defendants would enroll such students and admit them physically to the University; granting them the full rights and privileges of student status, including but not limited to access to campus facilities, access to campus activities, and live, in-person instruction in a physical classroom.

78.    The rights and privileges of student status that comprise the contractual terms are also set forth by Defendants through its FSU Policies and Regulations, website, academic catalogs,

student handbooks, correspondence, marketing materials, acceptance letters, online web portals, and other circulars, bulletins, and publications.

79.    These documents detailed the educational services that Defendants would provide in exchange for the payment of tuition and fees and complying with the University's rules and regulations.

80.    These rights and privileges form the basis of the bargain on which prospective students agree to accept Defendants' offer of enrollment in exchange for the payment of fees for tuition and other in-person services and access.

81.    One such right is the ability to be physically present on campus, and fully enjoy the facilities, services, and opportunities provided thereon, including the campus' location and surrounding opportunities at the University.

82.    Defendants have failed to fully provide those services and have otherwise not performed under the contract as set forth above.

83.    Plaintiff and other members of proposed Class accepted Defendants' offer for live in-person on-campus education and in-person access to campus facilities and paid valuable consideration in exchange.

84.    However, after accepting such consideration from Plaintiff and other members of the proposed Class, Defendants unilaterally provided a materially different product, which deprived Plaintiff and other members of the proposed Class of the benefit of the bargain for which they had already paid.

85.    Defendants retained fees paid by Plaintiff and other members of the proposed Class, without providing them the full benefit of their bargain.

86.    Plaintiff and other members of the proposed Class have suffered damage as a direct

and proximate result of Defendants' breach amounting to the difference in the fair market value of the services and access for which they contracted, and the services and access which they actually received.

87.     This cause of action does not seek to allege "academic malpractice."

88.     As a direct and proximate result of Defendants' breach of contract, Plaintiff and other members of the proposed Class are legally entitled, in an amount to be decided by the trier of fact, to restitution of the pro-rata amount of fees that were collected but for which services were not provided.

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, demands judgment from Defendants in accordance with the prayer for relief set forth below.

## SECOND CLAIM FOR RELIEF

### (Unjust Enrichment)

89.     Plaintiff repeats and re-alleges the factual allegations contained in paragraphs 1 through 74, as if fully set forth herein.

90.     Plaintiff brings this count in the alternative on behalf of himself and other members of the proposed Class.

91.     This claim is pled in the alternative to, and to the extent it is determined a contract does not exist or otherwise apply, the contract-based claim set forth in the First Cause of Action above.

92.     Plaintiff and other members of the proposed Class paid substantial fees for live, in-person instruction in physical classrooms on a physical campus with all the attendant benefits.

93.     Plaintiff and other members of the proposed Class conferred a benefit on

Defendants when they paid these fees.

94.    Defendants have realized this benefit by accepting such payment.

95.    Defendants have retained this benefit, even though Defendants have failed to provide the services for which the fees were collected, making Defendants' retention unjust under the circumstances.

96.    It is significantly cheaper for Defendants to provide the online product than the on-campus product.

97.    As a result of closing of the University campus and moving classes online, Defendants saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced or eliminated hours for paid work study students, and otherwise.

98.    Simply put, it is significantly cheaper to operate a remote, on-line campus than a fully open physical campus. But even if it was not, it is not the product that students were offered and not the product the students expected to receive.

99.    Equity and good conscience require that Defendants return a portion of the monies paid in fees by Plaintiff and other members of the proposed Class.

100.    This cause of action does not seek to allege "academic malpractice."

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, demands judgment from Defendants in accordance with the prayer for relief set forth below.

## **REQUEST FOR RELIEF**

Plaintiff, individually and on behalf of the other Class members, prays for judgment against Defendants as follows:

(A)     Declaring this action to be a proper class action;

(B)     Certifying the Class as proposed herein;

(C)     Designating Plaintiff as Class representative, and appointing counsel for the Plaintiff as Class Counsel;

(D)     Declaring that Defendants are financially responsible for notifying the Class members of the pendency of this action;

(E)     Requiring that Defendants disgorge fee payments wrongfully retained for services not provided;

(F)     Awarding monetary damages;

(G)     Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from retaining the pro-rated, unused fees monies;

(H)     Awarding Plaintiff's reasonable attorney's fees, costs and expenses, as permitted by law;

(I)     Awarding pre- and post-judgment interest on any amounts awarded, as permitted by law; and

(J)     Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: May 10, 2021                           Respectfully submitted,

**EGGNATZ | PASCUCCI**

By: /s/ Joshua H. Eggnatz
Joshua H. Eggnatz, Esq.
Fla. Bar No.: 0067926
Michael J. Pascucci, Esq.
Fla. Bar No.: 0083397
7450 Griffin Rd, Ste. 230

Davie, FL 33314
Telephone: (954) 889-3359
Facsimile: (954) 889-5913
Email: JEggnatz@JusticeEarned.com
Email: Mpascucci@JusticeEarned.com

*Local Counsel for Plaintiff and the Putative Class*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
Robert J. Schupler
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: egleston@gme-law.com
Email: rschupler@gme-law.com

*Trial Counsel for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 10, 2021 a true and correct copy of the foregoing was e-filed and served via the Court's e-Filing portal pursuant to Fla. R. Jud. Admin. 2.516.


By: /s/ Joshua H. Eggnatz

Case 4:21-cv-00328-AW-MAF    Document 1-1    Filed 08/06/21    Page 29 of 163

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I.    CASE STYLE

IN THE CIRCUIT COURT OF THE <u>SECOND</u>  JUDICIAL CIRCUIT,
IN AND FOR <u>LEON</u>  COUNTY, FLORIDA

<u>Harrison Broer</u>
Plaintiff

Case # <u>2021 CA 000859</u>

Judge _____

vs.

<u>Florida State University, Florida State University Board of Trustees</u>
Defendant

### II.    AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

- ☐  $8,000 or less
- ☐  $8,001 - $30,000
- ☐  $30,001- $50,000
- ☐  $50,001- $75,000
- ☐  $75,001 - $100,000
- ☒  over $100,000.00

### III.    TYPE OF CASE      (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

**CIRCUIT CIVIL**

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
      ☐ Business governance
      ☐ Business torts
      ☐ Environmental/Toxic tort
      ☐ Third party indemnification
      ☐ Construction defect
      ☐ Mass tort
      ☐ Negligent security
      ☐ Nursing home negligence
      ☐ Premises liability—commercial
      ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
      ☐ Commercial foreclosure
      ☐ Homestead residential foreclosure
      ☐ Non-homestead residential foreclosure
      ☐ Other real property actions

☐Professional malpractice
      ☐ Malpractice—business
      ☐ Malpractice—medical
      ☐ Malpractice—other professional
☐ Other
      ☐ Antitrust/Trade regulation
      ☐ Business transactions
      ☐ Constitutional challenge—statute or ordinance
      ☐ Constitutional challenge—proposed amendment
      ☐ Corporate trusts
      ☐ Discrimination—employment or other
      ☐ Insurance claims
      ☐ Intellectual property
      ☐ Libel/Slander
      ☐ Shareholder derivative action
      ☐ Securities litigation
      ☐ Trade secrets
      ☐ Trust litigation

**COUNTY CIVIL**

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

    **IV.**    **REMEDIES SOUGHT** (check all that apply):
    ☒ Monetary;
    ☐ Nonmonetary declaratory or injunctive relief;
    ☐ Punitive

    **V.**    **NUMBER OF CAUSES OF ACTION:** [   ]
    (Specify)

    2

    **VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
        ☒ yes
        ☐ no

    **VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
        ☒ no
        ☐ yes If "yes," list all related cases by name, case number, and court.

    **VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
        ☒ yes
        ☐ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Joshua H. Eggnatz        Fla. Bar # 67926
        Attorney or party            (Bar # if attorney)

Joshua H. Eggnatz            05/10/2021
   (type or print name)           Date

CIVIL ACTION SUMMONS

## IN THE CIRCUIT COURT OF THE 2nd JUDICIAL CIRCUIT,
## IN AND FOR LEON COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.    2021 CA 000859

HARRISON BROER, Individually and on
Behalf of all others similarly situated,

      Plaintiff,

      -vs-

FLORIDA STATE UNIVERSITY and
FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES,
AS THE PUBLIC BODY CORPORATE OF FLORIDA STATE UNIVERSITY

      Defendant.

_____/

## SUMMONS
## PERSONAL SERVICE ON A CORPORATION

TO DEFENDANT(S):

Florida State University Board of Trustees
Office of the General Counsel
Attn: Custodian of Public Records
222 S. Copeland Street, Suite 424
Tallahassee, FL 32306-1400

## IMPORTANT

A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached complaint/petition with the Clerk of this Court, located at 301 S. Monroe Street #100, Tallahassee, FL 32301. A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court.  There are other legal requirements.  You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

Joshua H. Eggnatz, Esq.
Fla. Bar No.: 0067926
Michael J. Pascucci, Esq.
Fla. Bar. No.: 83397
**EGGNATZ | PASCUCCI**
7450 Griffin Road, Suite 230
Davie, FL 33314
Tel: (954) 889-3359
Fax: (954) 889-5913
JEggnatz@JusticeEarned.com
Mpascucci@JusticeEarned.com
Sgizzie@JusticeEarned.com

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:  You are commanded to serve this Summons and a copy of the complaint/petition in this lawsuit on the above named defendant(s).

DATED ON _____, 2021.

(SEAL)                          CLERK OF THE CIRCUIT COURT

BY: _Cynth Michael_    05/11/2021
                                Deputy Clerk

(See reverse side)
(Vease al reves)
(Voir de l'autre cote de)

**<u>SECOND CIRCUIT – LEON:</u>**

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Francene Brown, 301 South Monroe Street, Tallahassee, FL 32301, Phone: 850-606-4449 or Fax: 850-606-4343 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene 20 Dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera.  Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.  Un simple coup de telephone est insuffisant pour vous proteger. Vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, an meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse scrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

<u>CIVIL ACTION SUMMONS</u>

IN THE CIRCUIT COURT OF THE 2nd JUDICIAL CIRCUIT,
IN AND FOR LEON COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.    2021 CA 000859

HARRISON BROER, Individually and on
Behalf of all others similarly situated,

       Plaintiff,

       -vs-

FLORIDA STATE UNIVERSITY and
FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES,
AS THE PUBLIC BODY CORPORATE OF FLORIDA STATE UNIVERSITY

       Defendant.

_____

**<u>SUMMONS</u>**
**<u>PERSONAL SERVICE ON A CORPORATION</u>**

TO DEFENDANT(S):

Florida State University
Office of the General Counsel
Attn: Custodian of Public Records
222 S. Copeland Street, Suite 424
Tallahassee, FL 32306-1400

**<u>IMPORTANT</u>**

    A lawsuit has been filed against you.  You have 20 calendar days after this summons is served on you to file a written response to the attached complaint/petition with the Clerk of this Court, located at located at 301 S. Monroe Street #100, Tallahassee, FL 32301. A phone call will not protect you.  Your written response, including the case number given above and the names of the parties, must be filed if you want the Court to hear your side of the case.  If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court.  There are other legal requirements. You may want to call an attorney right away.  If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a copy of your written response to the "Plaintiff/Plaintiff's Attorney" named below.

Joshua H. Eggnatz, Esq.
Fla. Bar No.: 0067926
Michael J. Pascucci, Esq.
Fla. Bar. No.: 83397
**EGGNATZ | PASCUCCI**
7450 Griffin Road, Suite 230
Davie, FL 33314
Tel: (954) 889-3359
Fax: (954) 889-5913
JEggnatz@JusticeEarned.com
Mpascucci@JusticeEarned.com
Sgizzie@JusticeEarned.com

THE STATE OF FLORIDA

TO EACH SHERIFF OF THE STATE:  You are commanded to serve this Summons and a copy of the complaint/petition in this lawsuit on the above named defendant(s).

DATED ON _____, 2021.

(SEAL)                          CLERK OF THE CIRCUIT COURT

BY: _Cynthia Michael_____     05/11/2021

(See reverse side)                      Deputy Clerk
(Vease al reves)
(Voir de l'autre cote de)

**SECOND CIRCUIT – LEON:**

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Francene Brown, 301 South Monroe Street, Tallahassee, FL 32301, Phone: 850-606-4449 or Fax: 850-606-4343 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711.**

2

## IMPORTANTE

Usted ha sido demandado legalmente.  Tiene 20 Dias, contados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentarla ante este tribunal.  Una llamada telefonica no lo protegera.  Si usted desea que el tribunal considere su defensa, debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesadas.  Si usted no contesta la demanda a tiempo, pudiese perder el caso y podria ser despojado de sus ingresos y propiedades, o privado de sus derechos, sin previo aviso del tribunal.  Existen otros requisitos legales.  Si lo desea, puede usted consultar a un abogado inmediatamente.  Si no conoce a un abogado, puede llamar a una de las oficinas de asistencia legal que aparecen en la guia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney" (Demandante o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciares ont ete entreprises contre vous.  Vous avez 20 jours consecutifs a partir de la date de l'assignation de cette citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce tribunal.  Un simple coup de telephone est insuffisant pour vous proteger.  Vous etes oblige de deposer votre reponse ecrite, avec mention du numero de dossier ci-dessus et du nom des parties nommees ici, si vous souhaitez que le tribunal entende votre cause.  Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du tribunal.  Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat.  Si vous ne connaissez pas d'avocat, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez de deposer vous-meme une reponse ecrite, il vous faudra egalement, an meme temps que cette formalite, faire parvenir ou expedier une copie de votre reponse scrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.



# LEON COUNTY Receipt of Transaction
## Receipt #    1569949

GWEN MARSHALL
Clerk of Court and Comptroller
LEON COUNTY, FLORIDA

**Received From:**
Eggnatz Pascucci
7450 Griffin Road, Suite 230
Davie, FL  33314

**On Behalf Of:**

,

On: 5/11/2021   3:57:53PM
Transaction # 100832299
Cashiered by: C MCREED

CaseNumber   2021 CA 000859

**Judge   J LAYNE SMITH**

**HARRISON BROER   *VS*   FLORIDA STATE UNIVERSITY**

Comments:

| Fee Description | Fee | Prior Paid | Waived | Due | Paid | Balance |
|---|---|---|---|---|---|---|
| (COMP_CA) COMPLAINT | 400.00 | 0.00 | 0.00 | 400.00 | 400.00 | 0.00 |
| (SUIS) SUMMONS ISSUED | 10.00 | 0.00 | 0.00 | 10.00 | 10.00 | 0.00 |
| (SUIS) SUMMONS ISSUED | 10.00 | 0.00 | 0.00 | 10.00 | 10.00 | 0.00 |
| **Total:** | **420.00** | **0.00** | **0.00** | **420.00** | **420.00** | **0.00** |
| **Grand Total:** | **420.00** | **0.00** | **0.00** | **420.00** | **420.00** | **0.00** |

PAYMENTS

| Payment Type | Reference | | Amount | Refund | Overage | Change | Net Amount |
|---|---|---|---|---|---|---|---|
| CREDIT CARD EFILE | 126509578 | OK | 420.00 | 0.00 | 0.00 | 0.00 | 420.00 |
| | | **Payments Total:** | **420.00** | **0.00** | **0.00** | **0.00** | **420.00** |

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA

HARRISON BROER, Individually and On
Behalf of All Others Similarly Situated,

     Plaintiff,

                                     CASE NO.: 2021 CA 859

vs.

FLORIDA STATE UNIVERSITY, and
FLORIDA STATE UNIVERSITY BOARD
OF TRUSTEES, AS PUTLIC BODY CORPORATE
OF FLORIDA STATE UNIVERSITY,

     Defendants.

_____/

## UNIFORM ORDER FOR ACTIVE, DIFFERENTIAL CIVIL CASE MANAGEMENT

     In compliance with Florida Supreme Court directives on active, differential civil case management established in Supreme Court Administrative Order AOSC20-23, Amendment 12, and Second Judicial Circuit Administrative Order 21 - 04, all parties in the above-styled cause are bound by this Case Management Order.

**Plaintiff shall serve this order on all parties with service of the original complaint. Strict enforcement is required unless good cause is shown for an exception or as otherwise required by law.**

### I. PROJECTED TRIAL DATE

     All **COUNTY COURT Civil cases** are designated **STREAMLINED CASES** with a projected trial date of **360 days** from the date of filing of the complaint.

     All **CIRCUIT COURT Civil cases** for which the complaint **does not demand trial by jury** are designated **STREAMLINED CASES** with a projected trial date of **360 days** from the date of filing of the complaint.

All **CIRCUIT COURT Civil cases** for which the **complaint demands trial by jury** are **GENERAL CASES** with a projected trial date of **540 days** from the date of filing of the complaint.

**A change in the above designations may be made by the presiding judge on the judge's own initiative or upon motion of any party.** Should any party assert that a civil case should be treated other than designated above, such party shall file a written motion requesting such change and the motion shall be expeditiously resolved by the presiding Judge.

## II. Notice that Cause is at Issue and Firm Trial Date

The parties **must file a _Joint_ Notice** that the Cause is at Issue **no later than 15 days after the pleadings are closed**. In the event of a dispute, either party may file a motion and request a hearing to determine if the cause is at issue.

Upon joint notice or judicial determination that the cause is at issue, the Court will schedule a Firm Trial Date consistent with the Projected Trial Date above unless either party requests a different date in their Notice that the Cause is at Issue. Should either party request a Firm Trial Date different than the Projected Trial Date, the Plaintiff shall expeditiously set a case management conference to determine the Firm Trial Date.

## III. Mandatory Deadlines for _Streamlined_ Cases

If this case is designated as a STREAMLINED CASE, the following deadlines shall apply and, by directive of the Florida Supreme Court, must be strictly enforced unless good cause is shown for an exception or as otherwise required by law:

120 days after filing: Service of Complaints
150 days after filing: Service under any Extension of Time
180 days after filing: Adding New Parties
210 days after filing: Resolution of Objections to Pleadings and Motions to Dismiss
270 days after filing: Completion of Fact and Expert Discovery
270 days after filing: Resolution of Pretrial Motions, including Motions for Summary Judgment

## IV. Mandatory Deadlines for *General* Cases

If this case is designated as a GENERAL CASE, the following deadlines shall apply and, by directive of the Florida Supreme Court, must be strictly enforced unless good cause is shown for an exception or as otherwise required by law:

120 days after filing:  Service of Complaints
180 days after filing:  Service under any Extension of Time
210 days after filing:  Adding New Parties
270 days after filing:  Resolution of Objections to Pleadings and Motions to Dismiss
400 days after filing:  Completion of Fact and Expert Discovery
450 days after filing:  Resolution of Pretrial Motions, including Motions for Summary Judgment

## V. Mediation

All parties must mediate unless excused by court order for good cause shown or as otherwise required by law and in compliance with Rules of Civil Procedure 1.700 -1.730.

## VI. Noncompliance

**By Order of the Florida Supreme Court, strict, good faith compliance with this Uniform Order for Active, Differential Civil Case Management is required unless good cause is shown for an exception or as otherwise required by law. These procedures and time standards do not supplant any existing rule, statute, or law.**

**Failure to appear at the pretrial conference or failure to comply with the terms of this order may result in such sanctions as are just and lawful including: an immediate ex parte hearing and entry of final judgment of default or dismissal, limitation of witnesses or other evidence, striking of claims or defenses, or imposition of attorney fees or costs.**

## VII. Hearings by Audio-Video Technology

During the COVID-19 Public Health Emergency, all hearings other than jury selection and trial *shall* be conducted consistent with Florida Supreme Court and Second Circuit Administrative Order by audio-video technology. Each judge is responsible to establish the process for such audio-video technology hearings by notice of hearing including technology access.

After the conclusion of the COVID-19 Public Health Emergency all hearings other than jury selection and trial *may* be conducted by audio-video technology. Each judge is responsible to establish the process for such audio-video technology hearings by notice of hearing including technology access.

DONE AND ORDERED this 3th day of May, 2021.

_____
CIRCUIT JUDGE

Copies to:

All Counsel of record

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

**HARRISON BROER, Individually and on
Behalf of all others similarly situated,**

      Plaintiff,

v.                                    **Case No.: 2021 CA 000859**

**FLORIDA STATE UNIVERSITY
and FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, as the public
body corporate of Florida State University,**

      Defendant.

_____/

**FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES'
MOTION TO STAY DISCOVERY AND FOR A PROTECTIVE ORDER
PENDING FINAL ADJUDICATION OF DISPOSITIVE MOTION**

Defendant, **FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES** ("FSU"), by

and through its undersigned counsel and pursuant to Fla. R. Civ. P. 1.280(c), moves to stay all

discovery in this matter until the final adjudication of its forthcoming dispositive motion and for a

protective order absolving it from any obligation to respond to discovery and from the conduct of

depositions.

**Introduction and Summary of the Allegations**

1.      Plaintiff, **HARRISON BROER** ("Plaintiff"), filed this action on May 10, 2021, on

behalf of himself and other similarly situated FSU students. Fairly summarized, Plaintiff

complains that the class is owed a *pro rata* refund of fees and tuition paid from the Spring 2020

semester onward because of public safety measures taken by FSU to protect the university

community from the COVID-19 pandemic by moving from in-person to virtual instruction.

(Compl. at ¶¶ 1, 5, 77).

2.    The Complaint contains two Counts, both of which are barred by sovereign immunity: Count I (Breach of Contract); Count II (Unjust Enrichment).[1]

3.    Importantly, sovereign immunity in Florida is not just immunity from liability, ***but immunity from suit itself***.  Moreover, the defense of sovereign immunity is a defense directed to the subject matter jurisdiction of the Court. *See*, <u>Wallace v. Dean</u>, 3 So. 3d 1035, 1045 n.14 (Fla. 2009); <u>Brevard County v. Morehead</u>, 181 So. 3d 1229, 1233 (Fla. 5th DCA 2015) (applying sovereign immunity to unjust enrichment, quantum meruit and implied contract claims and finding circuit court lacked subject matter jurisdiction over them). Accordingly, discovery in this case is unnecessary, unwarranted and intrusive until FSU is able to have its sovereign immunity defense adjudicated.

4.    Florida university boards of trustees are expressly included in the definition of "state agency and or subdivision" in Section 768.28(2), <u>Florida</u> <u>Statutes</u>, and therefore are guaranteed the sovereign immunity provided for in Article X, Section 13 of the Florida Constitution. *See*, § 768.28(2), <u>Fla</u>. <u>Stat</u>. (2020).

5.    Recognizing this bar to his claims, FSU expects Plaintiff to conduct extensive discovery early in the litigation.

6.    Before discovery is served or responses to discovery are required, and before any depositions are taken, FSU is entitled to first obtain adjudication of its dispositive motion raising, as a threshold issue, the sovereign immunity defense.

---

[1]   The Complaint names both Florida State University and the Florida State University Board of Trustees as Defendants. It is improper to sue "Florida State University" since the Florida Legislature has established university boards of trustees as the proper entities with the power to sue and be sued. *See*, § 1001.72(1), <u>Fla</u>. <u>Stat</u>. (2020).

**Argument and Authority** - Discovery Should be Stayed Pending the
Resolution of FSU's Dispositive Motion and a Protective Order Should
Be Issued as to any Discovery Sought by Plaintiff

7.      This Court has broad discretion and wide latitude to control the timing of discovery.

*McClure v. Publix Super Markets, Inc.*, 124 So. 3d 998, 999 (Fla. 4th DCA 2013); Fla. R. Civ. P.

1.280(c). Pursuant to Rule 1.280(c) of the Florida Rules of Civil Procedure, a trial court possesses

broad discretion in limiting discovery and protecting parties that come before it, which such

discretion includes protecting a party from undue burden or expense upon a showing of good cause.

Fla. R. Civ. P. 1.280(c); *see also, Rojas v. Ryder Truck Rental, Inc.*, 641 So. 2d 855, 857 (Fla.

1994).

8.      This Court should, and must, exercise its discretion to stay discovery pending the

disposition of FSU's dispositive motion and enter a protective order with respect to any discovery

sought by Plaintiff.

9.      Florida appellate courts have long upheld decisions of trial courts staying discovery

until a ruling is made on a motion to dismiss. *See*, *e.g.*, *Hollywood, Inc. v. Broward County*, 90 So.

2d 47 (Fla. 1956) (preventing deposition in class action seeking declaratory relief while motions

to dismiss were pending). Where, as here, sovereign immunity is asserted, Florida's First District

Court of Appeal has made it clear that a trial court must rule on the defense before authorizing

discovery on the merits of a lawsuit. *Florida Dep't of the Lottery v. Curcio*, 71 So. 3d 931, 932

(Fla. 1st DCA 2011) (per curiam) ("We also find that the court must rule on the sovereign

immunity defense to Counts I & II before authorizing discovery on the merits of Curcio's claims.").

10.      It is clear error to permit discovery to go forward while a motion asserting a

sovereign immunity defense is pending, when that defense rests on pure legal grounds and

discovery is not necessary to resolve the applicability of the defense. The sovereign immunity

3

defense to be asserted by FSU is that there is simply no express, written contract sufficient to find that FSU waived sovereign immunity with respect to the breach of contract claim, and that unjust enrichment claims are likewise barred by sovereign immunity. *See*, *e.g.*, *Pan-Am Tobacco Corp. v. Dep't of Corr.*, 471 So. 2d 4, 6 (Fla. 1984) (holding that state will not be deemed to have waived immunity from breach of contract claims unless such claims are premised on the breach of an express, written contract). This Court need only look at the allegations contained in the four corners of the Complaint and the documents alleged to be "express, written" contracts as that term is used in the *Pan-Am Tobacco* line of cases, and to analyze the unjust enrichment claim as pled, to determine if FSU has waived its sovereign immunity.

11.     The recent decision of the Third District Court of Appeals in *Bank of America, N.A., v. Lisa S. Dulberg De Morales, et al.*, is on point. *See,* Case No. 3D19-1782, --- So. 3d ----, 2020 WL 7233359 (Fla. 3d DCA Dec. 9, 2020). In that case, the Third District noted that when a motion to dismiss "hinges on the application of a complete ... immunity from suit ... requiring a party entitled to that immunity to continue litigating the suit constitutes irreparable harm in and of itself." *Id.* at *2 (*quoting* *Univ. of Miami v. Ruiz ex rel. Ruiz*, 164 So. 3d 758, 763 (Fla. 3d DCA 2015); *and citing* *James v. Leigh*, 145 So. 3d 1006, 1008 (Fla. 1st DCA 2014)). The court then held that "[g]iven the purpose of the immunity asserted, the potentially dispositive nature of the motion, and the circumstances, the trial court abused its discretion in failing to stay discovery until it ruled on the [defendant's] motion to dismiss." *Id.* at *2.

12.     Importantly, sovereign immunity occupies an even higher plane than the litigation immunity at issue in *Bank of America*. As this Court is well aware, in Florida, "sovereign immunity is both an immunity from liability and an immunity from suit." *Florida Highway Patrol v. Jackson*, 288 So. 3d 1179, 1185 (Fla. 2020).

4

13.    Because the State of Florida's immunity from suit in the first instance is addressed by the sovereign immunity defense, "entitlement to sovereign immunity should be established as early in the litigation as possible." *Id.* The importance of adjudicating the defense at the earliest stage of litigation is particularly important "in light of the separation of powers principles that animate the doctrine of sovereign immunity." *Id.* Indeed, the Florida Supreme Court has gone so far as to amend the Florida Rules of Appellate Procedure to permit interlocutory appeals of orders that deny the defense, even if not explicitly. *See, Id.* at 1186.

14.    The unambiguous holding in *Curcio* that trial courts "must rule" on the substantive merits of sovereign immunity before discovery is allowed to commence recognizes the crucial role the defense plays when a party sues the State of Florida and its subdivisions. Courts are called on to play a fundamental gatekeeper role to fully determine whether, as an initial matter, sovereign immunity applies to ensure that the doctrine established in the Florida Constitution is given proper treatment. *See,* Art. X, § 13, Fla. Const. It is only through exercising this gatekeeper function that the purposes of sovereign immunity are given effect. These purposes include "protection of the public treasury", the "maintenance of the orderly administration of government", [*Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 471 (Fla. 2005)] and ensuring the judicial branch does not improperly "second guess the political and police power" decisions of coordinate branches of government "absent a violation of constitutional or statutory rights." *Trianon Park Condo. Ass'n v. City of Hialeah,* 468 So. 2d 912, 918 (Fla. 1985).

15.    In this respect, courts treat the sovereign immunity defense similar to the way the qualified immunity defense is treated. *See, Siegert v. Gilley*, 500 U.S. 226, 231-32 (1991) (holding the threshold immunity question should be resolved before discovery is allowed). Like a state's sovereign immunity, qualified immunity is immunity from suit and not merely liability. *Ray v.*

*Folz*, 370 F.3d 1079, 1082 (11th Cir. 2004). And like sovereign immunity, the denial of qualified immunity may be tested through interlocutory appeal. *See, Tucker v. Resha*, 648 So. 2d 1187, 1189-90 (Fla. 1994) (adopting federal precedent and permitting interlocutory appeal of qualified immunity denial); *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985) (holding availability of qualified immunity is subject to interlocutory appeal where the issue turns on a question of law).

16.     The underlying reason behind the requirement in *Curcio* that questions of sovereign immunity be resolved before discovery is obvious; namely, immunity from suit is effectively lost if the state is forced to litigate claims for which it is immune. *Fuller v. Truncale*, 50 So. 3d 25, 28 (Fla. 1st DCA 2010) (finding irreparable harm where judicial immunity was not granted before trial). The state "cannot be 're-immunized' if erroneously required to stand trial or face the other burdens of litigation." *Tucker*, 648 So. 2d at 1189. Indeed, the purpose of sovereign immunity is completely lost if the party asserting immunity is forced to engage in defensive litigation on the merits prior to the adjudication of that defense, and this burden of defensive litigation cannot be remedied on a later appeal. *See, Stephens v. Geoghegan*, 702 So. 2d 517, 521 (Fla. 2d DCA 1997) (holding, in a qualified immunity case, that "[b]ecause of the nature and purpose of a claim of immunity, an appeal after final judgment would not be an adequate remedy"). Stated differently, the cat cannot be put back in the bag.

17.     Moreover, any speculation by Plaintiff that there "may" be other documents constituting an express, written contract to which he himself is a party should be rejected out of hand. Were such speculative assertions sufficient to defeat a sovereign's immunity from suit, then that immunity is meaningless.

18.     FSU intends to interpose a sovereign immunity defense to Plaintiff's claims based on a pure issue of law for which discovery is not needed. Accordingly, an order staying discovery

and a protective order precluding discovery prior to the adjudication of FSU's motion to dismiss or, in the alternative, motion for judgment on the pleadings in which sovereign immunity is asserted is warranted.

### Conclusion

WHEREFORE, Defendant, Florida State University Board of Trustees, respectfully requests the entry of an Order staying all discovery and for entry of a protective order preventing any discovery from occurring until final adjudication of its dispositive motion and absolving it from having to respond to discovery, along with such other and further relief as this Court deems appropriate.

Respectfully submitted this 21st day of May, 2021.

/s/ Robert J. Sniffen
**ROBERT J. SNIFFEN**
Florida Bar Number: 0000795
rsniffen@sniffenlaw.com
**JEFFREY D. SLANKER**
Florida Bar Number: 0100391
jslanker@sniffenlaw.com
**MATTHEW J. CARSON**
Florida Bar Number: 0827711
mcarson@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Counsel for the Florida State University Board of Trustees*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 21st day of May, 2021, a true and correct copy of the foregoing was electronically filed in the Florida E-Courts Filing Portal to all counsel of record.

*/s/ Robert J. Sniffen*
**ROBERT J. SNIFFEN**

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

**HARRISON BROER, Individually and on
Behalf of all others similarly situated,**

      Plaintiff,

v.                                    **Case No.: 2021 CA 000859**

**FLORIDA STATE UNIVERSITY
and FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, as the public
body corporate of Florida State University,**

      Defendant.

_____/

## NOTICE OF APPEARANCE AND E-MAIL DESIGNATION

      **PLEASE TAKE NOTICE** that Robert J. Sniffen of Sniffen & Spellman, P.A., hereby enters his appearance as counsel of record for **FLORIDA STATE UNIVERSITY and FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, as the public body corporate of Florida State University** ("FSU" or "Defendant"). All correspondence, pleadings, notices, and other materials filed or issued in this cause should be directed to the undersigned as counsel of record at the address listed below.

      Pursuant to Rule 2.516, Florida Rules of Judicial Administration, counsel hereby designates the following primary and secondary e-mail addresses for service of all documents in this proceeding:

Primary Email address:                rsniffen@sniffenlaw.com
Secondary Email addresses:         gjennings@sniffenlaw.com
                                   mcarson@sniffenlaw.com
                                   lkiser@sniffenlaw.com
                                   jslanker@sniffenlaw.com
                                   crauh@sniffenlaw.com
                                   lfountain@sniffenlaw.com

rdyson@sniffenlaw.com
jeubanks@sniffenlaw.com
mrodriguez@sniffenlaw.com
mherring@sniffenlaw.com
hmckinney@sniffenlaw.com

Dated this 21st day of May, 2021.

Respectfully submitted,

/s/ *Robert J. Sniffen*
**ROBERT J. SNIFFEN**
Florida Bar Number: 0000795
rsniffen@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Counsel for Florida State University and Florida
State University Board of Trustees*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 21st day of May, 2021, a true and correct copy of the foregoing was electronically filed in the Florida E-Courts Filing Portal to all counsel of record.

/s/ *Robert J. Sniffen*
**ROBERT J. SNIFFEN**

IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA

**HARRISON BROER, Individually and on
Behalf of all others similarly situated,**

     Plaintiff,

v.                                       **Case No.: 2021 CA 000859**

**FLORIDA STATE UNIVERSITY
and FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, as the public
body corporate of Florida State University,**

     Defendant.

_____/

### FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES' MOTION TO DISMISS CLASS ACTION COMPLAINT OR, IN THE ALTERNATIVE, MOTION FOR JUDGMENT ON THE PLEADINGS AND SUPPORTING MEMORANDUM OF LAW

     Defendant, **FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES** ("FSU"), by and through its undersigned counsel and pursuant to Fla. R. Civ. P. 1.140(b) and (c), moves to dismiss the Class Action Complaint ("Complaint") filed by Plaintiff, **HARRISON BROER** ("Plaintiff" or "Broer"), with prejudice or, in the alternative, moves for judgment on the pleadings. (See, § III, *infra*). Additionally, because FSU's dispositive motion to dismiss (or for judgment on the pleadings) seeks the disposal of the named Plaintiff's claims with prejudice, dismissal of the class claims is appropriate as well. (See, § IV, *infra*).

**I.    SUMMARY OF THE CASE AND BASES FOR DISMISSING AND STRIKING THE SECOND AMENDED COMPLAINT**

     1.    Plaintiff filed this action on May 10, 2021, on behalf of himself and other similarly situated FSU students. Fairly summarized, Plaintiff complains that the class is owed a *pro rata* refund of fees and tuition paid from the Spring 2020 semester onward because of public

safety measures taken by FSU to protect the university community from the COVID-19 pandemic by moving from in-person to virtual instruction. (Compl. at ¶¶ 1, 5, 77).[1]

2.    The Complaint contains two (2) counts, as follows:

**Count I**        **Breach of Contract**

**Count II**        **Unjust Enrichment**

3.    Florida university boards of trustees are expressly included in the definition of "state agency and or subdivision" in Section 768.28(2), Florida Statutes, and therefore are guaranteed the sovereign immunity protections and limitations provided for in Article X, Section 13 of the Florida Constitution, subject to the limited waiver contained in Section 768.28, Florida Statutes. *See*, § 768.28(5), Fla. Stat. (2020).

4.    Importantly, sovereign immunity in Florida is the rule, not the exception. A waiver of sovereign immunity must be strictly and narrowly construed, and may not be arrived at by inference or implication. Moreover, the defense of sovereign immunity is a defense directed to the subject matter jurisdiction of the Court.

5.    The Complaint filed in this case is subject to dismissal with prejudice or, alternatively, to an order granting judgment on the pleadings because:

---

[1]    The Complaint names both the Florida State University Board of Trustees and Florida State University as Defendants. It is improper to sue "Florida State University" since the Florida Legislature has made it clear that university boards of trustees are the proper entities with the power to sue and be sued. *See*, § 1001.72(1), Fla. Stat. (2020). Thus, "Florida State University" must be dismissed from this action, since it is not a party capable of being sued. *See*, *Hui Li v. Univ. of Florida Bd. of Trustees*, No. 1:14-cv-236-RS-GRJ, 2015 WL 1781578, at *2 (N.D. Fla. Apr. 20, 2015) ("The program is governed by Defendant University of Florida Board of Trustees, which is the only University of Florida entity with the capacity to be sued." (citing § 1001.72(1), Fla. Stat.); *U.S. E.E.O.C. v. Fla. Gulf Coast Univ.*, No. 2:06-cv-326-FtM-29SPC, 2007 WL 2077577, at *2 (M.D. Fla. July 6, 2007) ("The Court concludes that The Gulf Coast University Board of Trustees is the proper party, and that The Gulf Coast University should be dismissed.").

2

**(a)**      There is no contract between Plaintiff and FSU−let alone an express contract−thereby dictating dismissal of Plaintiff's breach of contract claim based upon sovereign immunity. (Count I) (See, § III(A), *infra*).

**(b)**      Unjust enrichment claims are also barred by sovereign immunity. (Count II) (See, § III(B), *infra*).

**(c)**      Additionally, the Florida Legislature did not create a cause of action for alleged overpayments of application and orientation fees, and did not waive sovereign immunity with respect to such claims. (All Counts Against FSU) (See, § III(C), *infra*).

**(d)**      Finally, even assuming, *arguendo*, the reasons stated above are not sufficient grounds for dismissal of Plaintiff's claims, and accepting all of the allegations of the Complaint as true, the voluntary payment doctrine acts as a bar to Plaintiff's claims. (See, § III(D), *infra*).

6.      Inasmuch as Plaintiff's claims are subject to dismissal with prejudice (or judgment on the pleadings), the class action claims should also be dismissed. (See, § IV, *infra*).

## II.      STANDARDS OF REVIEW

### A.      <u>Motions to Dismiss</u>

"Florida is a fact-pleading jurisdiction." *Cont'l Baking Co. v. Vincent*, 634 So. 2d 242, 244 (Fla. 5th DCA 1994). "Mere statements of opinions or conclusions unsupported by specific facts will not suffice." *Brandon v. Pinellas Cnty.*, 141 So. 2d 278, 279 (Fla. 2d DCA 1962) (citations omitted). "To state a cause of action, a complaint must allege sufficient ultimate facts to show that the pleader is entitled to relief." *Samuels v. King Motor Co. of Ft. Lauderdale*, 782 So. 2d 489, 495 (Fla. 4th DCA 2001) (citations omitted). Florida law requires plaintiffs to plead every fact essential to their cause of action "distinctly, definitely, and clearly." *Ocala Loan Co. v.*

*Smith*, 155 So. 2d 711, 716 (Fla. 1st DCA 1963). *See also*, *Beckler v. Hoffman*, 550 So. 2d 68, 70 (Fla. 5th DCA 1989) ("We find these allegations to be too general and vague and conclusory and therefore, insufficient."). The defense of sovereign immunity is appropriately considered on a motion to dismiss. *City of Gainesville v. State, Dept. of Transp.*, 778 So. 2d 519, 531 (Fla. 1st DCA 2001); *Charity v. Bd. of Regents of Div. of Univ. of Fla. Dep't of Educ.*, 698 So. 2d 907 (Fla. 1st DCA 1997) (en banc).

    **B.**    **Motions for Judgment on the Pleadings**

A motion for judgment on the pleadings is governed by the same legal test as a motion to dismiss for failure to state a cause of action. *Henao v. Prof'l Shoe Repair, Inc.*, 929 So. 2d 723, 725 (Fla. 1st DCA 2006).

**III.**    **ARGUMENT AND AUTHORITY – MOTION TO DISMISS AND MOTION FOR JUDGMENT ON THE PLEADINGS**

    **A.**    **Plaintiff's Breach of Contract Claim Fails Because There is no Contract Between the Parties and Certainly no "Express Contract" Sufficient to Overcome Sovereign Immunity**

    **1.**    **There is no Express Contract**

Plaintiff has not attached the express contract guaranteeing him the return of student fees in the event virtual instruction is substituted for in-person instruction for any reason, let alone a worldwide pandemic. Rule 1.130, Florida Rules of Civil Procedure requires as much; however, even putting that Rule aside, at a basic level, for an enforceable contract to exist, there must be a meeting of the minds on terms which are: (1) absolute and unconditional; (2) identical with the terms of the offer; and (3) in the mode, at the place, and within the time expressly or impliedly stated within the offer. An acceptance must contain an assent - or meeting of the minds - to the essential terms contained in the offer. *E.g.*, *Central Properties, Inc. v. Robbinson*, 450 So. 2d

277, 280 (Fla. 1st DCA 1984); _Greater New York Corp. v. Cenvill Miami Beach Corp._, 620 So. 2d 1068, 1070 (Fla. 3d DCA 1993) (citations omitted). "The rule is generally recognized that for the parties to have a contract, there must be reciprocal assent to certain and definite propositions." _Truly Nolen, Inc. v. Atlas Moving & Storage Warehouses, Inc._, 125 So. 2d 903, 905 (Fla. 3d DCA 1961).

"An express contract is an actual agreement between the parties, the terms of which are openly uttered or declared at the time of formation." _Jenks v. Bynum Transp., Inc._, 104 So. 3d 1217, 1223 (Fla. 1st DCA 2012); _see generally_, Ballentine's Law Dictionary (2010 ed.) (defining "express contract" as "a contract which expresses the intentions of the parties in words."); _Baron v. Osman_, 39 So. 3d 449, 451 (Fla. 5th DCA 2010) ("A contract based on the parties' words is characterized as express, whereas a contract based on the parties' conduct is said to be implied in fact."). The formation of an express contract "depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties having meant the same thing but on their having said the same thing." _Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp._, 302 So. 2d 404, 407 (Fla. 1974) (quoting _Gendzier v. Bielecki_, 97 So. 2d 604, 608 (Fla. 1957)).

Here, Plaintiff has not alleged concrete facts demonstrating a meeting of the minds or the existence of an express written contract sufficient to overcome sovereign immunity. Plaintiff has not established his absolute and unconditional acceptance of an "express offer" by FSU to return payment of student fees under certain conditions, nor can he do so. _See, e.g._, _Shaffer v. George Washington Univ._, 2021 WL 1124607, at *2-*3 (D. D.C. March 21, 2021) (rejecting breach of contract claim in a similar action on motion to dismiss and noting "plaintiffs do not identify any

language or other evidence, in these university documents or elsewhere, indicating GW's intent to be bound to provide in-person instruction.").

Numerous courts have held that the nature of the relationship between a college or university student and a public institution is not that of an express contractual relationship. _Williams v. Florida State University_, No. 4:11-cv-350-MW/CAS, 2014 WL 340562, at *5-*6 (N.D. Fla. 2014) (applying sovereign immunity and holding a student's relationship with a university is an implied, not an express, written contract), _aff'd sub nom_, _Williams v. Becker_, 608 Fed. App'x 905 (11th Cir. 2015); _Pinkston v. University of South Florida Board of Trustees_, 2019 WL 1383467 at 3-4 (M.D. Fla. 2019) (citing _Williams_ and concluding that no express contractual relationship exists between a Florida university and its students); _Hamke v. Univ. of Central Fla._, No.: 10-cv-1828-ORL-19KRS, 2011 WL 881699, at ¶¶ (E)(1)-(4) (M.D. Fla. Feb. 7, 2011) (describing the nature of student and public post-secondary institutions).

Even in cases in which a signed writing is in place, courts have refused to find that a contract exists between a public university and its students. _See_, _Acosta v. District Board of Trustees of Miami-Dade Community College_, 905 So. 2d 226, 228 (Fla. 3d DCA 2005). In _Acosta_, the Third District Court of Appeal held that no contract existed between students in a medical assistant program and Miami-Dade Community College, despite the fact that the students were provided an acceptance letter – that they signed – which outlined specific program costs. _Id._ After the students were accepted, the college increased the fees charged to the students. _Id._ The student-plaintiffs sued the college for breach of contract. _Id._ In reaching its conclusion, the court noted "[t]he rule is generally recognized that for the parties to have a contract, there must be reciprocal assent to certain and definite propositions. _Id._ It is well established that a

meeting of the minds of the parties on all essential elements is a prerequisite to the existence of an enforceable contract." *Id.*[2]

Simply stated, there is no enforceable written contract between Plaintiff and FSU. And because there is no *express contract* between the parties, as § III(A)(2) *infra* makes clear, Plaintiff's breach of contract claim is barred by sovereign immunity.

### 2.    The Breach of Contract Claim is Barred by Sovereign Immunity

Even if an implied contractual relationship existed between Plaintiff and FSU, Plaintiff's breach of contract claim still fails and should be dismissed because the Florida Legislature has not waived sovereign immunity from suits alleging the breach of an implied, unwritten contract. "The doctrine of sovereign immunity, which provides that a sovereign cannot be sued without its permission, … was a part of the English common law when the State of Florida was founded and has been adopted and codified by the Florida Legislature." *American Home Assurance Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 471 (Fla. 2005); *City of Key West v. Florida Keys Community College*, 81 So. 3d 494, 497 (Fla. 3d DCA 2012) (citing *Am. Home Assurance Co.*). In Florida, "sovereign immunity is both an immunity from liability ***and an immunity from suit***." *Florida Highway Patrol v. Jackson*, 288 So. 3d 1179, 1185 (Fla. 2020) (emphasis added).

Article I, Section 13 of the Florida Constitution authorizes the Florida Legislature to waive the state's sovereign immunity "by general law." Only the Florida Legislature has authority to enact a general law that waives the state's sovereign immunity. *Am. Home Assurance Co.*, 908 So. 2d at 471 (citing *Manatee County v. Town of Longboat Key*, 365 So. 2d 143, 147

---

[2]  For private universities, an implied contract can arise between a student and the institution in certain limited circumstances. *See*, *Jallali v. Nova Southeastern University*, 992 So. 2d 338, 342 (Fla. 4th DCA 2008) (*citing John v. Stetson Univ. v. Hunt*, 102 So. 637, 640 (Fla. 1924)); *Univ. of Miami v. Militana*, 184 So. 2d 701, 704 (Fla. 3d DCA 1966); *Salerno v. Florida Southern College,* Case No. 8:20-cv-1494-30SPF, 2020 WL 5583522 (M.D. Fla. Sept. 16, 2020).

(Fla.1978)).

The state's limited waiver of sovereign immunity is codified in Section 768.28, <u>Florida Statutes</u>, which provides:

> In accordance with s. 13, Art. X of the State Constitution, the state, for itself and for its agencies or subdivisions, hereby waives sovereign immunity for liability for torts, but only to the extent specified in this act.

"In Florida, sovereign immunity is ***the rule, rather than the exception***…" <u>Pan–Am Tobacco Corp. v. Dep't of Corr.</u>, 471 So. 2d 4, 5 (Fla. 1984) (emphasis added); <u>City of Key West</u>, 81 So. 3d at 497. It is well established that "any waiver [of sovereign immunity] must be clear and unequivocal." <u>Am. Home Assurance Co.,</u> 908 So. 2d at 471–72 (citing <u>Longboat Key</u>, 365 So. 2d at 147; <u>Rabideau v. State</u>, 409 So. 2d 1045, 1046 (Fla. 1982)). Legislative waivers of sovereign immunity must be strictly construed. <u>Id.</u> (citing <u>Longboat Key</u>, 365 So. 2d at 147); *see also*, <u>*Hightower v. Fla. Dept. of Highway Safety and Motor Vehicles*</u>, -- So. 3d --, 2020 WL 5988204 at *2 (Fla. 1st DCA Oct. 9, 2020). Accordingly, "waiver will not be found as a product of inference or implication." <u>Id.</u> (citing <u>Spangler v. Fla. State Tpk. Auth.</u>, 106 So. 2d 421, 422 (Fla.1958)).

Furthermore, the defense of sovereign immunity asserted herein is a defense directed to the subject matter jurisdiction of the Court. *See*, <u>Wallace v. Dean</u>, 3 So. 3d 1035, 1045 n.14 (Fla. 2009); <u>Brevard County v. Morehead</u>, 181 So. 3d 1229, 1233 (Fla. 5th DCA 2015) (applying sovereign immunity to unjust enrichment, quantum meruit and implied contract claims, and finding circuit court lacked subject matter jurisdiction over them). Therefore, since FSU has not waived sovereign immunity, this Court lacks subject matter jurisdiction to hear Plaintiff's breach of contract claim.

There is no question FSU is a public entity for purposes of the limited waiver of sovereign immunity set forth in Article X, Section 13 of the Florida Constitution and Section 768.28, Florida Statutes. *See*, § 768.28(2), Fla. Stat. (2020). Therefore, FSU cannot be sued for breach of contract in the absence of an express, written contract.

In Florida, the seminal case regarding state sovereign immunity in contract actions is *Pan-Am Tobacco v. Dep't of Corr.*, 471 So. 2d 4 (Fla. 1984). In *Pan Am*, the Florida Supreme Court explained that while the Florida Legislature waived sovereign immunity for tort actions, there was "no analogous waiver in contract." *Id.* at 5. Although the Court held that sovereign immunity will not protect a state agency from an action arising from a breach of a contract legislatively authorized by general law, a situation not present here, the Court emphasized that its holding was specifically limited "to suits on express, written contracts into which the state agency has statutory authority to enter." *Id.* at 5-6; *See also*, *Charity*, 698 So. 2d at 907-08 (applying sovereign immunity to bar breach of contract claim by student who was prevented from pursuing a doctoral degree); *Williams*, 2014 WL 340562 *5-*6 (student's breach of contract claim against university barred by sovereign immunity because "[w]hile a student's relationship with his university is contractual in nature, it is an implied contract and not an express, written contract.").

Student fees are established in Section 1009.24, Florida Statutes. The fact that the Legislature set specific fees to charge for these activities is not evidence of the existence of an express written contract, nor is it a clear, positive, unequivocal waiver of sovereign immunity. Quite the contrary. The decision in *City of Key West*, 81 So. 3d 494 is on point. There, a community college sought declaratory relief, establishing that it enjoyed sovereign immunity from suit for non-payment of stormwater fees the city was statutorily authorized to charge. *Id.*

9

The Third District Court of Appeal held the college was entitled to sovereign immunity and the mere fact that the applicable statute allowed municipalities to collect charges from entities served by its public works facilities was not evidence of the Legislature's intention to waive sovereign immunity. _Id._ at 497.

 Here, the non-existence of an express written contract between Plaintiff and FSU is a fundamental deficiency that is fatal to Plaintiff's breach of contract claim and cannot be cured with an amendment. Accordingly, this Court should dismiss Count I, **_with prejudice_**, as any attempt at amendment would be futile. _See_, _Charity_, 698 So. 2d at 607 (affirming trial court's order dismissing breach of contract claim with prejudice and noting "[w]e…hold that failure to allege the existence of an express written contract was properly considered on the motion to dismiss...We also hold that the trial court properly dismissed the complaint because it failed to allege an express written contract.") (citing, _inter alia_, _Pan Am_, 471 So. 2d at 6); _See also_, _City of Gainesville._, 778 So. 2d at 531 (citing _Charity_, _supra_, and holding the lack of an express written contract is properly considered on a motion to dismiss).

### B.  Sovereign Immunity Bars Plaintiff's Unjust Enrichment Claim

Because Plaintiff has no viable breach of contract claim against FSU as a matter of law, he attempts to assert an unjust enrichment claim. This claim fares no better.

Plaintiff's claim for unjust enrichment must also be dismissed, with prejudice. Plaintiff's unjust enrichment claim complains of the same actions as the breach of contract claim, and is pled in the alternative to the extent it is determined a contract does not exist or otherwise apply. (Compl. at ¶¶ 90-91).  "[A] claim for unjust enrichment is an equitable claim based on a legal fiction which implies a contract as a matter of law even though the parties to such an implied contract never indicated by deed or word that an agreement existed between them." _14th &_

_Heinberg, LLC v. Terhaar and Cronley General Contractors, Inc._, 43 So. 3d 877, 880 (Fla. 1st DCA 2010).

As set forth above, Plaintiff must establish the existence of an express, written contract, rather than an implied contract, in order to overcome the sovereign immunity bar. Because an unjust enrichment claim is necessarily based on an implied contract, sovereign immunity bars the claim, and dismissal with prejudice is required.  _See_, _City of Ft. Lauderdale v. Israel_, 178 So. 3d 444, 447-48 (Fla. 4th DCA 2015) (claim for unjust enrichment barred by sovereign immunity); _Morehead_, 181 So. 3d at 1232-33 (holding that sovereign immunity barred claims for unjust enrichment, quantum meruit and implied contract,  stating: "When an alleged contract is merely implied … sovereign immunity protections remain in force."). _Calderone v. Scott_, No. 2:14-cv-519-FtM-29CM, 2015 WL 1800315 at *2 (M.D. Fla. April 16, 2015); ("Because unjust enrichment claims are not torts, Florida's legislature has not waived sovereign immunity pursuant to Fla. Stat. § 768.28."); _Brandt v. Public Health Trust of Miami-Dade County_, No. 10–22376–CIV, 2010 WL 4062798 at *1 (S.D. Fla. Oct. 15, 2010) (finding sovereign immunity barred unjust enrichment claim and plaintiff's claim that Section 768.28 waived immunity for such claims was "frivolous").[3]

Last fall, the Second District Court of Appeal considered whether unjust enrichment claims are subject to sovereign immunity. _Lee Memorial Health Sys. v. Hilderbrand_, 304 So. 3d 58 (Fla. 2nd DCA 2020). There, a class action complaint asserting an unjust enrichment claim was filed on behalf of former patients of Lee Memorial Health System, who contended they were due a refund of medical bills collected under a claim of lien statute that was declared

---

[3]    While not binding or even persuasive authority, ironically in the very Order from the 11th Judicial Circuit upon which Plaintiff makes much ado throughout the Complaint, the circuit court found that sovereign immunity bars unjust enrichment claims. (_See_, Compl. at Ext. A).

unconstitutional. *Id.* at 59. Based upon its status as a public entity, Lee Health filed a motion to dismiss asserting sovereign immunity. *Id.* at 60. The trial court accepted a report and recommendation of a magistrate that found sovereign immunity did not apply to the plaintiffs' unjust enrichment claim. *Id.* The Second District reversed the trial court's order denying sovereign immunity. In so doing, the court held that unless the monies at issue were extracted in direct contravention of a direct legislative mandate (i.e., a statute expressly prohibiting the extraction), or the public entity ignored clearly established law prohibiting the tax or fine assessed, sovereign immunity bars unjust enrichment claims. *Id.* at 61-62.

By imposing the legal fiction required to state a valid unjust enrichment claim and finding that sovereign immunity has been waived, this Court would run headlong into the mandate that waivers of sovereign immunity must be strictly construed and may not be arrived at by "inference or implication." *Spangler.*, 106 So. 2d at 422; *Hightower*, -- So. 3d --, 2020 WL 5988204 at *2. Respectfully, this Court should decline Plaintiff's request that it do so. Moreover, the student fees at issue in this litigation were not "extracted" by FSU in violation of a statutory mandate or by violating clearly established law prohibiting the collection of student fees or any portion thereof. *Lee Memorial Health*, 304 So. 3d at 60-61. Accordingly, Count II must also be dismissed with prejudice or, alternatively, judgment on the pleadings should be granted.

C.    **The Florida Legislature Has Not Created a Statutory Cause of Action for the Recovery of Fees**

Plaintiff's attempt to manufacture a cause of action from the statutory rubric requiring the payment of student fees is yet another fundamental reason to dismiss the Complaint with prejudice, or to grant judgment on the pleadings. The recovery of unused or partially unused student fees, or recovery of a *pro rata* share of tuition based upon the subjective feelings of

students who, in the face of a worldwide emergency, feel they were shortchanged, are not the types of concerns that may be pursued as a private cause of action against the Board.

Student tuition and fees are authorized in Section 1009.24, <u>Florida</u> <u>Statutes</u>, which does not authorize a private cause of action for students, parents, or others responsible for paying a student's tuition and fees who are dissatisfied with the fees charged. Simply put, there is no language in Chapter 1009, <u>Florida</u> <u>Statutes</u>, even remotely evidencing an intent by the Legislature to create a private cause of action for recovery of the costs to attend a public university. *See*, <u>*Murthy v. N. Sinha Corp.*</u>, 644 So. 2d 983, 985 (Fla. 1994). "The question of whether a statute establishes a duty to take precautions to protect or benefit a particular class of persons is no longer determinative on the question of whether a cause of action should be recognized." <u>*Sorenson v. Professional Compounding Pharmacists*</u>, 191 So. 3d 929, 934 (Fla. 2d DCA 2016) (citing <u>*Murthy*</u>, 644 So. 2d 985). "[L]egislative intent, rather than the duty to benefit a class of individuals, should be the primary factor considered by a court in determining whether a cause of action exists when a statute does not expressly provide for one." <u>*Id.*</u> at 934.

This is consistent with the rationale for sovereign immunity in the first place, "a doctrine designed to protect the public treasury from what would otherwise be countless claims filed by the vast number of citizens affected by the actions of a government. [Sovereign immunity], at least to the extent retained by the legislature and courts, is a positively necessary and rational safeguard of taxpayers' money." <u>*Southern Roadbuilders, Inc. v. Lee County*</u>, 495 So. 2d 189, 190 n.1 (citing Prosser, Law of Torts 971 (4th Ed. 1971)). Had the Legislature intended a different result, it would have provided the avenue of relief Plaintiff seeks here. It did not.

In fact, in its latest expression of intent on the issue, the Florida Legislature passed HB 1261, which made it clear that public colleges and universities are shielded from liability for

13

actions taken during the COVID-19 pandemic. As of the filing of this Motion, HB 1261 is before Governor DeSantis for consideration and, if signed by the Governor, will become law. *See*, https://www.flsenate.gov/Session/Bill/2021/1261 (last viewed 5/16/2021). Thus, in the legislative session that ended weeks ago, with dozens of cases such as this one pending throughout the State, the Florida Legislature had the opportunity to provide the very cause of action Plaintiff has attempted to construct in the case *sub judice*. Instead of authorizing lawsuits such as this one, the Legislature shielded public colleges and universities from being bankrupted by class action litigation.

It is also notable that there is no express waiver of sovereign immunity for claims asserted based upon the fees established in Section 1009.24, <u>Florida</u> <u>Statutes</u>. Courts may also find a waiver of sovereign immunity based on legislative intent. *E.g.*, <u>*Royal World Metro., Inc. v. City of Miami Beach,*</u> 863 So. 2d 320, 322 (Fla. 3d DCA 2003) ("[W]e find that a fair reading of Section 70.001(1), Florida Statutes, evinces a sufficiently clear legislative intent to waive sovereign immunity...."). That intent does not exist here. Such intent is easily found when the Legislature enacts a statute ***expressly*** waiving sovereign immunity for tort claims, or where the Legislature expressly authorizes the sovereign to enter into contracts, which must have mutuality of remedies to be enforceable.

The lack of an express right to sue FSU is consistent with the rationale for sovereign immunity: "a doctrine designed to protect the public treasury from what would otherwise be countless claims filed by the vast number of citizens affected by the actions of a government. [Sovereign immunity], at least to the extent retained by the legislature and courts, is a positively necessary and rational safeguard of taxpayers' money." <u>*S. Roadbuilders, Inc. v. Lee Cnty.*</u>, 495 So. 2d 189, 190 n.1 (Fla. 2d DCA 1986) (citing Prosser, Law of Torts 971 (4th Ed. 1971)). Had

the Legislature intended a different result, it would have provided the avenue of relief Plaintiff seeks here and, at a minimum, must have included an express waiver of sovereign immunity in Section 1009.24, <u>Florida</u> <u>Statutes</u>.

### D.    <u>The Voluntary Payment Doctrine Bars Plaintiff's Claims</u>

Lastly, Florida's voluntary payment doctrine provides that "money voluntarily paid upon claim of right, with full knowledge of all the facts, cannot be recovered merely because the party, at the time of payment, was ignorant, or mistook the law, as to his liability." *Hall v. Humana Hosp. Daytona Beach*, 686 So.2d 653, 657 n.7 (Fla. 5th DCA 1996), *rev. denied*, 694 So. 2d 738 (Fla. 1997); *Ruiz v. Brink's Home Sec., Inc.*, 777 So. 2d 1062, 1064 (Fla. 2d DCA 2001) ("The voluntary payment doctrine provides that 'where one makes a payment of any sum under a claim of right with knowledge of the facts, such a payment is voluntary and cannot be recovered.'") (citation omitted). "The rule seems to be universal that where one makes a payment of any sum under a claim of right with knowledge of the facts such a payment is voluntary and cannot be recovered." *City of Miami v. Keton*, 115 So.2d 547, 551 (Fla. 1959) (holding that voluntary payment doctrine barred class action suit for a declaratory decree to recover fines paid to city for traffic violations); *see also*, *Sanchez v. Time Warner, Inc.*, No. 98-211-CIV-T-26A, 1998 WL 834345 at *2 (M.D. Fla. Nov. 4, 1998) ("It is a well-recognized rule that money voluntarily paid under a claim of right to the payment, and with knowledge of facts by the person making the payment, cannot be recovered back, and this is true even though the claim thus paid was illegal ....") (quoting *McMullen v. Inland Realty Corp.*, 113 Fla. 476, 482-483, 152 So. 740, 742 (1933)). The foundation of the doctrine is that if a party resists an unjust demand of payment, he must do so at the "threshold." *Id.*

In Florida, "[a]ll payments are presumed to be voluntary until the contrary is made to

appear." *N. Miami v. Seaway Corp.*, 9 So. 2d 705, 707 (Fla. 1942). For a payment to be involuntary, the payor must show "compulsion or coercion" (1) involving an "actual or threatened exercise of power" from which he or she "has no other means of immediate relief than by advancing the money, "[*Hall*, 686 So. 2d at 657 n. 7]; and (2) that is "sufficient to overcome the mind and will of a person of ordinary firmness." *Hassen v. Mediaone of Greater Fla., Inc.*, 751 So. 2d 1289, 1290 (Fla. 1st DCA 2000); *see also*, *Hall*, 686 So. 2d 657 n. 7 (holding that patients' voluntary payment of their bills barred their common law claims absent continuous coercion up to the time of payment).

To meet the threshold requirement of compulsion, the payor must ordinarily object, and pursue alternatives to, payment. *See*, *Keton*, 115 So. 2d at 551. Objecting to the payment is, however, only a first step, and the payor must further show true compulsion to make payment. *See, Seaway*, 9 So. 2d at 707. *See, Easter v. City of Orlando*, 249 So. 2d 723 (Fla. 5th DCA 2018) (affirming denial of class certification pursuant to the voluntary payment doctrine where there was no showing that penalties for non-payment of fines were so severe that they negated protest requirement, and the majority of proposed class members did not protest their fines).

Here, Plaintiff alleges he paid his fees for the Spring 2020 semester. (Compl. at ¶¶ 4, 5). Plaintiff does not allege that he objected to either fee payment at any time prior to filing suit, or that he suffered the type of compulsion required to overcome the voluntary payment doctrine. Simply stated, Broer has failed to allege any ultimate facts sufficient to overcome the presumption that their payments were voluntary, and therefore all Counts should be dismissed with prejudice, or judgment on the pleadings granted.

## IV.    DISMISSAL OF CLASS CLAIMS

Given that this civil action was filed as a putative class action, but has not been certified, a stay of the Court's consideration of the class action allegations is warranted until after the substantive bases for dismissal are fully adjudicated. *See, Newberg on Class Actions* § 7:10 (5th ed.) (due to the early nature of most motions to dismiss, courts will often handle them prior to deciding a motion for class certification); *see also, Hollywood, Inc. v. Broward County*, 90 So. 2d 47 (Fla. 1956) (during the pendency of motions to dismiss, court stayed certain discovery until the dispositive motions were resolved); *Webster v. Royal Caribbean Cruises, Ltd.*, 124 F. Supp. 2d 1317, 1321 (S.D. Fla. 2000) (merits of a motion to dismiss considered prior to any consideration of class certification as "[t]he vast majority of courts have held that dispositive motions may be considered prior to ruling on a motion for class certification.").[4]

Because Plaintiff has failed to state any viable claim in his individual capacity, this Court should dismiss the action before proceeding to class certification inasmuch as dismissal of the claim of the named Plaintiff terminates the civil action, and renders moot the question of whether to certify the case as a class action. *See, Osceola v. Florida Dept. of Revenue*, 893 F. 2d 1231, 1232 (11th Cir. 1990) ("The district court granted the state's motion to dismiss and denied Osceola's motion for class certification because the issue was moot."); *Henley v. Turner Broad. Sys., Inc.*, 267 F. Supp. 3d 1341, 1357 (N.D. Ga. 2017) (when the named Plaintiff lacks a cause of action, the Court should dismiss the action before proceeding to class certification). Indeed, the determination of whether Plaintiff has stated a viable claim - and whether he even has standing to serve as a named plaintiff - represents a threshold inquiry that must be made before

---

[4]    Because Florida's class action rule is based on Federal Rule of Civil Procedure 23, Florida courts look to federal cases as persuasive authority in their interpretation of Rule 1.220. *Seven Hills, Inc. v. Bentley*, 848 So .2d 345, 352–53 (Fla. 1st DCA 2003).

addressing whether the case is properly maintainable as a class action. "A civil action does not become a 'class action' simply because the complaint bears the legend 'class action complaint' or, as required by Florida Rule of Civil Procedure 1.220, 'class representation.'" _Policastro v. Stelk_, 780 So. 2d 989, 991 (Fla. 5th DCA 2001). A named plaintiff who cannot establish the requisite case or controversy cannot seek relief on their own behalf or any other member of the putative class. _Taran v. Blue Cross_, 685 So.2d 1004, 1006 (Fla. 4th DCA 1997).

Moreover, ruling on a motion to dismiss is a more efficient procedure given that it will often render moot the necessity of the Court expending resources ruling on class certification. _See, Newberg on Class Actions_ § 7:9 (5th ed.) Assuming, _arguendo,_ Plaintiff's claims against the Board survive dismissal (which they should not), the Board reserves the right to fully challenge the adequacy and appropriateness of the proposed class at that time.

## V.    CONCLUSION

Payment of student fees is not a "pay as you go", "fee for service" model as Plaintiff would have this Court believe. The fees charged FSU students are mandated by statute and Plaintiff's attempt to recover a _pro rata_ portion of the fees paid for the Spring 2020 and subsequent semesters is barred by sovereign immunity. No amendment can cure this fundamental defect. Accordingly, dismissal of this action with prejudice is required.

Respectfully submitted this 26th day of May, 2021.


[THIS SECTION LEFT INTENTIONALLY BLANK]

Respectfully submitted,

*/s/ Robert J. Sniffen*
**ROBERT J. SNIFFEN**
Florida Bar Number: 0000795
rsniffen@sniffenlaw.com
**JEFFREY D. SLANKER**
Florida Bar Number: 0100391
jslanker@sniffenlaw.com
**MATTHEW J. CARSON**
Florida Bar Number: 0827711
mcarson@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Counsel for Florida State University Board of Trustees*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 26th day of May, 2021, a true and correct copy of the foregoing was electronically filed in the Florida E-Courts Filing Portal to all counsel of record.

*/s/ Robert J. Sniffen*
**ROBERT J. SNIFFEN**

19

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT,
IN AND FOR LEON COUNTY, FLORIDA**

Case No.: 2021 CA 000859

HARRISON BROER, individually and on behalf of
all others similarly situated,

       *Plaintiffs*,

vs.

FLORIDA STATE UNIVERSITY, and
FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES,
AS THE PUBLIC BODY CORPORATE OF
FLORIDA STATE UNIVERSITY,

       *Defendant.*

_____/

**VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE
PURSUANT TO FLORIDA RULE OF GENERAL PRACTICE AND
<u>JUDICIAL ADMINISTRATION 2.510</u>**

      **COMES NOW**, Gregory M. Egleston, Movant herein and respectfully represents the

following:

      1.      Movant resides in Manhattan, New York.

      2.      Movant is not a resident of the State of Florida.

      3.      Movant is an attorney and a member of the law firm of Gainey McKenna &

Egleston with offices at 501 Fifth Avenue, 19th Floor, New York, NY 10017.

      4.      Movant has been retained personally or as a member of the above-named law firm

on or about June of 2021, by Plaintiff to provide legal representation in connection with the above-

styled matter now pending before the above-named court of the State of Florida.

5.      Movant is active member in good standing and currently eligible to practice law in the following jurisdictions and Courts:

| JURISDICTION | ATTORNEY/BAR NUMBER |
|---|---|
| New York State Courts – All<br>Eastern District of New York<br>Southern District of New York<br>Appellate Division – First Judicial Department – New York | 2891455 |
| Connecticut State Courts – All<br>District of Connecticut<br>2nd Circuit Court of Appeals | 415732 |

6.      There have been no disciplinary, suspension, disbarment, or contempt proceedings initiated against Movant.

7.      Movant, either by resignation, withdrawal, or otherwise, has never terminated or attempted to terminate Movant's office as an attorney in order to avoid administrative, disciplinary, disbarment, or suspension proceedings.

8.      Movant is not an inactive member of The Florida Bar.

9.      Movant is not now a member of The Florida Bar.

10.     Movant is not a suspended member of The Florida Bar.

11.     Movant is not a disbarred member of The Florida Bar nor has Movant received a disciplinary resignation from The Florida Bar.

12.     Movant has not previously been disciplined or held in contempt by reason of misconduct committed while engaged in representation pursuant to Florida Rule of Judicial Administration 2.510.

13.     Movant has not filed motion(s) to appear as counsel in Florida state courts during the past five (5) years in the following matters.

2

14.    Local counsel of record associated with Movant in this matter is Joshua H. Eggnatz who is an active member in good standing of The Florida Bar (Bar No. 0067926) and has offices at 7450 Griffin Road, Suite 230, Davie, FL 33314, located in Broward County, FL. Telephone: (954) 889-3359.

15.    Movant has read the applicable provisions of Florida Rule of General Practice and Rule of Judicial Administration 2.510 and Rule 1-3.10 of the Rules Regulating The Florida Bar and certifies that this verified motion complies with those rules.

16.    Movant agrees to comply with the provisions of the Florida Rules of Professional Conduct and consents to the jurisdiction of the courts and the Bar of the State of Florida.

**WHEREFORE**, Movant respectfully requests permission to appear in this court for this cause only.

DATED this 2nd day of June 2021.

*/s/ Gregory M. Egleston*
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
501 Fifth Avenue, 19th Floor
New York, NY 10017
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: egleston@gme-law.com

3

STATE OF NEW YORK

COUNTY OF NEW YORK

I, Gregory M. Egleston, do hereby swear or affirm under penalty of perjury that I am the Movant in the above-styled matter; that I have read the foregoing Motion and know the contents thereof, and the contents are true of my own knowledge and belief.

*/s/ Gregory M. Egleston*
Movant

## LOCAL COUNSEL CONSENT

I hereby consent to be associated as local counsel of record in this cause pursuant to Florida Rule of General Practice and Judicial Administration 2.510.

Dated this 2nd day of June 2021.

*/s/ Joshua H. Eggnatz*
Joshua H. Eggnatz, Esq.
**EGGNATZ PASCUCCI, P.A**.
7450 Griffin Road, Suite 230
Davie, FL 33314
Tel: (954) 889-3359
Fax: (954) 889-5913
Fla. Bar No.: 0067926
Email: JEggnatz@JusticeEarned.com

## CERTIFICATE RE: E-FILING AND E-SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing motion was served by online upload to PHV Admissions, The Florida Bar accompanied by payment of the $250.00 filing fee made payable to The Florida Bar.

I HEREBY CERTIFY that this Verified Motion for Admission to Appear *Pro Hac Vice* Pursuant to Florida Rule of General Practice and Judicial Administration 2.510_was filed electronically in compliance with Florida Rules of Judicial Administration 2.515 and 2.516(e).

I FURTHER CERTIFY that this Motion was served electronically in compliance with Florida Rule of Judicial Administration 2.516(b)(1)(E) to all persons on the Service List on this 2nd day of June, 2021

I FURTHER CERTIFY for purposes of service of any documents after initial process that JEggnatz@JusticeEarned.com is primary, SGizzie@JusticeEarned.com as secondary.

Respectfully submitted,

**EGGNATZ PASCUCCI, P.A.**

By:  _/s/ Joshua H. Eggnatz_
Joshua H. Eggnatz (FBN: 0067926)
7450 Griffin Road, Suite 230
Davie, FL 33314
Tel: (954) 889-3359
Fax: (954) 889-5913
Email: JEggnatz@JusticeEarned.com

-and-

**GAINEY McKENNA & EGLESTON**
Gregory M. Egleston _(Seeking Pro Hac Vice Admission_)
501 Fifth Avenue, 19th Floor
New York, NY 10017
Tel.: (212) 983-1300
Fax: (212) 983-0383
Email: gegleston@gme-law.com

**_Attorneys for Plaintiff_**

5

## SERVICE LIST

Robert J. Sniffen
Fla. Bar No.: 0000795
**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, FL 32301
Tel: (850) 205-1996
Fax: (850) 205-3004
RSniffen@SniffenLaw.com
gjennings@sniffenlaw.com
mcarson@sniffenlaw.com
lkiser@sniffenlaw.com
jslanker@sniffenlaw.com
crauh@sniffenlaw.com
lfountain@sniffenlaw.com
rdyson@sniffenlaw.com
jeubanks@sniffenlaw.com
mrodriguez@sniffenlaw.com
mherring@sniffenlaw.com
hmckinney@sniffenlaw.com

*Counsel for the Florida State University and*
*Florida State University Board of Trustees*

6



THE HONORABLE

# GWEN MARSHALL

CLERK OF THE CIRCUIT COURT AND COMPTROLLER

CLERK OF COURTS • COUNTY COMPTROLLER • AUDITOR • TREASURER • RECORDER

June 03, 2021

Gregory Egleston
C/O Eggnatz, Joshua Harris
1920 N Commerce Pkwy Ste 1
Fort Lauderdale, Fl  33326

Re: Case # 2021 CA 000859

Dear Sir/Madam:

On 06/02/2021, you filed a new case or reopen motion or requested services like copies or recording with this office in the above case.  The paperwork has been processed, but you have not paid the statutorily required fees of $100.00.  Please submit payment to this office within 90 days of the date of this letter.

If we have not received your payment by the date noted, a $25.00 administrative set up fee per FS 28.24(26) will be assessed.  In addition, pursuant to FS 28.246(6), this matter may be referred to a collection law firm, which could add 40% to the amount owed.

Please submit your payment in person or mail payment to the address noted below.  Make sure to reference your case number when presenting payment.

Thank you for your immediate attention to this issue.

Sincerely,

_____
Deputy Clerk

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT,
IN AND FOR LEON COUNTY, FLORIDA**

Case No.: 2021 CA 000859

HARRISON BROER, individually and on behalf of
all others similarly situated,

       *Plaintiffs*,

   vs.

FLORIDA STATE UNIVERSITY, and
FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES,
AS THE PUBLIC BODY CORPORATE OF
FLORIDA STATE UNIVERSITY,

       *Defendant.*

_____/

## PLAINTIFF'S DESIGNATION OF E-MAIL ADDRESS AND CHANGE OF ADDRESS

       PLEASE TAKE NOTICE that the undersigned hereby appears as Attorney of Record on

behalf of Plaintiff, HARRISON BROER, in the above-styled cause, and requests that copies of all

pleadings, notices and correspondence, etc., be furnished to them in accordance therewith.

Pursuant to Fla. R. Jud. Admin. 2.516 the undersigned hereby designates their primary and

secondary address for the service of court documents in this matter as follows:

             Primary:          JEggnatz@JusticeEarned.com

             Secondary:     Sgizzie@JusticeEarned.com

I certify that my current mailing address is 7450 Griffin Road, Suite 230, Davie, FL 33314,

Telephone: 954-889-3359 and Facsimile: 954-889-5913.

Dated: June 4, 2021                    Respectfully submitted,

                                       **EGGNATZ PASCUCCI, P.A.**

                                       By: */s/ Joshua H. Eggnatz*
                                       Joshua H. Eggnatz (FBN: 0067926)
                                       7450 Griffin Road, Suite 230
                                       Davie, FL 33314
                                       Tel: (954) 889-3359
                                       Fax: (954) 889-5913
                                       Email: JEggnatz@JusticeEarned.com

                                       -and-

                                       **GAINEY McKENNA & EGLESTON**
                                       Gregory M. Egleston *(Pro Hac Vice Pending)*
                                       501 Fifth Avenue, 19th Floor
                                       New York, NY 10017
                                       Tel.: (212) 983-1300
                                       Fax: (212) 983-0383
                                       Email: gegleston@gme-law.com

                                       ***Attorneys for Plaintiff***

## CERTIFICATE RE: E-FILING AND E-SERVICE

I FURTHER CERTIFY that the foregoing was served electronically in compliance with Florida Rule of Judicial Administration 2.516(b)(1)(E) to all persons on the Service List on this **4th day of June 2021**

## SERVICE LIST

Robert J. Sniffen
Fla. Bar No.: 0000795
**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, FL 32301
Tel: (850) 205-1996
Fax: (850) 205-3004

RSniffen@SniffenLaw.com
gjennings@sniffenlaw.com
mcarson@sniffenlaw.com
lkiser@sniffenlaw.com
jslanker@sniffenlaw.com
crauh@sniffenlaw.com
lfountain@sniffenlaw.com
rdyson@sniffenlaw.com
jeubanks@sniffenlaw.com
mrodriguez@sniffenlaw.com
mherring@sniffenlaw.com
hmckinney@sniffenlaw.com

*Counsel for the Florida State University and
Florida State University Board of Trustees*

Case 4:21-cv-00328-AW-MAF    Document 1-1    Filed 08/06/21    Page 82 of 163

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT,
IN AND FOR LEON COUNTY, FLORIDA**

Case No.: 2021 CA 000859

HARRISON BROER, individually and on behalf of
all others similarly situated,

       *Plaintiffs,*

  vs.

FLORIDA STATE UNIVERSITY, and
FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES,
AS THE PUBLIC BODY CORPORATE OF
FLORIDA STATE UNIVERSITY,

       *Defendant.*

_____/

### ORDER GRANTING VERIFIED MOTION FOR ADMISSION TO APPEAR PRO HAC VICE PURSUANT TO FLORIDA RULE OF JUDICIAL ADMINISTRATION 2.510 OF GREGORY M. EGLESTON

This matter is before the Court on Gregory M. Egleston's Verified Motion for Admission

to Appear *Pro Hac Vice*, filed June 02, 2021 pursuant to Florida Rule of Judicial Administration

2.510, and it appearing to this Court that Gregory M. Egleston, is well taken,

    **IT IS HEREBY ORDERED AND ADJUDGED** that said motion is GRANTED.

Gregory M. Egleston is permitted to appear *Pro Hac Vice* in this cause of action.

    **DONE AND ORDERED** in Leon County, Florida, this _____ day of June 2021.

                                _____

                                J. LAYNE SMITH
                                CIRCUIT JUDGE

Copies furnished to:
Counsel of Record

Case 4:21-cv-00328-AW-MAF     Document 1-1     Filed 08/06/21     Page 83 of 163

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

**HARRISON BROER, Individually and on
Behalf of all others similarly situated,**

      Plaintiff,

v.                                    **Case No.: 2021 CA 000859**

**FLORIDA STATE UNIVERSITY
and FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, as the public
body corporate of Florida State University,**

      Defendant.

_____/

## DEFENDANT'S NOTICE OF HEARING

      YOU ARE HEREBY NOTIFIED that on **Thursday, August 19, 2021**, at **3:30 p.m.**, or as soon thereafter as counsel may be heard, the undersigned will bring on to be heard **Defendant's Motion to Dismiss, or in the Alternative, Motion for Judgment on the Pleadings and Supporting Memorandum of Law**, before the Honorable Judge J. Layne Smith, Circuit Court Judge, Leon County Courthouse, 301 South Monroe Street, Suite 301C, Tallahassee, Florida 32301. One (1) hour has been set aside for this hearing. **All parties will appear via Zoom.**

      Join Zoom Meeting
      https://zoom.us/j/92028058594?pwd=VDc4eWIvelRIb0ZQaHFkeTFLYUxKdz09

      Meeting ID: 920 2805 8594
      Passcode: 936018
      One tap mobile
      +17866351003,,92028058594#,,,,*936018# US (Miami)
      +16465588656,,92028058594#,,,,*936018# US (New York)

      Dial by your location
      +1 786 635 1003 US (Miami)
      +1 646 558 8656 US (New York)

*AMERICANS WITH DISABILITIES ACT*

In accordance with the Americans with Disabilities Act (ADA), persons in need of a

special accommodation to participate in this proceeding shall, within a reasonable time before

any proceeding, contact Counsel for Defendant.

Dated this 9th day of June, 2021.

Respectfully submitted,

/s/ *Robert J. Sniffen*
**ROBERT J. SNIFFEN**
Florida Bar Number: 0000795
rsniffen@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Counsel for Florida State University and Florida State University Board of Trustees*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 9th day of June, 2021, a true and correct copy of the foregoing was electronically filed in the Florida E-Courts Filing Portal to all counsel of record.

/s/ *Robert J. Sniffen*
**ROBERT J. SNIFFEN**

2

Case 4:21-cv-00328-AW-MAF    Document 1-1    Filed 08/06/21    Page 85 of 163

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

**HARRISON BROER, Individually and on
Behalf of all others similarly situated,**

    **Plaintiffs,**

v.                                                     **Case No.: 2021 CA 000859**

**FLORIDA STATE UNIVERSITY
and FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, as the public
body corporate of Florida State University,**

    **Defendants.**

_____/

## NOTICE OF APPEARANCE AND E-MAIL DESIGNATION

**PLEASE TAKE NOTICE** that Jeffrey D. Slanker of Sniffen & Spellman, P.A., hereby

enters his appearance as counsel of record for Defendants, **FLORIDA STATE UNIVERSITY**

**and FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, as the public body**

**corporate of Florida State University** ("FSU" or "Defendant"). All correspondence, pleadings,

notices, and other materials filed or issued in this cause should be directed to the undersigned as

counsel of record at the address listed below.

Pursuant to Rule 2.516, Florida Rules of Judicial Administration, counsel hereby

designates the following primary and secondary e-mail addresses for service of all documents in

this proceeding:

Primary Email address:             jslanker@sniffenlaw.com
Secondary Email addresses:      gjennings@sniffenlaw.com
                                   crauh@sniffenlaw.com

Dated this 8th day of June 2021.

/s/*Jeffrey D. Slanker*
**JEFFREY D. SLANKER**
Florida Bar Number: 100391
jslanker@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Counsel for Florida State University and Florida State University Board of Trustees*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 8th day of June 2021, a true and correct copy of the foregoing was electronically filed in the Florida E-Courts Filing Portal to all counsel of record.

/s/*Jeffrey D. Slanker*
**JEFFREY D. SLANKER**

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

**HARRISON BROER, Individually and on
Behalf of all others similarly situated,**

    Plaintiffs,

v.                                                      **Case No.: 2021 CA 000859**

**FLORIDA STATE UNIVERSITY
and FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, as the public
body corporate of Florida State University,**

    Defendants.

_____/

## NOTICE OF APPEARANCE AND E-MAIL DESIGNATION

**PLEASE TAKE NOTICE** that Matthew J. Carson of Sniffen & Spellman, P.A., hereby

enters his appearance as co-counsel of record for the Defendants, **FLORIDA STATE**

**UNIVERSITY and FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, as the**

**public body corporate of Florida State University.** All correspondence, pleadings, notices, and

other materials filed or issued in this cause should be directed to the undersigned as counsel of

record at the address listed below.

Pursuant to Rule 2.516, Florida Rules of Judicial Administration, counsel hereby

designates the following primary and secondary e-mail addresses for service of all documents in

this proceeding:

Primary Email address:               mcarson@sniffenlaw.com
Secondary Email addresses:        lkiser@sniffenlaw.com
                                    hmckinney@sniffenlaw.com

Dated this 8th day of June, 2021.

Respectfully submitted,

/s/ *Matthew J. Carson*
**MATTHEW J. CARSON**
Florida Bar Number: 0827711
mcarson@sniffenlaw.com

**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004

*Counsel for Florida State University and*
*Florida State University Board of Trustees*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 8th day of June, 2021, a true and correct copy of the foregoing was electronically filed in the Florida E-Courts Filing Portal to all counsel of record.

/s/ *Matthew J. Carson*
**MATTHEW J. CARSON**



# LEON COUNTY Receipt of Transaction
## Receipt #    1574865

GWEN MARSHALL
Clerk of Court and Comptroller
LEON COUNTY, FLORIDA

**Received From:**
EGGNATZ PASCUCCI PA
7450 GRIFFIN RD STE 230
DAVID, FL  33314

**On Behalf Of:**
JOSHUA HARRIS EGGNATZ

7450 GRIFFIN ROAD, SUITE 230
DAVIE, FL  33314

On: 6/9/2021  8:52:10AM
Transaction # 100837568
Cashiered by: Y SMITH
Payment Location: MAIL PAYMENT

| CaseNumber  2021 CA 000859 |
|---|

**Judge   J LAYNE SMITH**

**HARRISON BROER  *VS*  FLORIDA STATE UNIVERSITY**

Comments:

| Fee Description | Fee | Prior Paid | Waived | Due | Paid | Balance |
|---|---|---|---|---|---|---|
| (COMP_CA) COMPLAINT | 400.00 | 400.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| (SUIS) SUMMONS ISSUED | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| (SUIS) SUMMONS ISSUED | 10.00 | 10.00 | 0.00 | 0.00 | 0.00 | 0.00 |
| (PHVF) PRO HAC VICE FEE | 100.00 | 0.00 | 0.00 | 100.00 | 100.00 | 0.00 |
| Total: | 520.00 | 420.00 | 0.00 | 100.00 | 100.00 | 0.00 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Grand Total: | 520.00 | 420.00 | 0.00 | 100.00 | 100.00 | 0.00 |

| PAYMENTS |
|---|

| Payment Type | Reference | | Amount | Refund | Overage | Change | Net Amount |
|---|---|---|---|---|---|---|---|
| CHECK | 1235 | OK | 100.00 | 0.00 | 0.00 | 0.00 | 100.00 |
| | Payments Total: | | 100.00 | 0.00 | 0.00 | 0.00 | 100.00 |

Case 4:21-cv-00328-AW-MAF   Document 1-1   Filed 08/06/21   Page 90 of 163

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

**HARRISON BROER, Individually and on
Behalf of all others similarly situated,**

      Plaintiff,

v.                                         **Case No.: 2021 CA 000859**

**FLORIDA STATE UNIVERSITY
and FLORIDA STATE UNIVERSITY
BOARD OF TRUSTEES, as the public
body corporate of Florida State University,**

      Defendant.

_____/

## DEFENDANT'S NOTICE OF CANCELLATION OF HEARING

YOU ARE HEREBY NOTIFIED that the undersigned cancels the Zoom hearing scheduled

for **Thursday, August 19, 2021**, at **3:30 p.m.**, on Defendant's Motion to Dismiss, or in the

Alternative, Motion for Judgment on the Pleadings and Supporting Memorandum of Law, before

the Honorable Judge J. Layne Smith, Circuit Court Judge.

Dated this 22nd day of July, 2021.

                                Respectfully submitted,

                                _/s/ Robert J. Sniffen_
                                **ROBERT J. SNIFFEN**
                                Florida Bar Number: 0000795
                                rsniffen@sniffenlaw.com

                                **SNIFFEN & SPELLMAN, P.A.**
                                123 North Monroe Street
                                Tallahassee, Florida 32301
                                Telephone: (850) 205-1996
                                Facsimile: (850) 205-3004

                                _Counsel for Florida State University and Florida
State University Board of Trustees_

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 22nd day of July, 2021, a true and correct copy of the foregoing was electronically filed in the Florida E-Courts Filing Portal to all counsel of record.

/s/ *Robert J. Sniffen*
**ROBERT J. SNIFFEN**

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

**CASE NO.: 2021 CA 000859**

| | |
|---|---|
| HARRISON BROER, Individually and On Behalf Of All Others Similarly Situated, | **AMENDED CLASS ACTION COMPLAINT** |
| Plaintiff, | **JURY TRIAL DEMANDED** |
| v. | |
| FLORIDA STATE UNIVERSITY, and FLORIDA STATE UNIVERSITY BOARD OF TRUSTEES, AS THE PUBLIC BODY CORPORATE OF FLORIDA STATE UNIVERSITY, | |
| Defendants. | |

Plaintiff Harrison Broer, individually and on behalf of all others similarly situated (collectively, the "Class," as more fully defined below), brings this amended class action complaint against Defendants Florida State University ("FSU" or the "University") and Florida State University Board of Trustees ("FBOT", and collectively, "Defendants"). Plaintiff makes the following allegations upon personal knowledge as to his own acts, and upon information and belief, and his attorneys' investigation, as to all other matters, alleging as follows:

**I.    NATURE OF THE ACTION**

1.    This is a class action brought on behalf of all people who paid fees for tuition and other services for the Spring 2020 academic semester or any future semester at the University and who, because of Defendants' response and policies relating to the Novel Coronavirus Disease 2019 ("COVID-19") pandemic, had their educational experiences and class(es) moved to online learning and lost the benefits of the on-campus services for which their fees were paid, without

having a fair and pro-rated portion of those fees refunded to them in full and without condition.

2.      There is no question that classroom learning—and all the experiences that come with on-campus education—is more valuable to students than online learning. Students and their families pay—and borrow—hundreds of thousands of dollars for the on-campus experience because it provides the students the opportunity to engage directly with their professors and instructors, to meet and share experiences with diverse and accomplished individuals from around the world, to join student clubs, to build professional networks, and to experience the campus environment. Online learning does not offer these opportunities and carries few of the massive expenses associated with live classroom learning. After COVID-19, Plaintiff and members of the proposed Class were deprived of the opportunity, services, and experiences for which they paid.

3.      Plaintiff and Defendants entered into express contract(s) where Plaintiff and members of the proposed Class would provide payment for the fees charged for tuition and other services and Defendants would provide in-person educational services, experiences, opportunities, access to campus facilities and other related services.

4.      Plaintiff and members of the proposed Class paid Defendants as agreed, but FSU has not refunded any amount of the fees for tuition or any other related services, even though it canceled in-person classes on or about March 11, 2020, and unilaterally began the transition to online only learning.

5.      Because of the University's response to COVID-19, on or about March 11, 2020, the University also stopped providing services or facilities that the other fees were intended to cover.

6.      The University's failure to provide the services for which it was paid since approximately March 11, 2020 constitutes a breach of the contracts between the University and

Plaintiff and the members of the proposed Class and is unjust.

7.     In short, Plaintiff and the members of the proposed Class have all paid multiple fees for an on-campus education and an on-campus, in person educational experience and use of campus facilities, with all the appurtenant benefits offered by a major state university.  Instead, students like Plaintiff were provided a materially different alternative, which constitutes a breach of the contracts entered into by Plaintiff with the University.

8.     In the alternative, Defendants' retention of these fees for tuition and other services without providing those services in return is unjust, results in inverse condemnation, and/or is an unconstitutional and unjust taking of property.

9.     In addition, Plaintiff and the members of the proposed Class paid fees for services and access to and/or use of facilities that were simply not provided. This failure also constitutes a breach of the contracts entered into by Plaintiff (and separately, each member of the proposed Class) with FSU.

10.     In the alternative, the retention of these fees without providing these services is unjust, results in inverse condemnation, and/or is an unconstitutional taking of property.

11.     Rather than offer partial refunds, credits, or discounts to students like Plaintiff and members of  the proposed Class and balance the financial difficulties associated with COVID-19, Defendants have instead elected to place the financial burden entirely upon its students by charging them full fees for tuition and other services when the services FSU provided were not the full educational and on-campus opportunities, experiences, and services that Plaintiff and members of the proposed Class agreed to and reasonably expected.

12.     Plaintiff challenges Defendants' decision to retain monies paid by students like Plaintiff and refusal to offer any refunds, provide any discounts, or apply any credit to Plaintiff

and members of the proposed Class's financial accounts when Defendants failed to provide the in-person and on-campus services that were bargained for, promised and agreed to.

13.    Colleges and universities, including FSU, must be able to separately account for student payments, as well as financial aid received on an individual student's behalf, as these institutions are frequently required to issue refunds to the government and the student for instances where the student enrolls, but does not complete classes for which the institution has received financial aid payments from the federal government. The Higher Education Act ("HEA"), Title IV, governs federally funded student financial aid programs for college and post-secondary vocational training.  See 20 U.S.C. §§ 1070–1099 (1990 & 1992 Supp.).  The HEA requires that when a student withdraws partway through the enrollment period, the institution must refund a certain portion of the charges to account for its reduced educational obligations toward the student. *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1269 (D.C. Cir. 1996).  Thus, it is beyond dispute that any college or university receiving any fees for tuition or other services through government-provided financial aid must be able to account for what was paid for each individual student.  This means that each student's funds must be capable of being separately identified and sequestered.

14.    "Should there be a reimbursement back to the students?" Roy L. Waymaster, R-Bunker Hill, 109th Kansas House District state representative and chairman of the Appropriations Committee, asked himself "Yeah, I think there should be."[1]

15.    Plaintiff seeks, for himself and members of the proposed Class, an award of contract damages and/or the University's disgorgement and return of the pro-rated portion of the fees paid for tuition and other fees, proportionate to the amount of time in the respective semesters when the

---

[1]    Northwestern, Georgetown, Princeton, American University, and John Hopkins University have all provided refunds of 10% of students' tuition for the Fall 2020 semester after going fully virtual; and Williams College 15%.  https://www.marketwatch.com/story/more-colleges-are-reversing-course-and-going-remote-after-covid-19-outbreaks-and-some-are-now-reducing-tuition-11599076746.)

University closed and/or restricted campus access and switched to online only learning. The return of such amounts would compensate Plaintiff and the members of the proposed Class for damages sustained by way of Defendants' breach.

16.    Plaintiff seeks for himself and members of the proposed Class protections including injunctive and declaratory relief protecting members of the proposed Class from paying the full cost of fees for tuition and other services during the pendency of COVID-19 in light of the educational services, opportunities, and experiences Defendants can actually safely provide.

17.    Plaintiff and members of the proposed Class are entitled to a pro-rated refund of fees for tuition and other services for the duration of Defendants' COVID-19 related closures for the in-person education and on-campus services and opportunities that Plaintiff and members of the proposed Class have been denied.

18.    Courts have agreed:

> The Court further rejects Barry's materiality and damages arguments. Both arguments are predicated on the notion that, if a breach existed with respect to the transition to online teaching, it was de minimis, since Rosado would still earn credits toward a diploma. This is kind of like purchasing a Cadillac at full price and receiving an Oldsmobile. Although both are fine vehicles, surely it is no consolation to the Cadillac buyer that the "Olds" can also go from Point A to Point B. That is Barry's argument and the Court declines to consider it further.

*Rosado v. Barry Univ. Inc.*, No. 1:20-CV-21813, 2020 U.S. Dist. LEXIS 204355, 2020 WL 6438684, at *4 (S.D. Fla. Oct. 30, 2020).

19.    Defendants' performance under the contracts is not excused because of COVID-19. Even if performance were excused or impossible, Defendants would nevertheless be required to return the funds received for services and/or goods that it did not provide.

20.    Plaintiff is informed and believes and thereon alleges that FBOT is the final authority concerning waivers of fees charged to students at the University and, accordingly, is

5

ultimately responsible and liable for Defendants' decision not to order fair and pro-rated refunds of these monies.

## II.    PARTIES

### A.    Plaintiff

21.    Plaintiff Harrison Broer ("Plaintiff") is a Florida citizen, residing in Auburndale, Florida.  He was a student at the Florida State University College of Law in Tallahassee, Florida and paid, directly or indirectly, fees for tuition and other services for the Spring 2020 semester.

22.    Plaintiff paid said fees for the entire Spring 2020 semester, the benefits of which he did not receive because of the University's decision to close campus and deny the services contracted for by Plaintiff and the proposed Class.  Plaintiff has neither been offered nor provided a refund of said fees.

23.    Plaintiff is not suing to recover monies paid by taxes to the University; rather, Plaintiff files suit against FBOT, a corporate body that may be sued, for specific disgorgement of fees paid by students and their parents, guardians, and families for services not received.  Florida does not have sovereign immunity for breach of contract suits in its own courts.  *See, e.g.*, *Pan-Am Tobacco Corp. v. Dep 't of Corr.*, 471 So.2d 4, 5 (Fla. 1984) ("[W]here the state has entered into a contract fairly authorized by the powers granted by general law, the defense of sovereign immunity will not protect the state from action arising from the state's breach of that contract.")

### B.    Defendants

24.    Defendant Florida State University ("FSU" or the "University") is a public research university with its main campus in Tallahassee, Leon County, Florida.  It is a senior member of the State University System of Florida and traces its origins to 1851.

25.    Defendant Florida State University Board of Trustees ("FBOT") is the public body

corporate of the University. It sets policy for the institution and serves as the institution's legal owner and governing board. The Board of Trustees holds the institution's resources in trust and is responsible for their efficient and effective use. The thirteen-member Board of Trustees is composed of six members appointed by the Governor, five members appointed by the Florida Board of Governors, the Chair of the Faculty Senate and the President of the Student Body. Plaintiff is informed and believes and thereon alleges that FBOT is located in Tallahassee, Leon County, Florida.

## III.    JURISDICTION AND VENUE

26.    This is an action for damages and the amount in controversy exceeds this Court's minimum jurisdictional amount ($30,000 exclusive of interest, costs, and attorney's fees) and because more than two-thirds of the proposed class in the aggregate and FBOT are citizens of Florida. Further, the Plaintiff in this matter seeks declaratory relief as appropriate.

27.    This Court has personal jurisdiction over FBOT because it resides in Leon County, Florida. Additionally, all of the transactions and occurrences alleged herein, including Defendants' breaches and retention of Plaintiff's and class members' monies occurred within the State of Florida.

28.    Venue is proper in this District pursuant to section 47.011, Florida Statutes, because Defendants are located in Leon County, Florida, and because of Florida's common law home venue privilege.

29.    All conditions precedent have been satisfied, including Plaintiff satisfying all applicable pre-suit notice requirements. There is no adequate remedy, administrative or otherwise, available to Plaintiff and members of the proposed class, except through the judicial process of the court.

## IV.    FACTS

### A.  <u>Background</u>

30.    For American students, higher education is often the ticket to a more prosperous future. Compared to those with only high school diplomas, individuals with bachelor's degrees make more money[2] and are also more likely to be employed.[3]  A postsecondary degree also comes with many nonfinancial benefits.[4]

31.    For many postsecondary students, however, higher education offers more than just a diploma and the promise of a better life upon graduation.  Indeed, research shows that students also go to college for the specific on-campus experience they will receive while they pursue their degrees.  For example, a 2015 survey found that, when deciding which college to attend, 81 percent of students consider the school's location, 35 percent consider the student clubs, groups, and organizations available, and 23 percent consider the school's athletics or sports teams.[5]

32.    Students also value "college consumption amenities," including attractive living and recreational facilities.[6]  For this reason, colleges and universities have engaged in a so-called

---

[2]    Jennifer Ma, et al., *Education Pays* 2019: The Benefits of Higher Education for Individuals and Society (2019), https://research.collegeboard.org/pdf/education-pays-2019-full-report.pdf (In 2018, bachelor's degree holders with no advanced degree and working full-time made median annual earnings $24,900 higher than their peers with only high school diplomas.).

[3]    Jennifer Ma, et al., *Education Pays 2019: The Benefits of Higher Education for Individuals and Society* (2019), https://research.collegeboard.org/pdf/education-pays-2019-full-report.pdf ("The unemployment rate for individuals age 25 and older with at least a bachelor's degree has consistently been about half of the unemployment rate for high school graduates.").

[4]    *See* https://www.aplu.org/projects-and-initiatives/college-costs-tuition-andfinancial-aid/publicuvalues/employment-earnings.html (For instance, bachelor's degree holders are 47 percent more likely to have health insurance provided through their employers and can expect to live seven years longer than those with no postsecondary education).

[5]    Rachel Fishman, 2015 *College Decisions Survey: Part I: Deciding to Go to College* (2015), https://www.luminafoundation.org/files/resources/deciding-to-go-tocollege.pdf.

[6]    Brian Jacob, et al., *College as Country Club: Do Colleges Cater to Students' Preferences for Consumption?* (2013), https://www.nber.org/system/files/working_papers/w18745/w18745.pdf.

"amenities arms race" by "spending billions of dollars building and equipping facilities meant to lure students to their campuses.[7]

33.     That so many students deferred attending college altogether following COVID-19-related campus closures further supports the conclusion that students pursue higher education not only to obtain a degree, but also to receive an on-campus experience, complete with appurtenant opportunities, resources, and amenities.[8]

34.     Due to the many benefits of higher education—both on-campus and lifelong—American students pursue advanced degrees in droves, with roughly 19.7 million students attending colleges and universities in fall 2020.[9]  And they do so despite sharply rising costs:

35.     During the 1978 - 1979 school year, it cost the modern equivalent of $17,680 per year to attend a private college and $8,250 per year to attend a public college. By the 2008 - 2009 school year those costs had grown to $38,720 at private colleges and $16,460 at public colleges. [In 2019], those costs are closer to $48,510 and $21,370, respectively. That means costs increased by roughly 25.3% at private colleges and about 29.8% at public colleges.[10]

36.     Not only have annual increases to the cost of higher education outpaced inflation[11] but, overall, in the last twenty years, "published college tuition has increased in price more than

---

[7]     Michael T. Nietzel, *Students Begin To Top The Brakes On The Campus Amenities Arms Race*, <u>Forbes</u> (Nov. 5, 2018), <u>https://www.forbes.com/sites/michaeltnietzel/2018/11/05/students-begin-totap-the-brakes-on-the-campus-amenities-arms-race/</u>.

[8]     Scott Jaschik, *Nervous Freshmen, Nervous Colleges, Inside Higher Ed* (Aug. 10, 2020) <u>https://www.insidehighered.com/admissions/article/2020/08/10/survey-40-percent-freshmen-may-not-enroll-any-four-year-college</u> (explaining that 40 percent of surveyed incoming freshmen who aspired to attend a four-year residential college said that they are likely or highly likely to not attend any four-year college in fall 2020).

[9]     *See* <u>https://nces.ed.gov/fastfacts/display.asp?id=372#College_enrollment</u>

[10]     Abigail Johnson Hess, *The cost of college increased by more than 25% in the last 10 years—here's why*, <u>CNBC</u> (Dec. 13, 2019), <u>https://www.cnbc.com/2019/12/13/cost-of-college-increased-by-more-than-25percent-in-the-last-10-years.html</u>.

[11]     Tom Lindsay, *New Study: Despite Nonstop Talk Of 'Making College More Affordable,' Tuition Continues To Outpace Inflation*, <u>Forbes</u> (Jan. 29, 2020),

any other good or service besides hospital care."[12]  During the 2019-2020 academic year, costs continued to rise: The average cost of tuition, fees, room and board was, at public universities, $21,950 for in-state students and $38,330 for out-of-state students, and $49,870 at private universities.[13]

37.     Because public colleges and universities rely heavily on state and local tax revenue, and saw significant budget cuts following the Great Recession, these schools have raised their prices even more than their private counterparts.[14]  According to the College Board, between the late 1980s to 2018, the cost of an undergraduate degree rose by 213% at public schools, compared to only 129% at private schools, adjusting for inflation.[15]  Students attending Florida's public institutions have been hit especially hard:  Since the 2008 school year alone, Florida public colleges and universities have increased their published tuition by more than 60%, well above the national average of 37%.[16]  All told, since the turn of the century, the net price of attendance at an American public four-year college has more than doubled.[17]

---

https://www.forbes.com/sites/tomlindsay/2020/01/29/new-studydespite-nonstop-talk-of-making-college-more-affordable--tuition-continuesto-outpace-inflation/.

[12]     Preston Cooper, *A New Study Investigates Why College Tuition Is So Expensive*, Forbes (Aug. 31, 2020),     https://www.forbes.com/sites/prestoncooper2/2020/08/31/a-new-studyinvestigates-why-college-tuition-is-so-expensive/.

[13]     Abigail Johnson Hess, *How student debt became a $1.6 trillion crisis*, CNBC (June 12, 2020), https://www.cnbc.com/2020/06/12/how-studentdebt-became-a-1point6-trillion-crisis.html.

[14]     Michael Mitchell, et al., *State Higher Education Funding Cuts Have Pushed Costs to Students, Worsened Inequality* (2019), https://www.cbpp.org/sites/default/files/atoms/files/10-24-19sfp.pdf ("While states have been reinvesting in higher education for the past few years, resources remain well below 2008 levels — 13 percent lower per student — even as state revenues are now well above pre-recession levels.").

[15]     Shannon Insler, *Do Millennials Have It Better or Worse Than Generations Past?*, Student Loan Hero     (May     30,     2018),     https://studentloanhero.com/featured/millennials-have-better-worse-thangenerations-past/.

[16]     Michael Mitchell, et al., *State Higher Education Funding Cuts Have Pushed Costs to Students*, Worsened Inequality (2019), https://www.cbpp.org/sites/default/files/atoms/files/10-24-19sfp.pdf.

[17]     Preston Cooper, *A New Study Investigates Why College Tuition Is So Expensive*, Forbes (Aug. 31, 2020),     https://www.forbes.com/sites/prestoncooper2/2020/08/31/a-new-studyinvestigates-why-college-tuition-is-so-expensive/.

38.    As a result, the cost of postsecondary education, especially at public colleges and universities, has progressively shifted to students and their families.[18]  By 2017, the average net price of a public four-year institution accounted for 23% of a family's median household income.[19] As the cost of higher education becomes a greater burden on individual households, students are increasingly turning to loans.  Today, approximately 70% of college students graduate with debt, with an average balance of around $30,000—up from $10,000 in the early 1990s.[20]

39.    In Florida, the average balance is even higher, at $35,496.[21]  Overall, approximately 44 million Americans collectively hold more than $1.6 trillion in student debt.[22]  People refer to this situation as a student debt "crisis" for good reason, as the impacts of student debt are far-reaching, both on individual borrowers and society more broadly.  For example, student debt makes it more difficult to buy a home[23], start a business[24], or save for retirement.[25]  In addition,

---

[18]    Michael Mitchell, et al., *State Higher Education Funding Cuts Have Pushed Costs to Students, Worsened Inequality* (2019), https://www.cbpp.org/sites/default/files/atoms/files/10-24-19sfp.pdf

[19]    Michael Mitchell, et al., *State Higher Education Funding Cuts Have Pushed Costs to Students, Worsened Inequality* (2019), https://www.cbpp.org/sites/default/files/atoms/files/10-24-19sfp.pdf.

[20]    Annie Nova, Less than 11% of people with federal student debt are repaying their loans during Covid, CNBC (Oct. 7, 2020), https://www.cnbc.com/2020/10/07/less-than-11percent-of-people-withfederal- studentloans-are-paying-during-covid-19-.html.

[21]    Kelsey Sunderland, *Floridians have some of the highest student debt in the country*, WFLA (Dec. 17, 2020), https://www.wfla.com/news/education/floridians-have-some-of-the-higheststudent-debt-in-the-country/.

[22]    Abigail Johnson Hess, *How student debt became a $1.6 trillion crisis*, CNBC (June 12, 2020), https://www.cnbc.com/2020/06/12/how-studentdebt-became-a-1point6-trillion-crisis.html.

[23]    Annie Nova, Here's why millions of millennials are not homeowners, CNBC (Jul. 11, 2018), https://www.cnbc.com/2018/07/09/these-are-thereasons-why-millions-of-millennials-cant-buy-houses.html ("The researchers at the Urban Institute found that if a person's education debt went from $50,000 to $100,000, their chance of homeownership will decline by 15 percentage points.").

[24]    Annie Nova, *How student debt came to define people's lives*, CNBC (Dec. 28, 2019), https://www.cnbc.com/2019/12/28/how-student-debtcame-to-define-peoples-lives-in-the-2010s.html  ("A person with $30,000 in student debt is more than 10% less likely to start a business than a person who graduated debt-free.").

[25]    Annie Nova, *How student debt came to define people's lives*, CNBC (Dec. 28, 2019), https://www.cnbc.com/2019/12/28/how-student-debtcame-to-define-peoples-lives-in-the-2010s.html ("By the time college graduates turn 30, those without education debt are predicted to have double the amount saved for retirement as those with the debt, according to the Center for Retirement Research at Boston College.").

one survey found that over one-fifth of student borrowers have delayed getting married and more than one-quarter have pushed back having children.[26]

40.     In sum, "[o]nerous debt burdens make it more difficult for students to reach economic stability, costing resources that could instead go towards paying rent, saving for emergencies, or investing in the future."[27]   Moreover, student debt comes with the very real risk of default.  Indeed, more than 30% of student loan borrowers are currently in default, are late on their payments, or have stopped making payments altogether.[28]   Default impacts an individual's credit rating, which in turn makes it more difficult to secure future loans, housing, or even employment.[29]   Finally, student loans can lead borrowers to bankruptcy: "A recent study conclude[d] that 32% of Americans filing for bankruptcy have student loan debt, and of that group, student loan debt comprised 49% of their total debt on average.[30]

41.     It is against this backdrop that, during the Spring 2020 term, millions of students across the nation's public colleges and universities paid their invoices for tuition and fees.  FSU students were no exception.

42.     Plaintiff and other FSU students fulfilled their end of the contract by paying their invoices for the Spring 2020 term (and subsequent terms that the FSU cancelled in-person instruction), which included fees for tuition and for live on-campus and in-person instruction and

---

[26]     Abigail Johnson Hess, *How student debt became a $1.6 trillion crisis*, CNBC (June 12, 2020), https://www.cnbc.com/2020/06/12/how-studentdebt-became-a-1point6-trillion-crisis.html.

[27]     Michael Mitchell, et al., *State Higher Education Funding Cuts Have Pushed Costs to Students, Worsened Inequality* (2019), https://www.cbpp.org/sites/default/files/atoms/files/10-24-19sfp.pdf.

[28]     Abigail Johnson Hess, *How student debt became a $1.6 trillion crisis*, CNBC (June 12, 2020), https://www.cnbc.com/2020/06/12/how-studentdebt-became-a-1point6-trillion-crisis.html.

[29]     Michael Mitchell, et al., *State Higher Education Funding Cuts Have Pushed Costs to Students, Worsened Inequality* (2019), https://www.cbpp.org/sites/default/files/atoms/files/10-24-19sfp.pdf.

[30]     Hillary Hoffower, *An astounding number of bankruptcies are being driven by student loan debt*, Business Insider (June 13, 2019), https://www.businessinsider.com/people-filing-for-personal-bankruptcycarry-student-loan-debt-2019-6.

line items for specific student fees that were required to be paid in order for Plaintiff and other FSU students to have access to on-campus and in-person activities and services, technology, and laboratories, among other things. However, FSU failed to provide the contracted-for live in-person instruction and use of/access to its facilities and resources. Especially because many FSU students took out life-altering loans or otherwise experienced financial hardship to pay their invoiced fees (fulfilling their end of the bargain to Defendants), combined with the reality that many of these students will never receive degrees for their sacrifices, it is only lawful, and only fair, that FSU's contracts with its students be enforced.

### B. The Terms of the Parties' Agreement

43.     FSU is a public research university. The university is comprised of 16 separate colleges and more than 110 centers, facilities, labs and institutes that offer more than 360 programs of study, including professional school programs. FSU's main campus is in Tallahassee, Florida and it has a satellite campus in Panama City, Florida. FSU includes a College of Law and a College of Medicine and offers year-round Florida State study centers in Panama City, Mexico, London, England, Florence, Italy, and Valencia, Spain.

44.     FSU has admitted the benefits of the on-campus experience stating "[s]ome of the most memorable experiences for Florida State University students happen outside of the classroom."

45.     Plaintiff was enrolled as a full-time student for the Spring 2020 academic semester at the University in its College of Law.

46.     Plaintiff and members of the proposed Class as more fully defined hereunder are individuals that agreed to pay fees for tuition and other services for the Spring 2020 semester, and/or any future semester to the University.

47.     As a precondition for enrollment, Plaintiff was required to and did pay substantial fees for tuition for the Spring 2020 semester either out of pocket or by utilizing student loan financing, as did all members of the proposed Class (defined below).

48.     Defendants accepted Plaintiff's and members of the proposed Class' payments in exchange for in-person educational services, experiences, opportunities and access to campus facilities as detailed in Defendants' marketing, advertisements, and other public representations.

49.     The University offers both an in-person and online curriculum.  Plaintiff and members of the proposed Class did not choose to attend another institution of higher learning, but instead chose to attend FSU and enrolled on an in-person basis with significantly high fees and registered for in-person classes.

50.     All students attending FSU entered into an express contract with FSU by (1) completing and submitting an application for admission to FSU, (2) providing all required information and materials in support of the application for admission, (3) receiving an offer of admission to FSU, (4) accepting FSU's offer of admission, (5) registering for on-campus and in-person classes, (6) complying with the school's rules and regulations as to good standing, and (7) paying fees to FSU for tuition and other services for use of the on-campus and in-person classes and facilities for which they registered.

51.     By way of example, Plaintiff's agreement with Defendants was initially established with Plaintiff's application for admission to the University sent to Defendants, and Defendants' offer of admission to FSU sent to Plaintiff.  Defendants' offer of admission sent to Plaintiff is attached hereto as **Exhibit A**.  As stated therein in relevant part:

> Congratulations!  It is our great pleasure to admit you to the entering class at Florida State University College of Law.  We hope you accept our offer!....
> ***
> Please review the enclosed information carefully as it contains pertinent deadlines

14

and additional documentation required to accept your seat at the College of law.

52.    On or about April 8, 2019, Plaintiff accepted Defendants' offer of admission by fulfilling the requirements of Defendants' offer of admission. See **Exhibit B**. As stated therein in relevant part:

> "I accept Florida State University College of Law's offer of admission…"
> ***
> "Submit your seat deposit payment directly to Student Business Services"

53.    The scope of the agreement between Plaintiff and Defendants was formed throughout the application process, admission, enrollment, registration, and payment – including through all the documents and materials shared and agreed to during those processes.  By way of example only, FSU Regulation FSU-2.0249 provides in relevant part:

> Students incurring tuition and fees greater than $150.00 are eligible to execute an installment fee payment agreement for the Fall and Spring semesters only.

54.    By enrolling in courses and paying his fees for tuition and other services for the Spring 2020 semester, Plaintiff provided consideration for and accepted the Regulations and Policies established by Defendants and governing fees for tuition and other services.  On its website at https://regulations.fsu.edu/, Defendants define "Regulations" and "Policies" as:

> **University Regulations** are adopted by the Board of Trustees and are university-wide "laws". Regulations must be consistent with federal and state law and BOG Regulation.
>
> **Policies** are adopted by the President or Vice Presidents under the specific executive authorities granted to the President by the FSU Board of Trustees. Policies generally involve more detailed matters of procedure and matters not specifically addressed in state law or BOG or FSU Regulation.  FSU Policies may not conflict with State and Federal law, BOG Regulation or FSU Regulation.

55.    Regarding fees for tuition and other services, the FSU Regulations state in relevant part:

> **FSU-2.024 Tuition and Fees**.

15

The following tuition and fees shall be levied and collected in U.S. dollars for each student regularly enrolled, unless specifically provided otherwise […]

*** 

**FSU-2.0247 Tuition and Fee Liability**.

(1)    Tuition and fee liability shall be defined as the liability for the payment of tuition incurred at the point at which the student has completed registration, as defined in paragraphs FSU-2.024(2)(a), (b), F.A.C., above.

(2)    A student becomes liable for his/her tuition and fees upon registration.

56.    Additional agreements between Plaintiff and Defendants are bills provided by Defendants to students (including Plaintiff), invoices provided by Defendants to students (including Plaintiff), and other written policies requiring students to make specific fee payments in exchange for certain services.

57.    Additionally, while not presently in Plaintiff's possession, based upon information and belief, students must sign financial responsibility and registration agreements as a condition of registration that require payment of all fees for student and services after the add/drop period, makes students responsible for all charges posted on their account, and that authorizes or acknowledges Defendants' right to seek collection actions against students (including Defendants' attorneys' fees incurred in such collection efforts) in the event of non-payment.

58.    Plaintiff and members of the proposed Class agreed to apply, enroll, register, and pay to be part of Defendants' on-campus community and receive the in-person and on-campus educational services. The parties had the reasonable expectation that, in exchange for tuition and fee payments, Defendants would provide Plaintiff and members of the proposed Class with an on-campus education. At the time of registration for classes, students register for specific on-campus classes offered by Defendants by course number, students then accept those offers by registering

and then paying for those classes in exchange. The nature of the instruction provided by FSU at the time Plaintiff and members of the proposed Class enrolled (i.e., in-person classroom instruction) as well as the facilities and resources offered by FSU were and are material terms of the bargain and contractual relationship between students and Defendants.

59.    Plaintiff and members of the proposed Class registered and paid for classes by course number and class number that were offered for in-person and on-campus instruction.

60.    These contracts are express written agreements between Plaintiff and members of the proposed Class and the University and are further constituted by these bills provided to students, invoices provided to students, and other written documents and policies requiring students to make specific fee payments in exchange for certain services (e.g., see **Exhibit C**) (stating that overdue account may "be eligible for placement with a third-party collection agency and assessed collection fees up to 33% of the total outstanding balance").

61.    Although Plaintiff does not have all of the documents constituting the express contracts currently in his possession (*e.g.*, his application, course catalogs, mission statements, student handbooks, all bills/invoices for the relevant periods, registration agreements), Plaintiff should be given the opportunity to establish the contracts' existence by discovery directed to Defendants, who certainly have these express contracts in their sole and exclusive possession. *See, e.g.*, *Amiker v. Mid-Century Ins. Co.*, 389 So. 3d 974 (Fla. 1st DCA 1981).

62.    Plaintiff and members of the proposed Class did not enter into an agreement with Defendants for online education, but rather agreed to pay for and receive in-person education and access to campus facilities from the University. Defendants call their online degree programs "Distance@FSU" which has its own separate FSU website, https://distance.fsu.edu/.

63.    Defendants were unable to provide in-person educational experiences, services,

opportunities and access to campus facilities for approximately 50% of the Spring 2020 semester.

C.    **Defendants' Response To COVID-19**

64.    On March 2, 2020, the University announced that spring semester programs at Florida State University's Study Center in Florence, Italy were canceled, and preparations were underway to close the Florence Study Center no later than March 9, 2020.

65.    On March 11, 2020, the University announced that all its courses would shift to online instruction only, starting March 23 and remain in this format for at least two weeks.  This announcement added that on March 14, 2020 residence halls would close at noon to visitors and for those residents who depart for spring break. It added that residents who stayed may remain in the halls.

66.    On March 12, 2020, FSU Athletics announced that all FSU athletic competitions and events would be suspended until further notice.  On that date FSU also announced that it was postponing or canceling external speakers and groups scheduled to perform on campus.

67.    On March 17, 2020, FSU Athletics announced the cancelation of all spring sports seasons, cancelation of its annual spring football game along with the post-game concert, all athletics-related banquets and award ceremonies through the spring semester.  On that date FSU also announced that it was following CDC guidance for gatherings and crowds, and that campus events were canceled until at least May 3, 2020.

68.    On March 17, 2020, FSU also announced that all classes previously taught in-person would be delivered remotely for the remainder of the 2020 spring semester.

69.    On March 19, 2020, FSU's president John Thrasher announced that FSU had canceled the previously scheduled spring 2020 commencement ceremonies.

70.    On March 23, 2020, FSU announced that all courses for FSU's Summer Sessions

18

A, B, F, and Law (8 week) would be conducted remotely.

71. On March 25, 2020, FSU announced a modification of its grading policy. It stated that undergraduate courses that used letter grades would continue to use letter grades but that students may individually opt to receive a Satisfactory/Unsatisfactory (S/U) grade for eligible courses rather than a letter grade. However, students were instructed that they may not opt for S/U status after 11:59 p.m. ET Sunday, April 12, 2020.

72. On March 26, 2020 and in acknowledgment of the financial hardship COVID-19 was causing its students, FSU announced that the FSU Foundation launched an emergency fundraising effort ". . . aimed at helping students struggling due to financial fallout from the COVID-19 pandemic." It further stated that "[a]ll funds will go to FSU students and will cover a variety of needs from medical bills, rent, living expenses and technology to help distance learning."

73. On March 26, 2020, FSU also announced that the University would implement a Student Refund Plan for students who had paid or been assessed housing and dining charges for the Spring 2020 semester and were no longer utilizing these services. This announcement explicitly acknowledged FSU's agreements with its students and stated in relevant part:

- March 23, 2020 is considered the last service date for housing and meal plans.

- For University Housing residents, we will refund the respective spring semester rate per individual resident based on their number of unutilized bed nights and the specific rate for the residence hall in which they lived.

- For students on the Residential Dining Services All-Access Meal Plan, we will refund the respective spring semester rate per unused days and Flex Bucks. Block Meal Plans will be refunded based on the unused meal balance and Flex Bucks. Garnet Bucks will automatically roll over based on the Meal Plan Terms and Conditions.

•     Refunds will be applied to students' university accounts. Any university balance will be paid prior to the refund being disbursed.

•     Acceptance of the refunds will constitute full resolution of the student's residence hall and meal plan agreements.

We expect to electronically issue refunds the week of April 6. This will allow us time to calculate refund amounts and ensure all refunds are compliant with financial aid rules . . . .

74.     On April 8, 2020, FSU issued a reminder to students about their deadline to opt to receive a Satisfactory/Unsatisfactory (S/U) grade for eligible courses rather than a letter grade. FSU included the following additional information:

•     Students may select to change one or all of the eligible undergraduate classes in which they are enrolled. There is no requirement that students change any course if they wish to continue receiving a letter grade for any or all of their eligible undergraduate classes.

•     Students should consult with their instructors as to what constitutes an "S" or "U" in each class as it may be different.

•     The grading policy for graduate courses will not change. All graduate courses will receive letter grades.

•     Students in professional programs should check with their respective colleges for any grading policy changes.

75.     FSU's notices to its students regarding opting for a S/U grade was silent as to the implications of electing such an option. Instead, the notices provided yet another link for its students to follow.

76.     Defendant FBOT knew of and was kept apprised of FSU's changes to the delivery of courses (from in-person to online) and the impact on extracurricular activities as evidenced by the FBOT March 23, 2020 meeting minutes, which state in relevant part:

**IV.   PRESIDENT'S REPORT**

*Mr. John Thrasher, President*

President Thrasher provided an update in regards to the University's efforts during the COVID-19 pandemic. Today, ***March 3rd, was the first day of remote online teaching/classes***. Many of the professors are doing live teaching through ZOOM. ZOOM was used for Cabinet meeting and President Thrasher joined a Chemistry class using.  Administration is working with faculty to determine grading options.

FSU currently has approximately 180 students remaining on campus. Staff is continuing to work with these students and assist them with their needs.

***Spring graduation has been cancelled*** and administration hopes to have spring graduates participate in a later graduation.

***All spring athletic events have been cancelled.*** The NCAA is working to extend eligibility for spring sport athletes.

Vice President Jennings is creating a special fund to assist students who fall under financial hardships.   ·

***Students accepted for the summer term will do classes online due to campus being shut down***. Students should contact their academic advisors with questions regarding their summer schedules.  [Emphasis added]

### D.    Defendants, In Concert with Other Florida Universities, Agree to Not Refund Mandatory Fees

77.    By not later than April 1, 2020, Defendants had already decided not to refund fees.

Between March 24, 2020 and April 1, 2020 Defendants participated in a number of conference calls with the Council for Administrative and Financial Affairs ("CAFA") which is part of the State University System of Florida.  During the March 24, 2020 CAFA conference call, FSU expressly stated that it was not refunding fees. See **Exhibit D**., page ID 216-217.

78.    During this same conference call, it was proposed that all universities take the same position regarding the return of any fees to their students, FSU stating: "I think before any of us do refunds, I think all the Presidents need to get together and get a consensus."  Exhibit D., page ID 218.

79.    During the March 25, 2020 CAFA conference call where all universities were represented, and as evidence that the March 24, 2020 proposed consensus was formed, a UCF

representative asked, "Anyone considering [sic] refunds for tuition and fees?"  The response by representatives from all universities was "No".  Exhibit D, page ID 223.

80.     As evidenced by the CAFA conference call minutes (Exhibit D), Defendants had predetermined to not return any Mandatory Fees to Plaintiff and members of the proposed class

**E.     The CARES Act Allocation**

81.     The Federal Government has also responded to the COVID-19 pandemic in ways that benefit the University and help Defendants cover the costs associated with the disruption.

82.     The CARES Act required that at least half of the funds needed to be spent in the form of emergency aid to students, which could include grants to defray the cost of food, housing, course materials or childcare, according to the U.S. Department of Education.  Upon information and belief, however, only half of the money provided to the Universities under the CARES Act will be allocated to the students.

83.     Upon information and belief, as a result of COVID-19, the U.S. Department of Education ("DOE") allocated $29,339,828 to the University, of which the minimum allocation to be awarded for emergency financial aid grants to its students was $14,669,914.

84.     Upon information and belief, as a result of the Coronavirus Response and Relief Supplemental Appropriations (CRRSAA) Act, FSU received at least an additional $14.69 million from the DOE to support student aid.

**F.     In-Person Tuition vs. Online Tuition**

85.     The chart below lists the 2019-2020 Academic Year Undergraduate and Graduate cost to attend the University in-person:

| Fee Category | Undergraduate Courses | Graduate Courses |
|---|---|---|
| State Fees (per credit hour) | | |
| Matriculation Fee | $105.07 | $403.51 |

22

| | | |
|---|---|---|
| Student Financial Aid | $5.25 | $20.17 |
| Capital Improvement Fee | $4.76 | $4.76 |
| Subtotal of State Fees | $115.08 | $428.44 |
| | | |
| Local Fees (per credit hour) | | |
| Athletics Fee | $7.90 | $7.90 |
| Activities and Services Fee | $12.86 | $12.86 |
| Student Health Fee | $13.97 | $13.97 |
| Subtotal Local Fees | $34.73 | $34.73 |
| | | |
| Other Fees (per credit hour) | | |
| Transportation Fee | $8.90 | $8.90 |
| Tuition Differential Fee | $49.59 | $0.00 |
| Student Facilities Use Fee | $2.00 | $2.00 |
| Technology Fee | $5.25 | $5.25 |
| Subtotal University Fees | $65.74 | $16.15 |
| **Total In-State (per credit hour)** | **$215.55** | **$479.32** |
| | | |
| Out-of-State Fees (per credit hour) | | |
| Out-of-State Fee | $481.48 | $601.34 |
| Out-of-State Financial Aid Fee | $24.07 | $30.06 |
| **Total Out-of-State (per credit hour)** | **$721.10** | **$1,110.72** |
| | | |
| Term-based Flat Fees | | |
| Per-Semester Facilities Use Fee (all terms) | $20.00 | $20.00 |
| FSU Card Term Fee (Fall & Spring only) | $5.00 | $5.00 |

86.    The chart below lists the 2020-2021 Academic Year Undergraduate cost to attend

the University's College of Law in-person:

| Fee Category | Rate |
|---|---|
| State Fees (per credit hour) | |
| Matriculation Fee | $602.36 |
| Student Financial Aid | $30.11 |

23

| | |
|---|---|
| Capital Improvement Fee | $4.76 |
| Subtotal of State Fees | $637.23 |
| | |
| Local Fees (per credit hour) | |
| Athletics Fee | $7.90 |
| Activities and Services Fee | $12.86 |
| Student Health Fee | $13.97 |
| Subtotal Local Fees | $34.73 |
| | |
| Other Fees (per credit hour) | |
| Transportation Fee | $8.90 |
| Tuition Differential Fee | $0.00 |
| Student Facilities Use Fee | $2.00 |
| Technology Fee | $5.25 |
| Subtotal University Fees | $16.15 |
| **Total In-State (per credit hour)** | **$688.11** |
| | |
| Out-of-State Fees (per credit hour) | |
| Out-of-State Fee | $635.31 |
| Out-of-State Financial Aid Fee | $31.76 |
| **Total Out-of-State (per credit hour)** | **$1,355.18** |
| | |
| Term-based Flat Fees | |
| Per-Semester Facilities Use Fee (all terms) | $20.00 |
| FSU Card Term Fee (Fall & Spring only) | $5.00 |

87.     In addition to fees for tuition, Plaintiff and Class Members were charged other fees including but not necessarily limited to:

24

**Matriculation Fee**                  **Classification: State Fee**
Purpose: Basic fee charged for instruction provided by a public postsecondary educational institution in Florida. In some contexts matriculation is synonymous with "tuition." Except as otherwise provided by law, undergraduate tuition shall be established annually in the General Appropriations Act. The sum of tuition and out-of-state fees assessed to nonresident students must be sufficient to offset the full instructional cost of serving such students.

**Tuition Differential Fee**          **Classification: State Fee**
Purpose: Supplemental fee charged for instruction provided by a public university in Florida pursuant to 1s.1009.24(15). The fee is to be used to support undergraduate educational programs and services. Students continuously enrolled since before 07/01/2007 are exempt from this fee. Using a Florida Prepaid Plan purchased before 07/01/2007 qualifies students for a temporary waiver of this fee for terms in which the plan is billed by the school.

**Financial Aid Fee**                  **Classification: State Fee**
Purpose: A university board of trustees is authorized to collect, for financial aid purposes, an amount not to exceed five per cent of the tuition and out-of-state fee. The revenues from fees are to remain at each campus and replace existing financial aid fees.

**Capital Improvement Fee**           **Classification: State Fee**
Purpose: Exists to provide educational and support facilities for students, faculty, and staff in a manner that maximizes the effectiveness of the capital investment, maximizes the use of existing facilities, and promotes orderly, planned campus development.

**Athletics Fee Classification:**                    **Local Fee**
Purpose: Supplements the university's diverse athletic programs and provides students a means to enjoy university athletic events without direct cost to the student. Supports programming at athletic spaces.

**Activities and Services Fee Classification:**      **Local Fee**
Purpose: Supports student governing boards and programs and student organizations to improve services directly related to student activities.

**Health Fee Classification:**                       **Local Fee**
Purpose: Funds programming that promotes healthy lifestyle choices and provides students access to the campus-based Health and Wellness Center with many services offered at little to no direct cost to the student.

**Transportation Access Fee Classification:**       **University Fee**
Purpose: Funds the use of city and campus busses, the campus parking permit, campus pedestrian paths, parking lot lights and maintenance, and the creation of additional parking and transportation services. Students with vehicles may obtain

their parking permit at no additional charge on-line at FSU Transportation Services.

**Student Facilities Use Fee Classification:**          **University Fee**
Purpose: Assessed to main campus students to construct and renovate campus facilities for student services. In accordance with SGA's request, initial revenues were used to construct the new Health and Wellness Center.

**FSU Card Term Fee Classification:**          **University Fee**
Purpose: Assessed to students for Fall, Spring, or Summer semesters at a rate of $5 per term, but not exceeding $10 annually, to support the various uses of the FSU Card on campus.

**Technology Fee Classification:**          **University Fee**
Purpose: Funds the maintenance and expansion of University technology services, including the continued support of the Blackboard learning environment, and the expansion of wireless capabilities and services.

88.    As stated on the University's website at https://studentbusiness.fsu.edu/tuition-fees, "[s]ome courses are assessed additional costs for online fees, labs, materials and supplies, and general cost recovery."

89.    FSU offers a variety of online courses and degrees which is separate from the remote learning necessitated by COVID-19 and discussed above.  FSU refers to its online courses and degrees as "Distance@FSU".  Its website also states:

Distance students typically pay tuition plus a distance learning fee. Tuition for distance students reflects several fee reductions and waivers: FSU waives student health, transportation, and facilities use fees for distance students and significantly reduces athletics and activities/services fees.

90.    By way of example, the chart below lists the 2020-2021 Academic Year FSU School of Law cost of online attendance:

| Fee Category | Rate |
|---|---|
| State Fees (per credit hour) | |
| Matriculation Fee | $602.36 |
| Student Financial Aid | $30.11 |
| Capital Improvement Fee | $4.76 |

| | |
|---|---|
| Subtotal of State Fees | $637.23 |
| | |
| Local Fees (per credit hour) | |
| Athletics Fee | $0.69 |
| Activities and Services Fee | $9.88 |
| Student Health Fee | $0.00 |
| Subtotal Local Fees | $10.57 |
| | |
| Other Fees (per credit hour) | |
| Transportation Fee | $0.00 |
| Tuition Differential Fee | $0.00 |
| Student Facilities Use Fee | $0.00 |
| Technology Fee | $5.25 |
| Subtotal University Fees | $5.25 |
| **Total In-State (per credit hour)** | **$653.05** |
| | |
| Out-of-State Fees (per credit hour) | |
| Out-of-State Fee | $635.31 |
| Out-of-State Financial Aid Fee | $31.76 |
| **Total Out-of-State (per credit hour)** | **$1,320.12** |
| | |
| Term-based Flat Fees | |
| Per-Semester Facilities Use Fee (all terms) | $0.00 |
| FSU Card Term Fee (Fall & Spring only) | $5.00 |

### G.    University Marketing and Solicitation Brochures

91.    The University does not sell merely credit hours and diplomas as one would sell some common consumer commodity.  They sell an experience – one enriched both personally and

27

academically through social interaction and involvement with faculty and with other students.

92.    Defendants do not deny that the physical location and amenities of its campus is a main benefit of enrollment that attracts many students to the University.

93.    For example, in the FSU offer of admission received by Plaintiff specifically reiterated the importance of the Universities physical location, stating:

> Our students have many opportunities to apply what they learn **in the classroom** in the real world. Florida State's clinical programs and **location in Tallahassee** provide students a plethora of options to gain the legal experience that employers desire. Few other law schools in the nation can compete in terms of location. No other law school in Florida can provide the unique legal opportunities that accompany being **located in the state capital**.

*See* **Exhibit A**.

94.    Additionally, the University's website and recruitment brochures are the other means through which Defendants target prospective new students and attempt to influence such students to apply for enrollment at FSU as opposed to other institutions of higher learning.

95.    Through these publications, Defendants' market to and enroll students in two separate and distinct products.

96.    Defendants specifically market certain classes and degree programs as being offered on a fully online basis.

97.    Indeed, Defendants dedicate an entire section of the University website to these programs, known as "Distance@FSU" which can be accessed at https://distance.fsu.edu/.

98.    Conversely, Defendants' publications with respect to non-online classes are full of references to the on-campus experience, including numerous references to student activities; campus amenities; campus diversity, campus location, and the like.

99.    Upon information and belief, there were no references or disclaimers in any of Defendants' websites, circulars, bulletins, publications, brochures, or other advertisements prior

to January 1, 2020, that even referenced the possibility of in-person classes being changed to fully online classes at Defendants' unilateral discretion or for any other reason whatsoever after the start of a given term.

100.    In fact, it is clear that, prior to the onset of COVID-19, Defendants had no plans whatsoever to offer its in-person classes via an online delivery model, on an emergency basis or otherwise.

101.    Those prospective students who were interested in enrolling for in-person services at the University after consuming the marketing materials listed herein were invited to complete applications, and some were selected for and offered admission.

102.    The University's solicitation and marketing brochures, as they appear on its website, state[31]:

> No one benefits from a life of all work and no play. We encourage our students to be active, both inside the classroom and out. At Florida State, you'll find over 700 student organizations, an extensive array of intramurals to keep you active, a wealth of entertainment options, and countless service opportunities to do your part in making the world a better place.

> ### Live & Learn

> A residence hall is more than just a place to lay your head. It's the center of your collegiate life, a hub of social activity where new friendships are forged. Living on-campus is the best way to get involved, meet new people, and give yourself a leg up in the class room. It's a fact that students living on campus earn higher GPAs. With over a dozen residence halls on campus, you're sure to find one that fits your own personal style.

> #### Chow Down

> With a variety of meal plan options and 25 locations across campus, Seminole Dining has your food options covered. You can eat all you want at Suwanee Room and Seminole Café or grab a coffee between classes at Einstein's or Starbucks. Be on the lookout for new restaurants opening around campus and the new dining hall, 1851!

---

[31]    *See* https://admissions.fsu.edu/studentlife (lasted visited April 12, 2021).

**Noles Can Hack It**

At the newly opened Innovation Hub in the heart of campus, students have access to all the latest technologies and staff support. Build a prototype in the Design & Hacking lab, take your creation into reality using the Fablab's laser cutters and 3D printers, and then bring it to life with Raspberry Pi or Arduino boards and a little programming know-how. Leap into virtual and augmented reality with Oculus Rift, HTC Vive, Microsoft HoloLens, and 360° cameras. There's also plenty of hangout and collaboration space where you can get together with other Noles and create "the next big thing." After you've built up your skills in the Innovation Hub, show them off at the annual HackFSU hackathon!

## Get Involved

College is an amazing time to discover more about yourself and what you're really into. FSU students are into a lot of different things, and have formed over 700 recognized student organizations to share their passions. Join a club, honor society, Greek organization, community service group, or start your own brand new student org to meet like minds and make lifelong friends.

*    *    *

**Find What Moves You**

When class is over, it's time to play. At the Leach Recreation Center and Fitness & Movement Clinic, you can get in the zone on an extensive collection of workout equipment, run on the indoor track overlooking our 16-lane pool, and enjoy group fitness and personal training opportunities. Meet some new friends for a game at the Main Campus Fields, Rec SportsPlex, or Westside Courts. Play to win or just for fun by participating in one of over 50 intramural and club sports. Or, relax along the lake at the "Rez," FSU's lakefront property where you can sail, swim, sun, paddleboard, and more. It's all free for FSU students from Campus Rec.

If you're looking for the true fan experience, Seminole Athletics are where it's at. Cheer on our 20 NCAA Division I teams as they complete in the Atlantic Coast Conference (ACC). Go Noles!

**Are You Not Entertained?**

With tons of events and activities on campus, there's always something fun to do at the Oglesby Union's facilities. Enjoy music and comedy at Club Downunder. Get in a game of bowling or billiards at Crenshaw Lanes. Create a masterpiece at the Art Center. Marvel at the wonder of the FSU Flying High Circus, one of only two collegiate circuses in the nation. Catch free blockbuster, indie, foreign, or cult classic film at the Student Life Cinema. Battle it out in a tournament or just have

fun playing the hottest games with your friends in the Student Life Center's Cyber Café.

**Get Around**

With one of the most compact campuses in the state, it's already easy to get around Florida State. But Transportation & Parking Services has made it even easier with a variety of services. Six multi-level garages, real-time parking availability counts, and valet services mean campus parking has never been easier. Seminole Express shuttle buses will quickly get you to and around campus. During late night hours, services such as S.A.F.E. Connection, Night Nole, and Nole Cab provide transportation around campus so you won't have to walk alone. If you're looking to get off campus, FSU students ride for free on all City of Tallahassee (StarMetro) buses, or you can pick up a Zipcar at one of three campus locations and go your own way.

103.     On the same webpage and by way of example, FSU quotes its student Amanda Schell, who states:

"My extracurricular activities were essential to my undergraduate experience at Florida State - there is more to the collegiate experience than just academics!"

104.     On its website at https://campusrec.fsu.edu/outdoors/rez/activities/, Defendants identify various FSU activities and corresponding fees for gate entry, watercraft rentals, climbing wall, swimming, and sailing clinics.  The fees are either not charged or reduced for Plaintiff and other FSU students with a "valid FSUCard".  As noted above (¶87), Defendants charged Plaintiff and other members of the proposed Class a fee for their FSUCard.

105.     Defendants have not offered fair and/or appropriate refunds of fees charged for tuition and other services paid to cover the cost of certain on-campus services which are no longer available to students. To the extent refunds have been offered, the refunds have not been commensurate with the financial losses to the students and their families.

106.     Defendants have improperly retained monies paid by Plaintiff and the other members of the proposed Class, while prohibiting or otherwise preventing Plaintiff and the other members of the proposed Class from obtaining the benefits for which they paid. Even if

Defendants claim they did not have a choice, the University has nevertheless improperly retained funds for services it is not providing. Defendants' actions are unlawful and unfair, and as a matter of both contract and equity, Plaintiff and members of the proposed Class are entitled to disgorgement of the fees paid.

## V.    CLASS ACTION ALLEGATIONS

107.    Plaintiff brings this case individually and, pursuant to Florida Rule of Civil Procedure 1.220(a), (b)(2), (b)(3), and/or (c)(4) for damages, equitable relief, and disgorgement on behalf of the following Class:

> All people who paid fees to the University for tuition and other services for or on behalf of students enrolled in classes at the University for the Spring 2020 semester and thereafter but who were denied live, in-person instruction, and access to and use of campus facilities.

108.    Excluded from the Class are Defendants, and any of their respective members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the judicial officers, and their immediate family members, and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definition, as appropriate, during the course of this litigation, including the creation of separate or sub-classes.

109.    **Numerosity-Florida Rule of Civil Procedure 1.220(a)(l)**.  The Class members are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. The precise number of Class members is unknown to Plaintiff but may be readily ascertained from the University's records.  Members of the Class may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

110.    **Commonality-Florida Rule of Civil Procedure 1.220 (a)(2); Predominance-Florida Rule of Civil Procedure 1.220 (b)(3)**.  This action involves questions of law and fact

common to the Class, which predominate over any individual questions, including, without limitation:

(a)    Whether Defendants engaged in the conduct alleged herein;

(b)    Whether there is a difference in the cost paid by a consumer for an online distance learning program versus a live, on-campus instructional program;

(c)    Whether Defendants breached their contracts with Plaintiff and the other members of the Class by retaining a portion of their fees representing the difference between what the Plaintiff and the other members of the Class bargained for and what they received;

(d)    Whether Defendants breached their contracts with Plaintiff and the other members of the Class by retaining a portion of their fees representing the cost paid for access to campus facilities and services while denying Plaintiff and the other members of the Class access to said campus facilities and services;

(e)    Whether Defendants were unjustly enriched by retaining a portion of the fees paid by Plaintiff and the other members of the Class representing the difference between the cost of an online distance learning versus the cost of an on-campus, in-person learning program;

(f)    Whether Defendants were unjustly enriched by retaining a portion of the fees paid by Plaintiff and the other members of the Class representing the cost paid for access to campus facilities and services while denying Plaintiff and the other members of the Class access to said campus facilities and services;

(g)    Whether Defendants complied with the Constitutional requirements for seizing and retaining Plaintiff's and the Class members' property without providing the services that the fees for tuition and other services were intended to cover;

(h)     Whether certification of the Class proposed herein is appropriate under the Florida Rules of Civil Procedure;

(i)     Whether Plaintiff and the other members of the Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief; and

(j)     The amount and nature of relief to be awarded to Plaintiff and the other members of the Class.

111.    **Typicality-Florida Rule of Civil Procedure 1.220(a)(3)**. Plaintiff's claims are typical of the other members of the putative classes' claims because Plaintiff and the other members of the Class each paid fees for tuition and other services associated with the Spring 2020 semester at the University and thereafter but were not provided the services that those fees were meant to cover, nor were they reimbursed therefor. Plaintiff and the other members of the proposed Class each suffered similar harm, namely Defendants' retention of their fees paid as a direct and proximate result of the same wrongful conduct in which Defendants engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the other members of the proposed Class.

112.    **Adequacy of Representation-Florida Rule of Civil Procedure 1.220(a)(4)**. Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the proposed Class who he seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and his counsel.

113.    **Declaratory and Injunctive Relief-Florida Rule of Civil Procedure 1.220(b)(2)**. Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the other

34

members of the proposed Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

114. **Superiority-Florida Rule of Civil Procedure 1.220(b)(3)**. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

115. **Certification of Specific Issues-Florida Rule of Civil Procedure 1.220(c)(4)**. To the extent the proposed Class does not meet the requirements of Rules 1.220(b)(2) or (b)(3), Plaintiff seeks the certification all issues that will drive the litigation toward resolution.

**FIRST CLAIM FOR RELIEF**
**(Breach of Contract)**

116. Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 115 above as if fully alleged herein.

117. Plaintiff brings this claim individually and on behalf of the other members of the proposed Class.

118. Plaintiff and the other proposed members of the Class entered into contracts with the University which provided that Plaintiff and the other members of the Class would pay fees for tuition and other services to be provided on campus and in-person and, in exchange Defendants would enroll such students and admit them physically to the University; granting them the full rights and privileges of student status, including but not limited to access to campus facilities, access to campus activities, and live, in-person instruction in a physical classroom.

119.    The rights and privileges of student status that comprise the contractual terms are also set forth by Defendants through its FSU Policies and Regulations, website, academic catalogs, student handbooks, correspondence, marketing materials, acceptance letters, online web portals, and other circulars, bulletins, and publications.

120.    These documents detailed the educational services that Defendants would provide in exchange for the payment of fees for tuition and other services and complying with the University's rules and regulations.

121.    These rights and privileges form the basis of the bargain on which prospective students agree to accept Defendants' offer of enrollment in exchange for the payment of fees for tuition and other in-person services and access.

122.    One such right is the ability to be physically present on campus, and fully enjoy the facilities, services, and opportunities provided thereon, including the campus' location and surrounding opportunities at the University.

123.    For example, in the FSU acceptance letter received by Plaintiff states in part "Our students have many opportunities to apply what they learn in the classroom in the real world. Florida State's clinical programs and location in Tallahassee provide students a plethora of options to gain the legal experience that employers desire. Few other law schools in the nation can compete in terms of location. No other law school in Florida can provide the unique legal opportunities that accompany being located in the state capital." *See* **Exhibit A**.

124.    Defendants have failed to fully provide those services and have otherwise not performed under the contract as set forth above.

125.    Plaintiff and other members of proposed Class accepted Defendants' offer for live in-person on-campus education and in-person access to campus facilities and paid valuable

consideration in exchange.

126.    However, after accepting such consideration from Plaintiff and other members of the proposed Class, Defendants unilaterally provided a materially different product, which deprived Plaintiff and other members of the proposed Class of the benefit of the bargain for which they had already paid.

127.    Defendants retained fees paid by Plaintiff and other members of the proposed Class, without providing them the full benefit of their bargain.

128.    Plaintiff and other members of the proposed Class have suffered damage as a direct and proximate result of Defendants' breach amounting to the difference in the fair market value of the services and access for which they contracted, and the services and access which they actually received.

129.    This cause of action does not seek to allege "academic malpractice."

130.    As a direct and proximate result of Defendants' breach of contract, Plaintiff and other members of the proposed Class are legally entitled, in an amount to be decided by the trier of fact, to restitution of the pro-rata amount of fees that were collected but for which services were not provided.

131.    Defendants' performance under the contracts is not excused because of COVID-19.  Even if performance were excused or impossible, Defendants would nevertheless be required to return the funds received for services and/or goods that it did not provide.

132.    On or around March 29, 2021, and after the commencement of this action, Governor DeSantis signed into law CS/SB 72, a new COVID-19-related claim immunity shield codified as Section 768.38, Florida Statutes.  This statute is unconstitutional because it interferes with Plaintiff's express contract and contractual rights with Defendants. Any effort by Defendants

to use state action to bar Plaintiff's claims would unconstitutionally impair Plaintiffs' existing contract. See Art. I, §10, Fla. Const.

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, demands judgment from Defendants in accordance with the prayer for relief set forth below.

**SECOND CLAIM FOR RELIEF**
**(Unjust Enrichment)**

133.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 115 above as if fully set forth herein.

134.    Plaintiff brings this count in the alternative on behalf of himself and other members of the proposed Class, to the extent that Defendants contend, or the Court finds that no contract was formed between Defendants and Plaintiff and/or to the extent that Defendants contends or the Court finds that any applicable contract is silent or does not control the conduct at issue in this litigation.

135.    By paying FSU fees for tuition and other services for the Spring 2020 semester, Plaintiff and the other members of the proposed class expected to receive, among other things, an in-person and on-campus live education as well as use of the services and facilities for which the other fees were paid.

136.    Plaintiff and other members of the proposed Class conferred a benefit on Defendants when they paid these fees. Plaintiff paid fees for tuition and other services with the expresses understanding that such costs included the in-person classes, services, opportunities, and experiences that FSU has previously marketed, promoted, or made available prior to COVID-19.

137.    Defendants have realized this benefit by accepting such payment.

138.    Defendants have retained this benefit in the amount of fees paid for tuition and other services that Plaintiff and members of the proposed class tendered, even though Defendants

have failed to provide the services for which the fees were collected, making Defendants' retention unjust under the circumstances.

139.    For example, Defendants failed to provide Plaintiff and members of the proposed class access to any on-campus facility after in or around March 11, 2020. Yet Defendants assessed Plaintiff with fees for tuition and other services that covered the cost of upkeep and maintenance of such facilities, services, costs, and expenses.

140.    Plaintiff and the members of the proposed class were not able to access such facilities or services remotely.

141.    Upon information and belief, the costs incurred for having an online only program is significantly lower for Defendants than the overhead needed to provide an on-campus product. But even if it was not, it is not the product that students were offered and not the product the students expected to receive.

142.    As a result of closing of the University campus and moving classes online, Defendants saved significant sums of money in the way of reduced utility costs, reduced maintenance and staffing requirements, reduced or eliminated hours for hourly employees, reduced or eliminated hours for paid work study students, and otherwise.

143.    Equity and good conscience require that Defendants return a portion of the monies paid in fees by Plaintiff and other members of the proposed Class.

144.    Despite not being able to provide such services, FSU failed to provide reimbursements for fees paid for tuition and other services despite the altered nature of the education provided and the denial of use of the campus and its facilities.

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, demands judgment from Defendants in accordance with the prayer for relief set forth below.

### THIRD CLAIM FOR RELIEF
### VIOLATION OF THE TAKINGS CLAUSE
#### (On Behalf of Plaintiff and the Class)

145.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 115 above as if fully alleged herein.

146.    Plaintiff brings this claim individually and on behalf of the members of the proposed class against Defendants.

147.    The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V. The takings clause is made applicable to the states through the Fourteenth Amendment. *See* U.S. Const. Amend. XIV; *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942, 198 L. Ed. 2d 497 (2017) (citing *Chicago, B. & Q.R. Co. v. Chicago*, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897)).

148.    Takings claims may properly be brought against state agencies and are not barred by sovereign immunity.

149.    Common law has recognized that there is a property right by an owner in funds held in an account managed by another. Here, the University received payment of fees for tuition and other services from private citizens, as consideration for the benefit of receiving in-person course instruction, housing, and other on-campus benefits - the funds are thus private in nature but held by a public entity. Plaintiffs and the other members of the Class have a protected property right in all sums they paid to the Universities in exchange for their contracted educational benefits.

150.    Indeed, colleges and universities must be able to separately account for student payments, as well as financial aid received on an individual student's behalf, as these institutions are frequently required to issue refunds to the government and the student for instances where the student enrolls, but does not complete classes for which the institution has received financial aid

payments from the federal government. The Higher Education Act ("HEA"), Title IV, governs federally funded student financial aid programs for college and post-secondary vocational training. *See* 20 U.S.C. §§ 1070–1099 (1990 & 1992 Supp.). The HEA requires that when a student withdraws partway through the enrollment period, the institution must refund a certain portion of the charges to account for its reduced educational obligations toward the student. *Career Coll. Ass'n v. Riley*, 74 F.3d 1265, 1269 (D.C. Cir. 1996). Thus, it is beyond dispute that any college or university receiving any tuition payments through government-provided financial aid must be able to account for what was paid for each individual student. This means that each student's tuition funds must be capable of being separately identified and sequestered.

151.    In addition, prior to the start of the Spring 2020 term, Plaintiff and members of the proposed class paid for and/or agreed to pay for an in-person educational experience and access to Defendants' campus and facilities. As a result, Plaintiff and members of the proposed class also have a protected property interest in an enforceable right to receive such services.

152.    Defendants violated the Takings Clause by failing to provide ongoing contracted for services and by failing to return to Plaintiff and members of the Class that portion of the fees paid for tuition and other services for which they received nothing, or significantly less than what they bargained for. Neither Plaintiff nor the other members of the proposed class have made a knowing and voluntary waiver of their constitutional right under the Fifth Amendment to be paid just compensation for the taking of their property rights in those funds.

153.    Thus, Plaintiff and members of the proposed class are entitled to injunctive relief prohibiting Defendants from continuing to charge full fees for tuition and other services when only providing online distance learning and limited or no access to campus, and injunctive relief ordering Defendants to return said funds unlawfully withheld.

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, demands judgment from Defendants in accordance with the prayer for relief set forth below

## FOURTH CLAIM FOR RELIEF
### INVERSE CONDEMNATION
**(On Behalf of Plaintiff and the Class)**

154.    Plaintiff repeats and re-alleges the factual allegations set forth in paragraphs 1 through 115 above as if fully alleged herein.

155.    Plaintiff brings this claim individually and on behalf of members of the proposed class against Defendants.

156.    Article X, Section 6(a) of the Florida Constitution provides "No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner." Florida Const. Art. X, Section 6(a). Thus, the Florida Constitution prohibits Defendants from taking private property for public use without just compensation.

157.    Common law has recognized that there is a property right by an owner in funds held in an account managed by another. Here, Defendants received payment of fees for tuition and other services from private citizens, as consideration for the benefit of receiving in-person course instruction and other on-campus benefits—the funds are thus private in nature but held by a public entity. Plaintiff and Class Members have a protected property right in all sums they paid to Defendants.

158.    In addition, prior to the start of the Spring 2020 term, Plaintiff and members of the proposed class paid for and/or agreed to pay for an in-person educational experience and access to FIU's campus and facilities.  As a result, Plaintiff and members of the proposed class also have a protected property interest in an enforceable right to receive such services.

42

159.     Defendants violated the Florida Constitution by failing to provide the contracted for in-person on-campus education and experience or return and/or direct the return to Plaintiff and members of the proposed class that portion of the fees paid for tuition and other services for which they received nothing, or significantly less than what they bargained for in return. Neither Plaintiff nor members of the proposed class have made a knowing and voluntary waiver of their constitutional right under the Florida Constitution to be paid just compensation for the taking of their property rights in those funds.

160.     Thus, Plaintiff and members of the proposed class are entitled to just compensation for the taking of their property.

WHEREFORE, Plaintiff, individually and on behalf of the putative Class, demands judgement from Defendants in accordance with the prayer for relief set forth below.

## REQUEST FOR RELIEF

Plaintiff, individually and on behalf of the other Class members, prays for judgment against Defendants as follows:

(A)     Declaring this action to be a proper class action;

(B)     Certifying the Class as proposed herein;

(C)     Designating Plaintiff as Class representative, and appointing counsel for the Plaintiff as Class Counsel;

(D)     Declaring that Defendants are financially responsible for notifying the Class members of the pendency of this action;

(E)     Requiring that Defendants disgorge fee payments wrongfully retained for services not provided;

(F)     Awarding monetary damages;

(G)    Awarding injunctive relief as permitted by law or equity, including enjoining Defendants from retaining the pro-rated, unused fees monies;

(H)    Awarding Plaintiff's reasonable attorney's fees, costs and expenses, as permitted by law;

(I)    Awarding pre- and post-judgment interest on any amounts awarded, as permitted by law; and

(J)    Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: July 30, 2021                              Respectfully submitted,

**EGGNATZ | PASCUCCI**

By: /s/ Joshua H. Eggnatz
Joshua H. Eggnatz, Esq.
Fla. Bar No.: 0067926
Michael J. Pascucci, Esq.
Fla. Bar No.: 0083397
7450 Griffin Rd, Ste. 230
Davie, FL 33314
Telephone: (954) 889-3359
Facsimile: (954) 889-5913
Email: JEggnatz@JusticeEarned.com
Email: Mpascucci@JusticeEarned.com

*Local Counsel for Plaintiff and the Putative Class*

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
Robert J. Schupler
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com

44

Email: egleston@gme-law.com
Email: rschupler@gme-law.com

***Trial Counsel for Plaintiff and the Putative
Class***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 30, 2021 a true and correct copy of the foregoing was

e-filed and served via the Court's e-Filing portal pursuant to Fla. R. Jud. Admin. 2.516.


By: /s/ Joshua H. Eggnatz

# EXHIBIT A



FLORIDA STATE|
UNIVERSITY | *The* COLLEGE *of* LAW



March 15, 2019

Mr. Harrison Broer

Dear Mr. Broer:

Congratulations! It is our great pleasure to admit you to the entering class at Florida State University College of Law. We hope you will accept our offer! We would very much like you to tour our campus, observe a law class or two, and meet our faculty, staff, and students.

Our students have many opportunities to apply what they learn in the classroom in the real world. Florida State's clinical programs and location in Tallahassee provide students a plethora of options to gain the legal experience that employers desire. Few other law schools in the nation can compete in terms of location. No other law school in Florida can provide the unique legal opportunities that accompany being located in the state capital.

As a Florida State law student, you also will have access to our outstanding faculty and the fabulous professionals in our Career Services and Professional Development Office who are dedicated to helping students find jobs. Many of our professors have worked at prestigious national law firms or for the nation's most influential judges. We have a faculty that is very much at "the cutting edge." They are productive and successful, and want you to be, too.

Our 9,000-plus alumni are extraordinarily supportive of our school and students. They provide a vital network to help our students find employment. Our engaged and helpful alumni are the principal reason why Florida State Law graduates have success in the legal job market.

Our extraordinarily collegial student body is relatively small with approximately 600 total students; the number of applications we receive on the other hand, is quite large. In making our remaining admissions decisions, accordingly, we would appreciate your filling out and returning the enclosed Decision Statement as soon as possible.

Please review the enclosed information carefully as it contains pertinent deadlines and additional documentation required to accept your seat at the College of Law. We know that determining how to finance a legal education is a priority for most students, so enclosed is a copy of our Financial Aid Newsletter.

Once again, congratulations on your admission to Florida State University College of Law. Our students like their experiences at our law school and the careers we help them launch. We hope you will decide to join our fall entering class.

Sincerely,

Jennifer L. Kessinger
*Assistant Dean for Admissions*

Congratulations, Harrison!

Florida State University College of Law     425 W. Jefferson Street     Tallahassee, Florida 32306-1601
Telephone 850.644.3787     admissions@law.fsu.edu     Fax 850.644.7284

# EXHIBIT B



**College of Law**
**Office of Admissions**

## Decision Statement

Please indicate your decision by marking the appropriate ACCEPT OR DECLINE decision option below.  Then fill in the additional information requested at the bottom of this page and return it to the College of Law Admissions Office by the deadline listed on your checklist.

Your seat cannot be guaranteed if this acceptance form AND the non-refundable seat deposit of $200.00 are not received by the Office of Admissions by your deadline.

ACCEPT:

[X]  I accept Florida State University College of Law's offer of admission for the JD entering class. I understand am obligated to notify Florida State University College of Law in writing should my decision change for any reason.

DECLINE:

[ ]  I decline Florida State University College of Law's offer of admission for the JD entering class.   If you have elected to decline our offer, please provide us with the additional information below for our records.

I will be attending law school at (please print school name):    Florida State University

I will not be attending law school because:

Other:

## Scholarship Acceptance

ACCEPT:

[X]  I accept the scholarship offer included in my admit packet. I understand this scholarship will be disbursed ½ in the fall semester and ½ in the spring semester for each year it is offered. The scholarship does not apply to summer semesters. By accepting this scholarship, I certify that I am not presently confirmed with (nor otherwise committed to) any other law school(s) and/or that I will promptly withdraw any prior commitments to other law schools upon accepting this award. Failure to comply will result in withdrawal of this scholarship offer.

DECLINE:

[ ]  I decline the scholarship offer included in my admit packet.

[X]  **1L ORIENTATION REQUIREMENT**: I understand that as a member of the entering 1L class, **I am required to attend the mandatory orientation at the College of Law from August 19 – 23**. Fall classes start on August 26. Failure to attend the mandatory orientation may result in a loss of my seat in the entering class.

Print First, Middle, and Last Name:    Harrison Garrett Broer

Signature: *Harrison Garrett Broer*                    Date:    April 8th, 2019

Submit your completed decision statement by email to admissions@law.fsu.edu or by fax to 850-644-7284.

Submit your seat deposit payment directly to Student Business Services. Refer to your checklist for payment methods.

If you need any information about a special accommodation for a disability, we will be glad to assist you.  Please let us know or contact The Office of Student Advancement at saffairs@law.fsu.edu or (850) 644-7338.

425 W. Jefferson Street, R208 • Tallahassee, Florida • 32306-1601
Telephone: 850-644-3787 • Fax: 850-644-7284 • admissions@law.fsu.edu

# EXHIBIT C

Invoice Print Date: 08/31/2020



**FLORIDA STATE UNIVERSITY**
FINANCE & ADMINISTRATION

| Name | Customer ID | Career | Residency | Major |
|------|-------------|--------|-----------|-------|
| Harrison Broer | 200504902 | Law | In State | Law - JD |

| Term | Enrollment Status | Outstanding Balance |
|------|-------------------|---------------------|
| 2020 Spring | ENROLLED | $0.00 |

## Tuition & Mandatory Fees

| Description | Course ID | Credits | Base Fees | Out of State | Class Fees | Total |
|-------------|-----------|---------|-----------|--------------|------------|-------|
| Legal Writing and Research II | LAW 5793 | 3 | $2,064.33 | $0.00 | $0.00 | $2,064.33 |
| Legislation and Regulation | LAW 5522 | 3 | $2,064.33 | $0.00 | $0.00 | $2,064.33 |
| Constitutional Law I | LAW 5501 | 3 | $2,064.33 | $0.00 | $0.00 | $2,064.33 |
| Criminal Law | LAW 5100 | 3 | $2,064.33 | $0.00 | $0.00 | $2,064.33 |
| Contracts | LAW 5000 | 4 | $2,752.44 | $0.00 | $0.00 | $2,752.44 |
| Term Fee - Facilities | | 0 | $20.00 | $0.00 | $0.00 | $20.00 |
| **Total Credits** | | **16** | | **Total Assessed** | | **$11,029.76** |

*All charges in Tuition & Mandatory Fees are considered required tuition for the course.

## Charges

| Description | Reference Number | Due Date | Charge Amount | Outstanding Balance |
|-------------|------------------|----------|---------------|---------------------|
| FSUCard Term Fee | | 01/17/2020 | $5.00 | $0.00 |
| 2020 Spring Tuition | | 01/17/2020 | $5,006.16 | $0.00 |
| 2020 Spring Tuition | | 02/21/2020 | $6,023.60 | $0.00 |
| Installment Contract Fee | | 02/21/2020 | $10.00 | $0.00 |
| | | **Total** | **$11,044.76** | **$0.00** |

## Payments

| Description | Reference Number | Date | Payment Amount |
|-------------|------------------|------|----------------|
| First Year Law Scholarship | | 01/03/2020 | $2,753.00 |
| Payment - Electronic Check | SSP-MISC-PMT-20200116225108 | 01/16/2020 | $5.00 |
| Payment - Electronic Check | SSP-TUIT-PMT-20200116225109 | 01/16/2020 | $2,761.88 |
| Payment - Electronic Check | SSP-MISC-PMT-20200220231454 | 02/20/2020 | $10.00 |
| Payment - Electronic Check | SSP-TUIT-PMT-20200220231455 | 02/20/2020 | $5,514.88 |
| CARES Act Emerg Funds Fall/Spr | | 05/11/2020 | $400.00 |
| FSU Graduate Grant LAW FS | | 05/19/2020 | $1,000.00 |
| | | **Total** | **$12,444.76** |

## Refunds

| Description | Reference Number | Date | Refund Amount |
|-------------|------------------|------|---------------|
| Refund - Direct Payment | | 05/11/2020 | $400.00 |
| Refund - Financial Aid | | 05/21/2020 | $1,000.00 |
| | | **Total** | **$1,400.00** |

| Outstanding Balance | $0.00 |
|---------------------|-------|

**Invoice Print Date:** 08/31/2020



**FLORIDA STATE UNIVERSITY**
FINANCE & ADMINISTRATION

### REMITTANCE ADVICE

| Customer ID | Name | Total Balance |
|---|---|---|
| 200504902 | Harrison Broer | $0.00 |

Please write Student ID on the check/money order and make check payable to: **Florida State University**.

Mail payment to:

Harrison Broer                          Student Business Services
100 Lake Ariana Blvd                    A1500 University Center
Auburndale, FL 33823                    Tallahassee, FL 32306-2394

This invoice reflects charges due as of invoice print date. All accounts are due and payable at the Office of Student Business Services or online at http://fees.fsu.edu. Accounts 150 days past due might be eligible for placement with a third-party collection agency and assessed collection fees up to 33% of the total outstanding balance.

# EXHIBIT D

## CAFA CONFERENCE CALL

## March 24, 2020 - 8:00 AM


Ben Watkins – this morning I would like to cover a couple of things:
1) To share with you an overview of the muni market conditions so you have an awareness of what the dynamics are.
2) Plans for universities, responding to questions, doing this in an orderly way

The bottom line is that the muni market is closed for primary market influence at this time. We don't have any real prediction. Rates have come back from 5.20 daily rate to 2.5 percent. There is still a lot of selling pressure and leveraging on the long end of the market. I'm hopeful that we will see some stability over the next few weeks and then we can be in a position to execute the money. Refinancing – I'm happy to keep you updated on that as your individual circumstances have a need for information or planning around that. With respect to university credits, one thing is going to be obvious, with housing refunds specifically, one of the things to avoid is a piece-meal approach to providing information about the market place. A uniform response is really important. The rating analysts have a lot of other problems to deal with in sorting through the economic impact and what it's going to have on the individual credits. Higher education is obviously because you are on the front lines and have sent the kids homes. That will have some financial consequences. It is going to be important to provide them with meaningful information as things progress, but not try to "shoot from the hip." We will respond, after reading the documents and formulating questions, in writing so that everyone sees what the questions are that have been asked and what the answers are. We will also formulate appropriate actions at that time. I'm asking you to go through the credits we manage – because of the change in the analytical approach – and think about this uniformly of all credit and all debt that is outstanding. Any income you get, let us help you with an appropriate response. We will all be in a better place by doing it in this way. Let us take something off of your plate so you can focus on things more important, like operations. This is what we do every day. We need to integrate this with a broader picture with respect to the coronavirus and actions

taken in respect to that.  We are here as a resource and asking you to let us help in handling those matters.  I'll be happy to take feedback and answer questions.

FAU – About refinancing.   It makes a lot of sense, in savings to institutions, do you think they're going to get in a full blown view of that?

Ben - That's what I'm doing full time – is evaluating market conditions.  So the first thing the market has got to do is open back up, then we'll evaluate the funding issues.   They are going to be underwater, they will be specifically focused on the enterprise and review the entire credit.   Without necessarily involving everyone at the institution.

FIU – I have a couple of questions.  Behavior of the municipal markets over the last few weeks.  Your description today is worse than I anticipated.
Do you think it would get to the case where it would be cheaper to issue a taxable bond if the markets are in such bizarre behavior?

Ben – Anecdotally, our best example is looking back at 2008.  I would expect the Treasury to be an alternative, that is if Congress can get it together on passing a fiscal package.   The taxable market is also in disarray.  They also have those same dynamics.  This is not unique to the municipal space.  The real story is at the credit markets, due to a large expense, that is systematic of a dysfunctional market.  Your circumstances, we will continue to work with you on preparing the disclosure document so we can put the transaction on the shelf and ready to execute when the market opens up.

FIU – Housing Refunds to students - the comptroller's group has looked at this.  They often modify, or have their own methodology, but are they going to ignore the impact of the refunds.

Ben - All I can really do is treat it as a non-reoccurring and non-operating item.  I can tell you that that kind of question is so far down the list of what they are thinking about, that it won't be helpful to have a conversation with them at this time.

You guys are on the front lines and I appreciate it.  We'll respond to individual questions in writing so everyone is on the same page.

Regular CAFA group

Questions for Tim –

FIU – the University of GA sent out details what they are going to do.   Tim sent out something for us to complete.  Questions for Tim.

At FGCU, we need to come up with a number of sources with these refunds – my president is pushing that - he is wanting to be do fees refunds.   We don't have the amount of carryforward needed – so we may have to go into statutory reserve.  Is that going to be an issue?

Tim – You would be dipping below your 7 percent?

FGCU - Yes.   That carryforward for this year does not exist until June 30.  I didn't see any approval to use current E&G dollars.

We don't have a lot of those extra funds and carryforward, one option would be to dip in the 7%.

Tim - Look at the Florida Statute 1011.45(5), regarding using some of your 7% in emergency, approved by BOT and BOG.

FSU - I have a concern – Why?  I mean when one of us does that, that's going to put pressure on all of us.   I don't see how we are going to afford to do it.   It's just going to get worse.

FGCU - From the last several phone calls – it seems we have Presidents with different views – my President wants us to refund the students.   Refunding some of the athletic and student activity and health fees.   I don't know if anyone else is considering fees . . .

At FSU, we said flat out NO.
New College – We were not anticipating (at all) any refund of fees.
USF – We were not either.
Same with UCF

FIU - The only fees that we would be contemplating are materials and supplies fees.  If we sold them test tubes and they weren't delivered, we would return them to the stockroom and refund those because they were not consumed.

FGCU - I will make sure that my President knows that no other universities are doing fees.

FSU – Our bus service is still running, we are still providing transportation to students on and off campus.   Athletic fees – those were fixed costs that we have already paid for.   We are also incurring additional costs for remote labs.  I'm getting from colleges, how to pay for this.   You need to take it out of your supply fees or fund balance.   Our approach, we are still providing services with all of those fees that have been collected for the next month.

USF – What is UF going to do?

FSU - They are not refunding.  I've asked this about five times – we are only talking about refunding housing and meals.

Tim - Back to first of the question - are you guys using carryforward for refunds on housing?

UCF – our plan is to use carryforward.  We will not be dipping into our 7%

New College – Same as UCF.

FIU – Same as UCF – I am not anticipating that we need to do that – we need to determine the amount of cost we are going to incur.

Same with UCF.

Poly – We will pull from carryforward.

FAMU & USF – Same as UCF.

UNF will be close but not anticipating dipping into the 7%.

FSU - I just got a text back from UF, they don't have any indication on making any refunds on housing.

I think before any of us do refunds, I think all the Presidents need to get together and get a concensus.

FIU - Our board members are getting emails and calls – biggest challenge – students will live with the others fees.  For us, we have two student unions – the Graham Center and the Wolff Centers – the bulk of their budget goes toward the maintenance of their facilities.   We have about 600 students still on campus.   I think students will understand not getting refunds – food and housing are biggest concern.

We were going to think about it internally and come back with a recommendation about how much refund we would do, how much they could do.

We don't know how it's going to play out.  In South Florida, with hotels and restaurants being closed, what it's going to take to get people back to work.   You may experience this at your institutions, but they generally can get them back pretty quickly.   They are worried about employees leaving the area and not having a good draw to pull from.

Tim – Yesterday, our call was discussing a coordinated approach on communications on refunds.  Is that still it he works?

FGCU, there is an announcement about refunds.  We have a meeting here at 10:00 am.   For students – housing and dining.   We'll back off on fees rights now.

USF – We were considering doing a communication today.   I don't know if it will go out today or tomorrow.

UCF – We don't have a choice because the student newspaper published something about we were considering refunds, so that's already out there right now.

It is also the opinion of our housing people, once we make an announcement, then the housing students will go home.

Tim – At some point, does anyone have an idea of the amount of students remaining on campus?   How many will be left at each campus when the dust settles?

FSU – less than 180
New College– we have about 20 – but at the end of the week, it will be lower than that.
FAU – trying to estimate – under 1000, so when announcement gets made, probably to 400/500.  Still looking at that.
UWF – 180
UCF – 734.  124 are international, 111 are homeless with no place to go, the rest we are still working with.
Poly - At last count, we had just under 200.
FIU – has about 600.

Tim – Information being shared with Provost and General Counsel, we talked last week whether a distance learning fee would be charged.  I was asked to remind the group – you have to do a 28-day notice – your Provost and General Counsel are being informed.

Tim – One more thing – I'm just gonna throw it out there.  Our Board Chair mentioned doing some type of task force that would focus on community needs and how our university can help the community.  I was asked to get a reaction.  I know everyone is busy doing other stuff and this is the last thing.  I think you're already doing a good job on community needs.

No response.

Tim - I think your silence means it's not a good idea.

FIU - I think we are already doing that.  Our health professionals are already working with the community.  Our hospitality is working with restaurants.   I think I was told 50,000 are profits generated to provide assistance to restaurant workers.

Communicators Group can all talk about it and send it out at one time.

FGCU - Maybe we can coordinate through them – our Chief of Staff who is on that Group -sends out messages to our campus – I can talk to her to see if the group is looking for a consensus in doing it all at one time – then I'll email the group.

FAMU – Can we also think about or get feedback on when each institution is going to try to issue the refunds?  We are still crunching numbers, but that would be helpful too.

FGCU - What we have talked about here is having everyone moved out by April 6 and we would start the process on April 6.   Tentative.

The meeting adjourned at 9:00 am

**MINUTES**

**CAFA CONFERENCE CALL**

**MARCH 25, 8:00 AM**

Roll-call – all universities represented.

UF – Just a couple of things - we are moving forward with refunds for housing and dining. We are under a mandatory emergency order, so it really hasn't impacted the university. We have encouraged everyone to work from home if they can, but we have staff and students still on campus.

USF – What dates are your housing refunds starting from?

UF - We haven't set it in stone at this time, but the recommendation is if a student made an appointment to remove themselves from the dorm, it will be that date. If they did not make an appointment, it will be a later date – not sure what that will be. But essentially, the date they moved out.

USF - What about kids that didn't come back from Spring Break?

UF - We had a whole week of classes after Spring Break, so in theory, everyone came back.

USF – for meal plans we are looking at credits for those students that will be continuing. For graduation seniors, we will offer refunds upon request. Our financial aid person says you can do a credit to those students, with that student's permission, otherwise you have to issue a refund.

UF - Some of those meal plans were purchased by the parents and without aid or things of that nature, no one has tinged us on that. We just communicated our plan a couple days ago and we didn't get any comments about it.

UF - We are trying to do it on a dollar for dollar basis – I'll look back at the federal regulation. We were doing an auto-credit, based on if they didn't have any activity on their program or plan, and we can do the data on that. I think that regulation is assuming that all those plans were bought with some kind of financial aid process. We can go back and look and see how those plans were purchased. Not uncommon for students to withdraw and parents contacting us wanting refunds.

UF – we will communicate to our students after our board meeting on Thursday.

FAU – are you doing a flat or prorated refund?

UF – Prorated.

UF - Has anyone else decided on dates they are going to do the refunds by?

USF - We were going to do ours first thing this morning.   We talked to the board last night, however, our board chair has since (late last night) said that he wants to check with other universities, especially UF, before we go ahead and make our final determination.   He wants to be consistent with other universities.  The date we were going to use was April 6. Two weeks after spring break.

FAMU/FSU - Yes, that is how ours was.

USF - Is everyone using the same date for food service and housing?

FAU -  we would like to use the same date.

At New College, we have a declining balance, so we can calculate a date on whatever balance is left.  We told all our students they had to leave campus by the 20th.   Our classes won't end until April 6.

FAU – We have not finalized our plan.  I was pushing for a later date - maybe the last of March or April 6.  I don't have that one week in mid-March that some of you have.   Sometime in March, right after the announcement announcing the permanent movement of classes to distance learning.  Most of students are out already.

FAU – Using April 1 for right now, but still discussing it.  Going to May 7 which would be end of semester.

UCF – Using March 30.

UWF – Looking at March 15 when we told students to get out of housing, but I think we are going to revisit that date.

FAMU – We have about 300 students on campus.  We are talking April 6 or shortly thereafter to issue the refund – which is two weeks after our spring break because we gave them the option to come back after spring break, although we highly encouraged them not to.

FAU – We still have 922 students on campus.

UCF - We are going to bring our plan to the board tomorrow morning.  March 30 is our date for food and housing.  Orange County declared a lockdown on Thursday.

Anyone considering refunds for tuition and fees?

All No.

FSU – is anyone considering Furloughs or layoffs?

UWF - No, but I have been calculating the numbers in case we need to.

Others said no.

FFCU – We have not gone into furloughs.  We do have a hiring freeze for 9-month faculty.  We don't want anyone to spend except for essential spending.  We are good through the rest of this year.   We don't know what our enrollment is going to be for the Fall.  We are trying to situate ourselves with as much cash as possible.   If there are furloughs, they will occur next year.

FIU – We had discussion about this at the executive level.  We have not broadened the discussions.  Every position, academic and non-academic, will be revisited by the provost and president.  We are doing calculations on what budget reductions would look like.  We all agree that this will be impacting us tremendously relying on tourism and hospitality.   We are looking at the numbers.

FPU – I would like to ask everyone to circulate their plans once they are finalized.  That would be helpful in terms of consistency.

FSU -   I know feds have given us 80 hours of sick leave we have to award to employees.   Has anyone started having conversations about if they have to cut down the campus, after that sick leave is exhausted, would  you put people on administration leave or make them use their leave balances?

FIU – We are having those discussions now. Historically, this is dealing with hurricanes.  If we have closed the campus, we put them on administrative leave.

New College – if we are ordered to close, we go to administrative leave.  The faculty working remotely and still teaching.  It is different with a hurricane because we are still going to have some on-campus functions, so it is a little different.

USF – At this point, the Federal Government has told us that we can pay federal work study students.  Some of our federal work study students still want to go ahead and work – so we are at a loss as to how do we keep track of their hours and pay them.  Or, do we just continue to pay them for the three-week hours that we are paying everyone else?   Are you allowing your work study students to work?   Or are you telling them to stay off campus?

UWF – We are giving them work-at-home assignments.   They are being considered like OPS.

FAU/UNF/FGCU/FIU/FAMU – We are doing the same thing.

USF - Use of carryforward?  No one is going to dip into their 7% reserved, correct?

FGCU - We are not planning to.  When this started, I was concerned I would drop below my debt service ratio of 1.2.  But now, if we are able to use this and not affect the debt ratio, then I want to hold as much as I can in case tuition doesn't come through for us. I do have a question for Tim – We have two different directives – on one hand, we are told that carryforward money can't be used for reoccurring items.

Tim - Yes that is still in Statute.

On the other hand, we have a situation where the Governor has declared an emergency and it allows the trustees to use carryforward.  If we end up with a tuition shortfall next year and students are not coming back, will they be able to use that for operating expenditures?

Tim - Great question.   We will have to explore that.  The BOG has given you authority to use carryforward for dining and housing refunds.

UNF - Do we have to go back through the approval process?

Tim - No, that doesn't have to come back to BOG - only if you dip into your 7%.

That's interesting because we are using E&G dollars, that's good, but interesting.

The meeting adjourned at 8:31 am.

# MINUTES

## CAFA CONFERENCE CALL

### MARCH 26, 8:00 AM

Roll-call – all universities represented.

**Refunds:**

UF -   We are using March 24 – day of Emergency Order as our refund date.  If board decides they don't want to use that date, it will change today.

Tim – I appreciate the work that this group is trying to do in having consistency and being on the same page.  I got an email late last night regarding a more consistent methodology with regards to refunds.   There may be more guidance coming from the board for when the start date should be for issuing refunds and credits.

NCF – Can I suggest the possibility that, if there is definitive guidance coming out, that universities be allowed to provide a more generous date – if UF wants to say March 24 and the board must say later than April 1, that we have the option of having a longer period.

Tim – Thanks Chris.  I tried to get hold of the Chancellor about the email so I will be talking to him later and I'll mention that.  Some folks have already gone out with their dates, some have done flat amount, and some have done a prorated amount.

FSU – Some of us have acted in good faith and tried to wait for everyone to get all their stuff together to go out as a group.  Now to be penalized when we have to do it a certain way, when schools have already gone out, it feels unfair to us to be penalized to have to do it one certain way.   Some of us are trying to work together and be part of a system, and some schools are doing what they want.   We need to come up with a plan whether we will all work together, or we are not.

We were really talking as a group, you have your spring break one week, then two weeks after that.   But everyone's spring break is different.  We did have a plan from that perspective.   I think everyone was trying to do that.

UNF - I got approval for our date.  Am I supposed to hold up communication today?

Tim – I don't know.   We will know more today.

FSU - I appreciate the spirit of being fairly collaborative, but at the end of the day, there are mitigating factors where we couldn't all pick the same dates.  It is understandable - the frustration - but it is just not possible.   We all have different spring breaks and all have different orders.

Tim –It wouldn't be the same for everyone – there are at least three different spring breaks – so it would be different dates.

NCF – We forced our kids off on March 22.   I think it would be completely unfair to give our students one month.   We want the kids to come back – the ones not graduating. Just trying to fit it all into one exact box - it will be unfair.

Tim - I'll talk to the Chancellor - if there is guidance we will send that out.

FGCU - I think Tim understands that everyone has a different spring break date and all have different dates when students were sent home.

Tim – Yes, I am aware of your issues.

FGCU - From our housing people – we have had no calls about what was put out on Monday. There have been no parents or students calling us since we have put out our announcements about our refund. There is going to be complaints about whatever you do – the majority of our students live on campus.   Whatever we do is going to be better than what they are already getting.

UCF – We will be meeting with the board this morning.  We are using two weeks after spring break – March 30.   The curfew will be effective tonight at midnight.   If that becomes the adoptive date, there will be a day difference.

FIU – We are still looking at two dates – we asked students to vacate on Sunday, March 15, so for those students that departed, it will be effective March 15.  We had a lot of students that stayed and then we sent a second letter.  For those students that left, that will be their date.

FAU – We have been running all of our numbers on two weeks past spring break.  We have been giving updates.  We will probably be having a trustee conversation the first of the week.   That is our timeline.  Maybe it will be prorated or flat based on the style of housing unit.  We look forward to hearing from BOG.

FIU - Yes, that is where our management team believes is the appropriate spot.   Our board hasn't met yet, but that is the recommendation we would be taking.

FSU - It sounds like half of us agree with two weeks after spring break.

FGCU – I think where we are at - half of our schools are one way or another, the other half is about two weeks after spring break.

**DL Fees:**

FAU - I sent an email out to the majority of the team – some schools didn't have e-learning fees.   $30 hourly fee – that being charged in the summer.  UF was going to offset it with other fees – so a break-even for the students.   Note:  UF has not decided to do that – it is just in discussion.

FAU – Any others schools discussed elearning fees?

UNF – We are still in discussion.   Haven't made a decision yet.

Same at UWF.

FIU – Still having conversations.   That fee is essential to us because of the online programs.

USF – We are going to have a group that meets - tomorrow or Monday.

UCF – we will be meeting later today to discuss.

FAMU - Can I ask a question about the summer and technology fee?   These classes were originally scheduled to take place face to face, correct?  Yes.  Aren't the fees for face to face classes more expensive than online classes?   Yes.   So, in essence, we are making more money than we would normally on a class because it is remote.   Is there a need to charge that?   Or do we have authorization to charge that?  My provost said we aren't authorized to do that.

Nick – It was an academic decision when we talked about charging or not charging. When they started talking about decreasing fees for other student fees, that then impacts some of the auxiliary budgets, etc.   That becomes a bigger problem.   It impacts the CFOs as well.

FAMU – I think we shouldn't charge a distance learning fee on all the courses done online.   I think we will be crucified by the press.   We will have a lot of unhappy people.

FSU - What if we were able to lower the fees?  Would that be doable?  Because there are costs with doing it and doing it well?

Tim – Yes I understand that there are additional costs.   The Legislature set an average of $30 across institutions.  I just don't know about adding additional costs.   Gulf Coast does not charge a distance learning fee and I assume they are not going to.

FGCU - You actually have two other schools (New College and Florida Poly) that don't have that built into their schools today.

FGCU As Tim mentioned, FGCU doesn't have a distance learning fee.   One thought is - the courses that have already been online, I would have left those.  The ones going online now because of the institution, I wouldn't charge them.  There is no perfect answer, but that may be where we would have gone.

FSU - I suspect a lot of students are unregistering for the online classes, and now going and registering for the ones that don't have a fee.

**Housing Holds:**

FGCU - I would like to move to another topic – April 1 is the billing date for housing.  We have gone in and told our people that we are not putting any new holds on.  I don't know if you guys have done that or not.   We said March 30/April 1, there are no new holds.

FAU has no holds.

We have no holds at FIU for registration and when we do these refunds, these are going to be net refunds.

UNF same.

FAU – It sounds as if everyone is on the same page.   Dining – if there is a credit there – we want to make sure that it covers their dining bill first before it refunds anything else.

**Employees over 65:**

NCF – Maybe this is a tomorrow conversation, I would like to discuss what people are doing for 65 and over – that may be a long conversation – I say suggest putting that off until tomorrow.

Chris – We told those employees, effective today, that they need to just work remotely that we will put them on leave.

FSU - We are going to offer them an option, if they want to continue to come into work, or if they do not want to come in

NCF – We will be discussing that today with our group.   We will make sure it gets discussed tomorrow.

Meeting adjourned at 8:40 am.

## MINUTES

## CAFA CONFERENCE CALL

## APRIL 1, 8:00 AM

Roll call (all universities represented).

**Construction:**
UF - Had conversation with our board chair - we kind of came to a resolve.  Our plan is to continue all construction as best we can, but we won't start any new construction - without having conversations with our board chair and president. Those projects will continue to go through the phases, but we'll have conversation about construction start dates.

**DSO**:
UNF - Is there a possibility of DSO applying for some of the federal stimulus funds? They are non-profits.  Our DSOs are eligible to put in their own application for possible funding.

UCF – Do you have the summary from the Power firm in DC?  Our general counsel sent that out – it was a summary of the CARE ACT.   I'll forward that to Steve and he can then send it out to the group.

FAMU - EAB is having a webinar on Thursday on the CARE ACT.  It sounds like it may be informational.  There will be a panel and you can ask questions.  Did you get that? I will send to Steve so he can share.

**Distance Learning Fee:**
FSU - We are still talking about the distance learning fee, I was trying to get a sense from group – what we have for our summer, we have a system where the courses that were already scheduled to be online have a distance learning fee. The courses not scheduled to be online (face to face instruction) don't have a distance learning fee.   We have it scheduled to leave it that way.   Could I hear from people that are leaving their courses that way?

FAU – We are doing the same thing you are doing.   The ones that had existing distance learning will be charged.  The ones that are new, we will not charge. Same as you.

UWF – Same way.

Kyle, we don't have a distance Learning fee.

Neither does Florida Poly – no distance learning fee.

USF – We're reducing some of our other fees (athletics, etc.), but in place of that we are adding a distance learning fee.

FSU - I know what UF is doing. Most of us are concerned about your approach because it creates an approach for the rest of us. The students don't understand that. I think a lot of us are struggling about how to handle our PR message because we are getting questions based on what y'all are doing, but it is a net 0 for the students.

We are doing what we had planned back in January when we opened up the courses for when faculty were able to bill out their courses. We billed in February for summer. We are not changing their tuition and fees. If they had a distance learning fee, they will be charged a distance learning fee. If the ones that are moved online, there will not be a distance learning fee.

UCF – We had two meetings on that, trying to see if adopting the USF model would work for us. We decided to go against that. With implementation, it wasn't worth it at this time.

FSU - Do you have any fees in your summer charges or summer fees that relate to on-campus activity – like transportation or parking, or any other fees?

FIU - students are constantly planning for return of fees that they feel aren't justified.

FSU - We have a contract that requires us to continue to pay certain things. We still have bus service. We don't have a parking decal fee. We are still offering services at the rec center. There is stuff online. We have telehealth for our students. The Student Government Association is still meeting. There are a lot of virtual activities that are planned. We are going to keep it.

We have had a lot of students email about summer – why are you charging the transportation fee? We are having some conservable savings, because we are no longer offering the 12 hour a day buses. We are having savings, but a huge reduction in revenue – metered parking and special events held on campus that generate revenues, almost a perfect match. We are only looking at the expense side, but we have to look at the revenue side.

Just on revenue alone, that is ¼ to ½ million for the summer.

**Dining**:
FIU - I have a question on meals over summer A – first part of summer – we have been in discussion with Chartwells on what it is going to cost us. They want to go to a cost-recovery model – looking over 12M dollars to keep food venues open. Are the rest of you thinking you may want to discontinue offering a food program?

NCF - We are struggling with that – we only have a handful of students left on campus – these are international students or homeless students – they have no resources whatsoever. We had them on a meal plan. We are going to provide them two boxed meals a day – four/five days a week – just to keep them fed, but we are not going to charge the students for it. We probably will have to pay to get them off campus. Most students don't have resources, and are stuck here. We are now kind of stuck. I don't know if that is what you're talking about.

FPU - Proposal from Chartwells today – cost recovery – will cost us $200,000. They offered another solution – that we pay them %10 of their contract and then redo the contract. I'm thinking about shutting down food service for the whole summer. Anyone else thinking about that?

UCF – We are contemplating that – and allowing the independents to make their own choices. But as far as Aramark, it will be shutdown for the summer. We didn't really like the proposal from Aramark, it wasn't beneficial to the university, so we have decided to cover the refunds ourselves and not go with Aramark's proposal.

FSU - They always lose money over the summer. They lose money in spring and massive loses in the summer. Now we're going to hear about how poor they are and we're cutting off all their revenue.

**Housing**:
UCF – One question, are there universities that are looking at raising their Housing rates in the fall and are they continuing to pursue that?

FGCU – we have no intention of raising them.

NCF - We are looking at raising our rates 4-5% on average basis. Our debt coverage is hovering around 1.2x.

FAU – We're having conversations at this point - we have not made a decision to make any changes.

The meeting adjourned at 8:27 am.